UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BUILDING TRADES UNITED PENSION TRUST FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 2:09-cv-02642-JS |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| | ) | AMENDED COMPLAINT FOR |
| vs. | ) ) | VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| KENEXA CORPORATION, et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | |

This is a securities class action on behalf of all persons who purchased or acquired the common stock of defendant Kenexa Corporation ("Kenexa" or the "Company") between May 8, 2007 and November 7, 2007, inclusive (the "Class Period"). The claims asserted arise under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder and §20(a) of the Exchange Act. Kenexa is an end-to-end provider of software, proprietary content, services and process outsourcing that enables organizations to more effectively recruit and retain employees. Kenexa stock trades on the Nasdaq under the ticker symbol "KNXA." Defendants are Nooruddin "Rudy" S. Karsan ("Karsan") and Donald Volk ("Volk").

## SUMMARY

### Kenexa's Operations Prior to and During the Class Period

1.      Kenexa operates in the Human Capital Management ("HCM") market. The Company and its subsidiaries provide software, proprietary content, services and process outsourcing that enable organizations to more effectively recruit and retain employees. Kenexa offers software applications on an on-demand basis, along with a combination of outsourcing services, consulting services and proprietary content. Kenexa's software applications and services are collectively referred to as the Company's "solutions."

2.      Kenexa provides both talent acquisition and employee performance management solutions. "Talent acquisition" is defined as the "sourcing, recruiting, screening and assessment of employees," while "employee performance management" is the process by which a company tracks, monitors and optimizes employee productivity and evaluates employee performance through the use of reviews, appraisals and business metrics. Kenexa's solutions enable its clients to improve the effectiveness of their talent acquisition programs, increase employee productivity and retention, measure key HR metrics and make their talent acquisition and employee performance management programs more efficient. The Company derives revenue primarily from two sources: subscription fees for its solutions and fees for discrete professional services.

3.      In June 2005, Kenexa completed its initial public offering ("IPO"), selling 5.75 million shares of Kenexa common stock at a price of $12.00 per share. Because the HCM market is highly competitive, Kenexa faced tough competition from larger, better-capitalized competitors. Thus, in an attempt to compensate for competitive deficiencies, defendants immediately embarked on a campaign to grow Kenexa as quickly as possible, acquiring seven different companies from January 2006 through August 2007.

4.      One of the companies Kenexa acquired was a U.K.-based company that specialized in online and paper-based assessments products, training and consultancy. In November of 2006, Kenexa acquired Psychometric Services Limited ("PSL") in an effort to expand into the international assessments business. Assessments are used by companies to select and retain employees based on factors such as an employee's experience, skills, abilities and personality. By acquiring PSL, Kenexa represented that it automatically added an attractive customer list of commercial and governmental entities in the U.K.

5.      In addition to providing talent acquisition and employment performance management solutions, Kenexa also offers Employment Process Outsourcing ("EPO"). Kenexa's EPO services gives its clients the option of using Kenexa to outsource certain aspects of the client's staffing operations and recruiting campaigns, including the sourcing, recruiting, screening, assessment and on-boarding of employees. Kenexa usually enters into multi-year, multi-million dollar EPO contracts. At the beginning of the Class Period, Kenexa had 13 EPO accounts. Kenexa's EPO services account for approximately 15%-20% of Kenexa's total revenue, 50% of which falls into subscription revenue and 50% into "other" revenue.

**Summary of Defendants' False and Misleading**
**Class Period Statements and Market Impact**

6.      On May 8, 2007, the start of the Class Period, Kenexa announced its financial results for 1Q07. Kenexa reported total revenue of $42.2 million for the quarter, representing an increase of

- 2 -

83% from 1Q06. The Company also reported subscription revenue of $34.7 million and professional service and other revenue of $7.5 million. Defendant Karsan stated that market demand for Kenexa's services "is strong and interest is growing for talent management solutions." Karsan went on to state that "*Kenexa is benefitting from these trends due to [the Company's] differentiated value proposition, proven ability to deliver tangible business benefits for our customers and growing brand awareness*."[1] Defendants then issued guidance for 2Q07 and FY07, insisting that the Company would achieve 2Q07 revenue of $43.0-$44.9 million and *total revenue for FY07 of $186-$189 million*.

7.  In an earnings conference call held later that day, Karsan told investors that "progress with and opportunities related to the BrassRing acquisition, combined with the overall momentum in our business, have led us to raise our growth and profitability outlook for the full year 2007 . . . ." Later in the call, Volk stated that Kenexa's revenue was "*highly visible* as a result of [the Company's] diverse customer base, long-term contracts, renewal rates that continue to be in the 90%-plus range, and the growing number of new customers that we are adding to our overall customer base." Volk then reiterated guidance for 2Q07 and FY07, stating that the Company was "slightly increasing [its] revenue and profitability guidance" and that investors could expect total revenue of $186-$189 million and subscription revenues of $149-$152 million. Responding to an analyst question, Karsan represented that Kenexa's organic revenue growth of 35% on a year-over-year basis was unlikely to decrease materially.

8.  In response to defendants' positive statements and FY07 total revenue guidance on May 8, 2007, the price of Kenexa stock rose from $31.94 on May 8, 2007 to $32.96 on May 9, 2007 and continued to climb for the remainder of May. Karsan capitalized on the artificially inflated price

---

[1]    All emphasis is added, unless otherwise noted.

of Kenexa stock, selling 127,400 shares of Kenexa stock for proceeds of more than *$4.6 million* over

a three-week period in May 2007.  President and Chief Operating Officer ("COO") Troy Kanter

("Kanter") also sold 62,096 shares of Kenexa stock for proceeds of nearly *$2.25 million*.

9.      Lead Plaintiff alleges that defendants had no reasonable basis for issuing FY07

guidance of $186-$189 million.  At the same time defendants were reassuring the market that

revenue was "highly visible," that the Company was experiencing "momentum" in its business and

organic growth of 35%, defendants knew that one of Kenexa's largest EPO clients, a top-ten

biotechnology company, was suffering from a significant deterioration in its business that would

lead to the cancellation of its contract with Kenexa.[2]  Defendants also knew that the Company was

experiencing a lengthening in Kenexa's EPO sales cycles, and that there were material weaknesses

in Kenexa's international assessments business.

10.      In early 2007, before the start of the Class Period, one of Kenexa's largest EPO

clients, a U.S.-based biotechnology company, released a company-sponsored study, which showed

that off-label use of one of the company's drugs increased the risk of death in cancer patients.  Soon

thereafter, another study reported similar results.  In March 2007, the company received a "black box

warning" (the most severe kind) from the Food and Drug Administration ("FDA") for two of the

company's most popular drugs.  The FDA issued the warning after a spate of deaths in clinical trials

---

[2]      At the end of the Class Period, defendants disclosed that the cancellation of one of the Company's EPO clients caused the 3Q07 revenue miss and reduced FY07 guidance.  In a conference call on November 7, 2007, Karsan declined to identify the EPO customer by name, stating that their contract prevented Kenexa from disclosing the company's identity.  Karsan did, however, disclose that the customer operated in the health care sector.  A November 8, 2007 Brean, Murray Carret & Co. analyst report speculated that the EPO client was a top-10 pharmaceutical company.  Based on the independent investigation of Lead Counsel and as confirmed by Confidential Witnesses ("CWs"), Lead Plaintiff has identified the company that cancelled its EPO contract as a large, U.S.-based biotechnology company.  While Lead Plaintiff can name the company at issue, it elects not to out of consideration for the biotechnology company and in an effort to avoid confidentiality issues.  If and when a protective order is entered in this case, Lead Plaintiff will identify the company at issue by name.

and the release of several studies, such as the biotechnology company-sponsored study, which found that the drugs caused heart problems or hastened the death of cancer patients. Sales of the two drugs made up nearly half of the company's total sales.

11.    News of the negative studies and the black box warning sent the biotechnology company's shares tumbling, dropping $16.00 per share. Indeed, the FDA's black box warning was expected to cause as much as a 10% decline in the company's sales. Additionally, the biotechnology company was forced to delay its 1Q07 results and faced an inquiry by the Securities and Exchange Commission ("SEC") into the company's handling of news that a Danish trial involving the drugs had been postponed due to unexpected deaths.

12.    At the same time that the biotechnology company began experiencing the above-referenced problems, Kenexa started downsizing the employees who worked on-site at the biotechnology company's offices. As part of its EPO services, Kenexa provides on-site support for staffing operations or during hiring initiatives. For example, Kenexa's On-Site Recruiters are responsible for cold-calling candidates for open positions, screening applications and conducting pre-screening interviews. The On-Site Recruiter then passes the information obtained during the screening process to the client's HR department, who in turn determines whether to pursue an interview with the potential candidate. Because Kenexa employees worked on-site at its client's offices, Kenexa employees had knowledge of and were aware of any issues the client may have been experiencing. On-Site Recruiters also paid close attention to any news about the company for which they were recruiting job candidates. Thus, On-Site Recruiters working on the biotechnology company account were aware of the problems facing the company in early 2007 and following the FDA's black box warning.

13.    Indeed, according to CWs who worked on-site at the biotechnology company and had first-hand knowledge of the events that occurred prior to and during the Class Period, the first cut to

the team of Kenexa employees working on the biotechnology company account came in early 2007. At that time, On-Site Recruiters recalled hearing that the biotechnology company's staffing needs were slowing due to issues with the FDA and because the company was anticipating a loss in funds. Kenexa continued downsizing the employees working on the biotechnology company account through the spring and summer of 2007. As a result of the significant issues facing the biotechnology company, defendants knew that the company would not be able to continue its EPO contract with Kenexa. Thus, it was unreasonable for defendants to include revenue derived from the biotechnology company account, approximately $6 million annually, in its projected FY07 total revenue.

14.    In addition to the widely-reported losses facing the biotechnology company and the downsizing of Kenexa's on-site employees, defendants received weekly forecasts that would have indicated that there was a serious problem with the biotechnology company account. According to CWs, and as discussed in detail at ¶¶51, 53, 55, the Program Directors of each EPO account were required to prepare weekly forecasts that included projected revenues for the next three months on a rolling basis. The forecasts included the quarterly "run rate," or guaranteed money for the quarter, as defined in the client's contract. The forecasts also included a projection of the total number of new requisitions, along with the number of new hires that would begin employment within the next three months. While each contract differed slightly with regard to the amount of revenue received, Kenexa received revenue for each new requisition and for each new hire, once the new hires began employment with the client. Once complete, Program Directors submitted their forecasts every Thursday to the Director of Finance and Business Analytics, who then compiled the forecasts into one report. The Director of Finance and Business Analytics reported directly to Volk and provided the compiled forecasts to Volk. Program Directors earned bonuses based on the accuracy of these projections.

15.     Program Directors also attended Quarterly Business Review meetings led by Kenexa's Global Practice Leader, during which the Program Directors discussed the results of the previous quarter, the current quarter's projections and the overall health of the customer relationship. Each EPO account was discussed in a separate meeting. According to CWs, both Karsan and Volk were known to attend the Quarterly Business Review meetings. Program Directors were also required to complete a two-page document that set forth client-specific financial information, such as the previous quarter's results and the current quarter's forecasts.

16.     Based on the forecasts provided by the Program Directors and the information obtained during the Quarterly Business Review meetings, defendants knew that it was unreasonable to include the revenue from the biotechnology company account in the guidance for FY07. Defendants also knew that revenue from the account was not "highly visible" due to the uncertainties facing the biotechnology company's business. Notwithstanding this fact, defendants issued FY07 total revenue of $186-$189 million – a forecast defendants knew could not be achieved.

17.     In addition to the problems threatening one of Kenexa's largest EPO accounts, defendants also knew that the FY07 total revenue guidance lacked any reasonable basis due to a slowdown of EPO sales. According to CWs, and as discussed in detail at ¶¶55-56, the Company's financial projections included, in some instances, sales that may have had only a 50% chance of ever coming to fruition. Thus, it was unreasonable for defendants to include potential sales in its FY07 revenue guidance, as there was no certainty that those deals would ever close. This was particularly true given the fact that Kenexa's EPO sales were taking longer to close and the Company was losing EPO deals to competitors. Indeed, by the end of the Class Period, Kenexa had eliminated all incremental EPO sales from its financial forecasts. Defendants' representations that revenue was "highly visible" and that organic growth was increasing were also false and misleading when made,

due to the increased uncertainty in Kenexa's EPO business. Tellingly, by the end of the Class Period, Volk was no longer reassuring investors that revenue was "highly visible."

18.    Defendants also knew that the total revenue projected for FY07 lacked a reasonable basis at the time it was issued and could not be achieved due to the Company's failure to correct the revenue recognition accounting policies for its newly-acquired international assessments division, to bring the revenue accounting in-line with U.S. Generally Accepted Accounting Principles ("GAAP"). As discussed above at ¶4, in November 2006, Kenexa acquired PSL, a U.K.-based company specializing in employee assessments. At the time of the acquisition, PSL recognized more of its international assessments sales revenue up-front, as allowed under U.K. accounting principles, which are much more flexible than U.S. GAAP. In contrast, under U.S. GAAP, Kenexa was required to delay revenue recognition on significant portions of PSL's assessments sales revenue, and recognize it over a longer period of time instead.

19.    It is well-established that the SEC requires that public financial statements filed by domestic issuers (such as Kenexa), be prepared in accordance U.S. accounting principles. Indeed, there can be no dispute that defendants would have understood this. For example, in Kenexa's 2006 Form 10-K, filed with the SEC on March 16, 2007, defendants asserted in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" that the Company's financial statements were in fact prepared in accordance with U.S. accounting principles. The Form 10-K even asserted that the Company followed U.S. SEC Staff Accounting Bulletins with respect to revenue recognition:

> Our discussion and analysis of our financial condition and consolidated results of operations are based upon our consolidated financial statements, *which have been prepared in accordance with generally accepted accounting principles in the United States*. . . .

> [W]e follow the provisions of Staff Accounting Bulletin No. 101, Revenue Recognition in Financial Statements, as amended by Staff Accounting Bulletin No. 104, Revenue Recognition.

20.    Accordingly, because defendants understood that Kenexa's consolidated financial statements must be prepared using U.S. GAAP (and indeed asserted that they were), and understood PSL's financial statements would now be part of those consolidated public financial statements going forward, the Company knew, or was reckless in not knowing, that at the time of the acquisition, Kenexa was required to cease recognizing PSL's revenue under U.K. accounting rules and adopt U.S. GAAP. Despite this understanding, Kenexa failed to timely switch its U.K. revenue recognition accounting practices to comply with U.S. GAAP, because it understood that the required change would reduce the amount of revenue Kenexa could expect PSL to contribute to Kenexa's future consolidated public financial statements to be filed with the SEC for 4Q06 and FY07, and thereby jeopardize Kenexa's ability to achieve its FY07 projected revenue guidance. Indeed, as alleged at ¶¶58-59, CW10 and CW11 acknowledged that the change to finally and belatedly employ U.S. GAAP for reporting international assessments revenues was a contributing factor to Kenexa's 3Q07 revenue miss and reduced FY07 total revenue guidance.

21.    As a result of the problems facing Kenexa, as alleged above, defendants knew that they would never be able to deliver on their promise of FY07 total revenue of $186-$189 million and organic growth of 30%-35%. Defendants also knew that the only way Kenexa would meet its 2Q07 revenue projections would be by making yet another tuck-in acquisition. On June 8, 2007, Kenexa announced the acquisition of StraightSource, a provider of recruitment process outsourcing services. Following the acquisition, Kenexa updated its guidance for 2Q07 to reflect the expected revenue from the acquisition. Though the Company did not change its FY07 guidance, analysts following Kenexa predicted approximately $4-$7 million in additional total year revenue from the StraightSource acquisition.

22.    On August 8, 2007, Kenexa announced its financial results for 2Q07, meeting its revenue guidance for the quarter. Defendants also issued guidance for 3Q07 and increased total

revenue guidance for FY07 to $188-$192 million. Analysts and investors, however, were surprised by the minimal increase in FY07 total revenue guidance. Prior to the release of 2Q07 results, analysts predicted Kenexa would raise its FY07 total revenue guidance by $4-$7 million to account for revenue derived from the StraightSource acquisition. By raising FY07 guidance by only $2.8 million, Kenexa gave its first indication that the Company's organic growth was not nearly as strong as previously represented by defendants.

23. In a conference call held later that day, however, Karsan reassured investors that the Company's organic growth was "solid." In response to an analyst question specifically regarding Kenexa's organic growth, Karsan stated that Kenexa would be in the 30%-35% range for the second half of the year. Karsan then denied Kenexa was experiencing a slowdown in organic growth stating, "[w]e don't feel it. *I don't feel like a slow down* . . . I just feel like it's movement. I'm not feeling like it is a slow down in organic, *in fact I'm feeling like it's really, really solid*."

24. The price of Kenexa stock plummeted, from $41.00 on August 8, 2007 to $33.85 on August 9, 2007. But because of defendants' continued false assurances regarding the Company's organic growth and lack of full and complete disclosure, Kenexa stock continued to trade at artificially inflated, albeit lower, prices.

25. On November 7, 2007, Kenexa shocked the market by announcing preliminary results for 3Q07 that were $2 million short of Kenexa's own revenue projections. Defendants also significantly lowered guidance for FY07 by nearly *$7 million*. On that day, defendants also revealed to investors what they had known all along: the revenue miss and significantly reduced guidance was due to the cancellation of the biotechnology company EPO contract, lengthening EPO sales cycles and problems with the Company's international assessments sales.

26. The following chart provides the graphic story of defendants' fraud.



## Kenexa Corp.

27.     Significantly, only a month before disclosing these adverse facts to the public, Karsan unloaded yet another large block of Kenexa stock, selling a total of 37,500 shares of Kenexa stock on October 1, 2007 and October 3, 2007 for nearly *$1.2 million* in illegal insider trading proceeds. Tellingly, these sales were made pursuant to a Rule 10b5-1 trading plan adopted after the beginning of the Class Period, during which time Karsan was in the possession of material, non-public information. Karsan's fortuitously-timed stock sales further demonstrate defendants' knowledge that their FY07 guidance was baseless, that Kenexa's organic growth was slowing and that the truth about the foregoing, once known to the market, would batter the Company's stock price.

28.     While Kenexa insiders made off handsomely by selling millions of dollars of Kenexa stock and while the Company's share price was still artificially inflated, defendants' public announcement of their revised FY07 guidance badly damaged investors. As a result of their

- 11 -

November 7, 2007 disclosures, which stunned the market, Kenexa's stock price collapsed $11.23 per share, a decline of 40%, wiping out millions of dollars in market capitalization in just one day. Defendants are liable for the damages that their false and misleading statements and omissions during the Class Period caused to class members.

29.     In light of defendants' knowledge or reckless disregard of problems with one of Kenexa's largest EPO contracts, lengthening EPO sales cycles and weakness in international assessments sales, along with Kenexa's slowing organic growth, defendants made statements, particularized below, that they knew or recklessly disregarded were false and misleading at the time they made them. In addition, defendants misled the market by issuing false and misleading revenue guidance, which, based on their knowledge of then-current facts, defendants knew could not be achieved.

30.     As a result of the foregoing, the purchasers of the Company's common stock during the Class Period suffered substantial damages because the market price of Kenexa common stock was artificially inflated by defendants' misrepresentations and omissions during the Class Period. Accordingly, Lead Plaintiff seeks damages and other appropriate relief to compensate class members for the losses caused by defendants' violations of the securities laws.

## THE PARTIES

31.     Lead Plaintiff Building Trades United Pension Trust Fund purchased the common stock of Kenexa at artificially inflated prices during the Class Period and was damaged as a result of defendants' Class Period misrepresentations, which caused Kenexa's stock price to be artificially inflated, and their later disclosure of the truth about Kenexa's business and outlook for FY07, which caused the Company's stock price to decline.

32.     Defendant Kenexa is a public corporation with its executive offices in Wayne, Pennsylvania. Kenexa is an end-to-end provider of software, proprietary content, services and

process outsourcing that enable organizations to more effectively recruit and retain employees. Kenexa offers software applications on an on-demand basis, along with a combination of outsourcing services, consulting services and proprietary content. Kenexa's solutions enable its clients to improve the effectiveness of their talent acquisition programs, increase employee productivity and retention, measure key HR metrics and make their talent acquisition and employee performance management programs more efficient. In addition to providing talent acquisition and employment performance management solutions, Kenexa's EPO provides the Company's clients with the option of using Kenexa to outsource certain aspects of their staffing operations and recruiting campaigns, including the sourcing, recruiting, screening, assessment and on-boarding of employees. The Company derives revenue primarily from two sources: subscription fees for its solutions and fees for discrete professional services.

33.     During the Class Period, Kenexa stock traded on the Nasdaq, a highly efficient market.

34.     Defendant Nooruddin "Rudy" S. Karsan is Chief Executive Officer ("CEO") and Chairman of Kenexa. During the Class Period, Karsan sold 189,900 shares of his Kenexa stock (15.94% of the shares he owned) for over $6.7 million in proceeds. These sales were unusual in timing and amount and inconsistent with Karsan's pre-Class Period Kenexa stock sales. Karsan made many of the false and misleading statements alleged in this Amended Complaint.

35.     Defendant Donald Volk is Chief Financial Officer ("CFO") of Kenexa. During the Class Period, Volk sold 20,000 shares of Kenexa stock (33.32% of the shares he owned) for proceeds of $764,800. Volk made many of the false and misleading statements alleged in this Amended Complaint.

36.     Karsan and Volk are collectively referred to hereinafter as the "Individual Defendants."

37.    During the Class Period, each of the Individual Defendants, as senior executive officers and directors of Kenexa, was privy to non-public information concerning the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

38.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Securities Act of 1933 (Securities Act"), and was traded on the Nasdaq, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

39.    The Individual Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Kenexa, each of the Individual Defendants had access to the adverse undisclosed information about Kenexa's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse

facts rendered the positive representations made by or about Kenexa and its business issued or adopted by the Company were materially false and misleading.

40. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each individual defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

41. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Kenexa common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Kenexa's business, operations, management and the intrinsic value of Kenexa common stock; (ii) enabled the Individual Defendants and other Kenexa insiders to sell 271,996 shares of their personally-held Kenexa common stock generating proceeds of *$9,756,014*; and (ii) caused Lead Plaintiff and other members of the Class (defined below) to purchase Kenexa common stock at artificially inflated prices.

## JURISDICTION AND VENUE

42. The claims asserted in this Amended Complaint arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

43. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

44.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, Kenexa's principal executive officers are located within this District.

45.    In connection with the acts alleged in this Amended Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities market.

## CONFIDENTIAL WITNESSES

46.    Lead Plaintiff's allegations concerning the falsity of defendants' statements and their scienter, particularized herein, are based upon, in part, information obtained from numerous former Kenexa employees. Each of the CWs held a position within Kenexa that permitted him or her direct access to the information he or she provided.

47.    CW1 was employed by Kenexa from October 2006 through July 2007. CW1 was hired by Kenexa specifically to work on the biotechnology company account and was an On-Site Recruiter employed at the biotechnology company's Fremont, CA location. CW1 reported directly to the Program Director in charge of the biotechnology company account. As an On-Site Recruiter, CW1's responsibilities included screening job candidates' applications and conducting pre-screening interviews. CW1 would provide the information obtained during the pre-screening process to the biotechnology company's HR department, who would then determine whether to pursue an interview. According to CW1, the first cut to the team of Kenexa employees working on the biotechnology company account occurred in January or early February 2007, around the same time the biotechnology company announced the results of its company-sponsored studies. CW1 also recalled hearing in January or February 2007 that the biotechnology company was experiencing issues with the FDA and was anticipating a loss in funds. The witness and other On-Site Recruiters

were keeping track of the biotechnology company's problem through news articles. CW1 confirmed that On-Site Recruiters generally pay attention to any news relating to the company for which they are recruiting job candidates. CW1 was released from the biotechnology company account in late April or early May 2007, at which time approximately 50 Kenexa employees were also let go. CW1 confirmed that the downsizing was a direct result of the slowdown experienced by the biotechnology company following the release of negative studies and the FDA's black box warning.

48.    CW2 was an On-Site Recruiter for the biotechnology company and was employed at the biotechnology company's headquarters in Thousand Oaks, CA. Like CW1, CW2 reported directly to the Program Director in charge of the biotechnology company account. CW2 worked on the biotechnology company account from the time the witness was hired in 2006 through May or June 2007, at which time CW2 was transferred to a different account. As an On-Site Recruiter, CW2's responsibilities included cold-calling candidates and conducting pre-screening interviews, primarily for open positions in Research and Development. According to CW2 and as corroborated by CW1, Kenexa downsized employees working on the biotechnology company account beginning in early 2007. At that time, CW2 and other Kenexa employees working on the biotechnology company account were monitoring news about the company's problems with the FDA, and as a result, were concerned about their jobs. They expressed their concern to the Program Director in charge of the biotechnology company account at weekly team meetings, who responded that Kenexa and the company were "trying to work through some things." CW2 confirmed that Kenexa downsized employees working on the biotechnology company account three or four times between early 2007 and May or June 2007, at which time CW2 was finally transferred to a different account.

49.    CW3 was also an On-Site Recruiter at the biotechnology company's headquarters in Thousand Oaks, CA and was assigned to the account in January 2006. CW3 reported directly to the Program Director in charge of the biotechnology company account. According to CW3, and as

confirmed by CW1 and CW2, Kenexa began downsizing employees from the biotechnology company account in spring 2007 and continued to terminate employees through the summer of 2007, at which time CW3 was finally let go. At the time CW3 was laid off, only four Kenexa employees remained on the biotechnology company account.

50.     CW4 worked for Kenexa for ten years. Although CW4 left the Company in mid-May 2007, CW4 continued to be employed by Kenexa as a consultant through October 2007. CW4 was one of six business leaders in the EPO segment and became the Vice President of Human Resources in or around April 2006. At one point during CW4's employment, CW4 reported directly to Karsan. CW4, along with another individual, was responsible for selling the EPO "deal" to the biotechnology company. According to CW4, the biotechnology company account was one of Kenexa's biggest, and possibly its largest client. CW4 also confirmed that the biotechnology company was in fact the EPO client that canceled its contract during the Class Period.

51.     CW5 worked for Kenexa from November 2006 through October 2008, during which time the witness held several different roles. CW5 first joined Kenexa as a Program Director for one of Kenexa's EPO accounts. Based on the witness' position as a Program Director, CW5 had knowledge of the weekly forecasts compiled by the Program Directors on each of Kenexa's EPO accounts. According to CW5, Program Directors were required to prepare three-month rolling forecasts on a weekly basis. The forecasts, which were prepared in an Excel spreadsheet, included the quarterly "run rate," or money guaranteed for the quarter, as defined in the client's contract. The forecasts also included a projection of new requisitions, as well as the number of new hires who would begin employment with the client in the next three months. While each contract was tailored to meet the client's needs, CW5 confirmed that Kenexa was paid for each new requisition and for new hires, once the new hires began their employment with the client. As confirmed by CW5, Program Directors were required to submit their forecasts every Thursday by the close of business to

Kenexa's Director of Finance and Business Analytics, who would then compile the forecasts into one report. Karsan's assistant also received the forecasts and Volk received copies of the compiled forecasts. CW5 explained that the weekly forecasts would have indicated that there were issues with the biotechnology company account. CW5 also confirmed that Program Directors received bonuses based on the accuracy of the forecasts.

52.     CW5 also had knowledge of the Quarterly Business Review meetings that Program Directors were required to attend. CW5, who personally attended these meetings, confirmed that each EPO account was discussed in a separate meeting. During the meeting, those responsible for the EPO account, along with Volk, who attended nearly every meeting, discussed the results of the previous quarter, the current quarter's projections and the overall health of the customer relationship. CW5 explained that Program Directors were also required to complete a two page document, which contained client-specific financial information such as the previous quarter's results, along with the current quarter's forecasts.

53.     CW6 was a Program Director at Kenexa from July 2004 through March 2009, at which point the witness was laid off as part of a workforce reduction. As Program Director in charge of one of Kenexa's EPO accounts, CW6 managed a team of Recruiters, including several who worked at Kenexa's Wayne, PA headquarters and several On-Site Recruiters who worked at the client's offices. According to CW6 and as corroborated by CW5, Program Directors were required to submit weekly forecasts to Kenexa's Director of Finance and Business Analytics, as well as to Karsan's assistant. The Director of Finance and Business Analytics would then compile the forecasts into one report. CW6 also confirmed that Volk received the compiled forecasts.

54.     Based on the witness' position as Program Director, CW6 also had knowledge of the Quarterly Business Review meetings, which the witness personally attended. According to CW6, each Program Director was given approximately 20-30 minutes to meet with their supervisor and

several senior executives, including defendants. During the meetings, the Individual Defendants would often question the Program Directors directly, particularly if the actual numbers of new hires for the previous quarter varied from the forecasted number of new hires. CW6 confirmed that other Program Directors reported similar experiences.

55.    CW7 is the former president of one of Kenexa's wholly owned subsidiaries. CW7's company merged with Kenexa in 2006, after which CW7 reported directly to the COO at the time. CW7 left Kenexa in March 2008. Though CW7 was not a Program Director, the witness was sometimes asked to sit in on the Quarterly Business Review meetings held at the Company's headquarters in Wayne, PA. According to CW7 and as confirmed by CW5 and CW6, defendants attended the Quarterly Business Review meetings. As corroborated by CW6, the witness also explained that defendants were very engaged during the meetings and were very familiar with the EPO accounts, particularly about the numbers. CW7 also attended weekly meetings, held every Tuesday, for the EPO portion of Kenexa's business. According to CW7, all Program Directors called into the meetings, as did the EPO Sales Representatives. The weekly meetings focused on the activity that had taken place on each account during the previous week, forecasts for the remainder of the current week and potential up-sell opportunities. CW7 also confirmed that the EPO Sales Representatives would discuss potential deals in the pipeline. Like CW5 and CW6, CW7 also submitted weekly forecasts in the form of excel spreadsheets to Kenexa's Director of Finance and Business Analytics.

56.    CW8 was employed at Kenexa from November 11, 2007 until August 14, 2009, when the witness was laid off as part of a Company-wide workforce reduction. While at Kenexa, the witness worked as an Inside Sales Manager at the Company's Lincoln, NE location. Based on the witness' position as an Inside Sales Manager, CW8 had knowledge of the Company's sales cycle. According to CW8, there are six stages in the sales cycle. During stage one, the sale is just a

prospect and the Sales Representative has had only one or two meetings with the potential client. During stage two, a more in-depth meeting has occurred and the Sales Representative may have made presentations to the prospective client. By stage three, the prospective client is considering Kenexa and possibly four other HCM vendors. In stage four, the prospective client has narrowed down its selection to Kenexa or one other HCM vendor and Kenexa has a 50% chance of landing the deal. By stage five, Kenexa has obtained a verbal agreement from the prospective client and by stage six, a contract has been signed and the deal closed. CW8 confirmed that the Company's projections are based on sales that are in stages four through six. In other words, according to CW8, Kenexa's projections included sales that, in some instances, may have had only a 50% chance of coming to fruition.

57.     CW9 worked for Kenexa for nine months, through November 2007, during which time the witness was a Program Director in charge of one of the Company's EPO accounts. Based on the witness' position as a Program Director, CW9 had knowledge of quarterly conference calls held by Kenexa's Global Practice Leader, who reported to the COO. During the conference calls, EPO Sales Representatives would discuss which prospective clients the Company was expected to land during the quarter based on best and worst-case scenarios. CW9 also confirmed that the Company counted sales in the pipeline in financial forecasts, even though those sales had not been finalized.

58.     CW10 was a Senior Vice President of Kenexa's U.K. operations and was employed by Kenexa through the summer of 2007, at which time the witness was let go. Prior to joining Kenexa, CW10 worked for PSL, the U.K. assessment company acquired by Kenexa in November 2006. Based on this position, CW10 had knowledge of PSL's revenue recognition practices. According to CW10, at the time of the acquisition, it was acknowledged that PSL's revenue recognition practices needed to be changed to comply with U.S. GAAP. As explained by CW10,

Kenexa failed to timely make the switch from U.K. accounting practices to U.S. GAAP, thereby impacting Kenexa's FY07 total revenue projections.

59.    CW11 was employed by Kenexa as the European Sales Director for assessments from March 2007 until the end of February 2008. CW11 worked in Kenexa's London, England office. Based on CW11's role as European Sales Director, the witness had knowledge of Kenexa's international assessments sales. Part of CW11's responsibilities included compiling forecasts for the European assessments sales into a spreadsheet, which was then distributed to CW11's supervisor along with other Kenexa employees in the U.S. and U.K. According to CW11, the witness' supervisor met regularly with the Individual Defendants to discuss the forecasts. CW11 confirmed that Kenexa's international assessments sales were "soft." CW11 also confirmed that Kenexa was required to change its revenue recognition practices to comply with U.S. GAAP and that Kenexa's failure to timely change its practices contributed to Kenexa's revenue shortfall in 3Q07 and reduced FY07 revenue guidance.

## DEFENDANTS' CLASS PERIOD MISREPRESENTATIONS

60.    On May 8, 2007, after the close of trading, Kenexa issued a press release announcing its financial results for 1Q07, the period ended March 31, 2007. For the quarter, the Company reported total revenue of $42.2 million, representing an increase of 83% over the $23.0 million recorded for 1Q06. The Company also reported subscription revenue of $34.7 million and professional services and other revenue of $7.5 million. Karsan commented on the results, stating in pertinent part as follows:

> We were pleased with the company's first quarter results, which were strong across all key income statement, balance sheet and cash flow metrics. Market demand is strong and interest is growing for talent management solutions. Kenexa is benefiting from these trends due to our differentiated value proposition, proven ability to deliver tangible business benefits for our customers and growing brand awareness.

61.    In the same press release, the Company issued guidance for 2Q07 and FY07 as follows:

Second Quarter 2007: The Company expects revenue to be $43.0 to $44.9 million, subscription revenue to be $34.9 to $35.9 million and non-GAAP operating income to be $8.7 to $9.1 million. Assuming a 30% effective tax rate for reporting purposes and 25.9 million shares outstanding, Kenexa expects its non-GAAP diluted earnings per share to be $0.27 to $0.28.

Full Year 2007: *The Company expects total revenue to be $186 million to $189 million*, subscription revenue to be $149 to $152 million and non-GAAP operating income to be $40.7 to $42.8 million. Assuming a 30% effective tax rate and 25.7 million shares outstanding, Kenexa expects its non-GAAP diluted earnings per share to be $1.18 to $1.25.

62.    That same day, Kenexa held a conference call for analysts and investors to discuss the Company's earnings release and operations. During the call, Volk made the following statements:

Our clients typically purchase multiyear subscriptions with an average length of approximately two years. *Our revenue continues to be highly visible as a result of our diverse customer base, long-term contracts, renewal rates that continue to be in the 90%-plus range, and the growing number of new customers that we are adding to our overall customer base.*

\*        \*        \*

As a result of the significant expansion in our sales organization, *we are currently ahead of where we would target at this point in the year,* and as such we will be primarily focused on optimizing sales productivity in the near term.

Volk also reiterated guidance for 2Q07 and FY07:

*For the full year 2007, we are slightly increasing our revenue and profitability guidance. We now expect the following: Total revenue of $186 million to $189 million, subscription revenue to be $149 million to $152 million; non-GAAP operating income of $40.7 million to $42.8 million.* Assuming an effective tax rate of 30% for reporting purposes and 25.7 million shares outstanding, we expect our diluted non-GAAP EPS to $1.18 to $1.25.

For the second quarter of 2007, we expect the following: Revenue to be $43 million to $44.9 million, subscription revenue to be $34.9 million to $35.9 million, non-GAAP income from operations to $8.7 million to $9.1 million. Assuming an effective rate of 30% for reporting purposes and 25.9 million shares outstanding, we expect our diluted non-GAAP earnings per share to be $0.27 to $0.28.

- 23 -

63.     Analysts were pleased with the financial results, and relying on defendants' positive statements for FY07, issued analyst reports that, in some instances, repeated defendants' statements and optimism about Kenexa's business. For example, a May 8, 2007 Credit Suisse analyst report stated:

> Kenexa reported another solid quarter highlighted by revenue and EPS coming in ahead of our forecast/guidance, and management raised its revenue and earnings guidance for F2007.
>
> *          *          *
>
> For F2007, Kenexa raised its guidance to $186M-$189M in total revenue, $149-$152M subscription, pro forma operating income of $40.7-$42.8M and pro forma EPS of $1.18-$1.25.

64.     On May 9, 2007, Brean Murray Carret & Co. issued an analyst report describing Kenexa as one of its "top 2007 investment ideas." The report also stated that Kenexa *"is growing faster than the market with solid execution.*" Similarly, a May 9, 2007 William Blair & Company report noted the Company's organic revenue growth of 35% was "a solid result given that the market is only growing 15% to 20%."

65.     Also on May 9, 2007, Maxim Group reported that it "remain[s] confident that management and the company's salesforce can continue their pattern of solid execution through 2007" and that they "expect KNXA to sustain organic growth levels of 30%+ over 2007."

66.     In response to defendants' positive statements on May 8, 2007, the price of Kenexa stock rose from $31.94 to $32.36 on volume of 1.3 million shares. Kenexa's stock continued to climb throughout May 2007. As Kenexa's stock price increased, Karsan took advantage of the artificial inflation in the stock. Between May 11, 2007 and May 31, 2007, Karsan sold 127,400 shares of Kenexa stock for proceeds of more than *$4.6 million*.

67.     The positive statements, assurances and forecasts made on May 8, 2007 were materially false and misleading and lacked any reasonable basis when made because of the undisclosed material facts, which were known or recklessly disregarded by defendants:

- 24 -

(a)     One of Kenexa's largest EPO clients, a U.S.-based biotechnology company, was experiencing a significant deterioration in its business following adverse studies about two of the company's most popular drugs and a black box warning from the FDA. According to CW1, CW2 and CW3, Kenexa began downsizing employees on the biotechnology company account in the spring of 2007 due to anticipated slowdown in the biotechnology company account's hiring needs. According to CW5, CW6 and CW7, the weekly forecasts prepared by the Program Director in charge of the biotechnology company account – forecasts Volk received – would have indicated that the biotechnology company account was experiencing major issues. In addition, as Karsan disclosed at the end of the Class Period, because Kenexa manages the recruitment process of its EPO clients, defendants "*know first hand what pains our [EPO] customers are going through*." This statement is a tacit admission by Karsan that defendants were aware of the problems facing the biotechnology company prior to and during the Class Period;

(b)     Kenexa's FY07 total revenue guidance lacked any reasonable basis because Kenexa included sales that had not yet closed, and possibly would never close, in the Company's financial projections. According to CW8 and CW9, Kenexa included sales in stages four through six in the Company's financial projections, even though some sales may have had only a 50% chance of coming to fruition. Indeed, by the end of the Class Period, Kenexa had eliminated all incremental EPO sales from its forecasts;

(c)     Kenexa's revenue was not "highly visible" and organic growth of 30%-35% was unachievable due to lengthening in the EPO sales cycle and weakness in the Company's international assessments sales. The Company was experiencing difficulty closing EPO sales in the pipeline and was losing sales to competitors. In addition, according to CW11, assessment sales forecasts evidenced that Kenexa's international assessment sales were "soft." Tellingly, by the end of the Class Period, Volk was no longer reassuring investors that revenue was "highly visible";

(d)    The Company failed to timely change its international assessment revenue recognition practices from U.K. accounting practices to U.S. GAAP.  According to CW10 and CW11, at the time Kenexa acquired PSL, PSL recognized revenue from the sale of assessment products under the more flexible U.K. accounting practices.  Also according to CW10 and CW11, Kenexa understood that it would need to change PSL's accounting practices to conform with U.S. GAAP.  Kenexa failed to timely make the necessary change and as a result, the Company's FY07 forecast lacked any reasonable basis; and

(e)    As a result of the foregoing, defendants' positive statements about Kenexa's business and its total revenue guidance for FY07 had no reasonable basis and could not be achieved.

68.    On June 8, 2007, Kenexa announced the acquisition of StraightSource, a provider of recruitment process outsourcing services.  As a result of the acquisition, the Company updated its guidance for 2Q07 to reflect the expected impact from the acquisition, increasing 2Q07 revenue by $600,000 to $45.5 million.  While the Company did not issue FY07 guidance, analysts following Kenexa predicted approximately $7 million in additional total year revenue from the StraightSource acquisition.  Analysts raised their FY07 revenue estimates accordingly, from approximately $188 million to approximately $192 million.

69.    On news of the acquisition, the price of Kenexa stock rose from $35.88 on June 7, 2007 to $37.25 on June 8, 2007.

70.    On August 8, 2007, Kenexa announced its financial results for 2Q07, for the period ended June 30, 2007, meeting its previous revenue guidance and reporting total revenue of $45.2 million, representing an increase of 83% over the $24.7 million recorded for 2Q06.  The Company also reported subscription revenue of $37.0 million and professional services and other revenue of $8.2 million.  Karsan commented on the results, stating in pertinent part as follows:

We were pleased with the Company's second quarter results, *which were highlighted by solid organic and acquisitive revenue growth, profitability and cash*

*flow*. Market demand is strong, and Kenexa's brand recognition continues to grow as reflected by the growing number of inbound inquiries that we are fielding related to our total solution offerings.

71.     In the same press release, the Company issued guidance for 3Q07.  The Company also raised guidance for FY07 by approximately $2 million, as follows:

Third Quarter 2007: The Company expects revenue to be $48 to $50 million, subscription revenue to be $38.4 to $40 million and non-GAAP operating income to be $10.8 to $11.3 million. Assuming a 30% effective tax rate for reporting purposes and 25.9 million shares outstanding, Kenexa expects its non-GAAP diluted earnings per share to be $0.31 to $0.33.

Full Year 2007: ***The Company expects total revenue to be $188 million to $192 million***, subscription revenue to be $150 to $153 million and non-GAAP operating income to be $40.7 to $42.8 million.  Assuming a 30% effective tax rate and 25.7 million shares outstanding, Kenexa expects its non-GAAP diluted earnings per share to be $1.18 to $1.25.

72.     That same day, Kenexa held a conference call for analysts and investors to discuss the Company's earnings release and operations.  During the call, Karsan made the following statements:

[W]e had another very successful cash flow quarter.  And at the halfway point of the year, your cash flow from operations is up more than five-fold compared to the first six months of 2006.  We continue to benefit from our participation in an attractive market that is experiencing strong demand and growing awareness.  ***We are pleased with the high level of execution across all our global organization***.

\*          \*          \*

We are optimistic about our outlook for the remainder of the year and we continue to be very excited by our long term potential, based on the expanded breadth and depth of our solutions, growing market share and the strength of the talent management market momentum.

Volk also commented during the call as follows:

Our clients typically purchase multi-year subscriptions with an average length of approximately two years. ***Our revenue continues to be highly visible as a result of our diverse customer base, long-term contracts, renewal rates that continue to be in the 90% plus range and the growing number of new customers that we are adding to our overall customer base***.

Volk then reiterated guidance for 3Q07 and FY07:

For the full year 2007 we now expect the following, total revenue of $188 million to $192 million, subscription revenue to be $150 million to 153 million, non-

- 27 -

GAAP operating income of $40.7 million to $42.8 million.  Assuring a 30% tax rate for reporting purposes and 25.7 million shares outstanding, we expect our diluted non-GAAP EPS to be $1.18 to $1.25.

For the third quarter of 2007 we expect the following: revenue to be $48 million to $50 million, subscription revenue to be $38 million to $40 million, non-GAAP income from operations to be $10.8 million to $11.3 million.  Assuming a 30% tax rate for reporting purposes and 25.9 million shares outstanding, we expect our diluted non-GAAP earnings per share to be $0.31 to $0.33.

73.    Prior to the Company's August 8, 2007 announcement, analysts predicted Kenexa would raise its FY07 total revenue guidance by $4-$7 million to account for the StraightSource acquisition.  By raising FY07 total revenue guidance minimally, by only $2.8 million, Kenexa gave its first indication that the Company's organic growth was not nearly as strong as previously represented by defendants.

74.    Notwithstanding Kenexa's lower-than-expected revised FY07 revenue guidance, in an effort to maintain the artificial inflation in Kenexa's stock, defendants continued to reassure investors that the Company's organic growth was "solid."  For example, in response to an analyst question specifically regarding Kenexa's organic growth, Karsan stated:

I think we started this year, we were talking about organic growth at the beginning of the year at 29 to 32% range.  That's the range we gave.  If I look at it in the first half of the year we've been about 30 to 35.  *I would say the second half of the year we're going to be in the 30 to 35 range*.

Karsan then reassured investors that Kenexa was not experiencing any slowdown in organic growth:

We don't feel it.  I don't feel like a slow down . . . I just feel like it's movement.  I'm not feeling like it is a slow down in organic, *in fact I'm feeling like it's really, really solid*.

75.    Analysts and investors were surprised by Kenexa's FY07 revised guidance.  For example, an August 9, 2007 Wedbush Morgan Securities report stated:

2007 revenue guidance increased to $188-192M, . . . but the increase did not match the pick up from recently acquired StraightSource, *possibly implying that management might have lowered their 2007 revenue guidance were it not for the recently acquired revenue*.

76.    Similarly, Boenning & Scattergood, Inc. issued an analyst report on August 9, 2007 in which it expressed concern about the Company's revised FY07 guidance:

> The company's full year guidance increase is likely to be seen as disappointing. It increased its revenue guidance range by $2-3m and left its non-GAAP range unchanged. With StraightSource adding $600k/month in revenue over seven months, the full year revenue number should have increased by at least $4m independent of any changes to the organic revenue guidance. Either the company is being conservative with its StraightSource guidance *or the assumed organic revenue contribution is lower than previously indicated*.

77.    Despite the surprise expressed by some analysts, other analysts echoed Karsan's assurances of "solid growth." For example, an August 9, 2007 CIBC World Markets report stated:

> While sales and EPS were largely in line with its upwardly revised mid-Q outlook, we believe better than expected subscription revenue, *30-35% organic growth* and 20%+ operating margins highlight KNXA's strong business momentum and solid execution.
>
>            *    *    *
>
> KNXA remains one of our favorite HCM names given its *solid growth* (organic & otherwise), superior margins, and continued overall performance.

78.    On August 9, 2007, Maxim Group issued a similar report, stating:

> According to management, excluding acquisition-related revenue, KNXA grew approximately 30%-35% organically yr/yr in 2Q07. We expect KNXA to sustain organic growth levels of 30% through 2H07 and believe that our expectation for 28% growth in 2008 could prove conservative, particularly in light of continued strong renewal rates.

79.    Also on August 9, 2007, Brean Murray Carret & Co. issued an analyst report based on the recent conference call. The reported stated:

> Kenexa raised its full year revenue guidance to $188-192 million from $186-189 million and maintained its EPS guidance of $1.18-1.25. In addition, 3Q07 revenue guidance of $48-50 million was in line, while EPS guidance of $0.31-0.33 was below the consensus of $0.34. The 2007 revenue guidance increase was a bit lower than our expectations, since StraightSource contributed over $0.6 million in revenue in just the month of June. However, management suggested StraightSource should contribute about $2-3 million in 2007 and accounts for the entire guidance increase. This also implies the company chose not to tweak up its base business projections.

The report then reiterated its "Buy" rating, noting that "Kenexa is benefitting from a strong macro trend, *and is growing faster than the market with solid execution*."

80.    Upon defendants' partial disclosure of previously misrepresented and/or concealed information on August 8, 2007, the artificial inflation caused by defendants' prior false statements began to come out of the stock, damaging earlier Class Period purchasers. Kenexa's stock price fell from $41.00 on August 8, 2007 to $33.85 on August 9, 2007. However, Karsan's statements had their intended effect. Due to defendants' lack of full and complete disclosure, false assurances and continuing misrepresentations, Kenexa's stock continued to trade at artificially inflated, albeit lower, prices through the remainder of the Class Period.

81.    The positive statements, assurances and forecasts made on August 8, 2007 were materially false and misleading and lacked any reasonable basis when made because of the undisclosed material facts, which were known or recklessly disregarded by defendants:

(a)    One of Kenexa's largest EPO clients, a U.S.-based biotechnology company, was experiencing a significant deterioration in its business following adverse studies about two of the company's most popular drugs and a black box warning from the FDA. According to CW1, CW2 and CW3, Kenexa began downsizing employees on the biotechnology company account in the spring of 2007 due to anticipated slowdown in the biotechnology company account's hiring needs. According to CW5, CW6 and CW7, the weekly forecasts prepared by the Program Director in charge of the biotechnology company account – forecasts Volk received – would have indicated that the biotechnology company account was experiencing major issues. In addition, as Karsan disclosed at the end of the Class Period, because Kenexa manages the recruitment process of its EPO clients, defendants "*know first hand what pains our [EPO] customers are going through.*" This statement is a tacit admission by Karsan that defendants were aware of the problems facing the biotechnology company prior to and during the Class Period;

(b)      Kenexa's FY07 total revenue guidance lacked any reasonable basis because Kenexa included sales that had not yet closed, and possibly would never close, in the Company's financial projections. According to CW8 and CW9, Kenexa included sales in stages four through six in the Company's financial projections, even though some sales may have had only a 50% chance of coming to fruition. Indeed, by the end of the Class Period, Kenexa had eliminated all incremental EPO sales from its forecasts;

(c)      Kenexa's revenue was not "highly visible" and organic growth of 30%-35% was unachievable due to lengthening in the EPO sales cycle and weakness in the Company's international assessments sales. The Company was experiencing difficulty closing EPO sales in the pipeline and was losing sales to competitors. According to CW11, assessment sales forecasts evidenced that Kenexa's international assessment sales were "soft." Tellingly, by the end of the Class Period, Volk was no longer reassuring investors that revenue was "highly visible";

(d)      The Company failed to timely change its international assessment revenue recognition practices from U.K. accounting practices to U.S. GAAP. According to CW10 and CW11, at the time Kenexa acquired PSL, PSL recognized revenue from the sale of assessment products under the more flexible U.K. accounting practices. Also according to CW10 and CW11, Kenexa understood that it would need to change PSL's accounting practices to conform with U.S. GAAP. Kenexa failed to timely make the necessary change and as a result, the Company's FY07 forecast lacked any reasonable basis; and

(e)      As a result of the foregoing, defendants' positive statements about Kenexa's business and its total revenue guidance for FY07 had no reasonable basis and could not be achieved.

82.      In an effort to maintain the artificial inflation in Kenexa's stock and further conceal the serious problems facing the Company, defendants continued their message of "solid" growth in

the months that followed.  On September 16, 2007, following a meeting with Kenexa senior

management, Credit Suisse issued a report that stated as follows:

> **We see no signs that business fundamentals have changed or that organic growth has slowed below the 29-32% goal that management has indicated.**

> Some investors are concerned that the U.S. economy may weaken and that the affect on U.S. job growth/unemployment will hurt Kenexa's business.  For its part, Kenexa is not seeing any sign of slowdown at this time.

> **Management remains consistent that organic revenue growth remains in the range of 29-32%, and that it was 30-35% in Q2.**

83.     At the end of September 2007, Kenexa hosted its World User Conference.  Analysts

were among some of the attendees; Karsan was the keynote speaker.  On October 1, 2007, Wedbush

Morgan Securities issued a report on Kenexa based on the World User Conference.  The report

stated:

> Following the user conference we are incrementally more positive on the shares and believe that the negative sentiment since the Q2 earnings call is mostly unwarranted, as customers we spoke with seemed very satisfied with their engagements. . . .  However, the conference reinforced our view that the company's revenue comes more from services, surveys and assessments, than from HCM software sales.

84.     The price of Kenexa stock subsequently rose from $30.78 on September 28, 2007 to

$31.78 on October 1, 2007 and continued to climb thereafter, surpassing the $32.00 per share mark

for the first time in nearly two months.

85.     Karsan took advantage of the artificial inflation in Kenexa stock created by the

October 1, 2007 positive analyst report, selling a total of 37,500 shares of Kenexa stock on October

1, 2007 and October 3, 2007 for nearly **$1.2 million** in illegal insider trading proceeds.  Tellingly,

these sales were made pursuant to a Rule 10b5-1 trading plan adopted **after** the beginning of the

Class Period, during which time Karsan was in the possession of material, non-public information.

## THE TRUTH EMERGES

86.    On November 7, 2007, Kenexa issued a press release announcing its financial results

for 3Q07, for the period ended September 30, 2007. Kenexa disclosed that the Company suffered a

more than $2 million *decrease* in total revenue for the quarter. Instead of reporting total revenue of

$48-$50 million, Kenexa reported significantly lower total revenue of $46.8 million. Kenexa also

reported subscription revenue of $38.2 million and professional services and other revenue of $8.6

million. Additionally, Kenexa *lowered* its FY07 guidance by more than *$7 million*, from $188-$192

million to $181.5-$182.5 million and lowered the Company's organic revenue growth to the *low-to-*

*mid 20%* range. Karsan commented on the results, disclosing for the first time that:

> *Our top line performance was impacted by a single contract with a*
> *customer that faced a company-specific business issue, in addition to longer sales*
> *cycles in the EPO and assessments components to our business*. While we have re-
> adjusted our 2007 forecast as a result of these factors, we remain confident in the
> underlying growth profile of the company as we approach 2008 based on Kenexa's
> differentiated value proposition, significant number of new customers adopting our
> solutions, growing brand and high profile customer wins across both the hiring and
> retention segments of the talent management market. This confidence is evidenced
> by our preliminary 2008 forecast of low-to-mid 20% revenue growth, non-GAAP
> operating margins of 20 plus% and strong cash flow.

87.    In a conference call with analysts later that day, Karsan attempted to explain the

shocking results:

> Our top line performance was impacted by a single contract with the
> customer that faced the Company's specific business issue in addition to longer sales
> cycles in the EPO and assessments component of our business.

Karsan elaborated further on the lost EPO client:

> *One of the primary reasons we adjusted our full year revenue forecast is*
> *related to one of our larger EPO customers*.
>
> This customer encountered Company specific issues that have been publicly
> disclosed and which eliminated the need of Kenexa's outsourced services. They
> continue to use a subscription based talent management solutions, but given their
> circumstances we relieve them from their committed EPO obligation. This was the
> right thing to do. However, from a short term perspective, it impacted our third
> quarter revenue performance *and it will impact our full year 2007 revenue by about*
> *$3 million*.

- 33 -

88.    Karsan then commented on "longer sales cycles associated with the EPO portion of the business," stating that certain companies Kenexa targeted for EPO deals "have been rethinking the global allocation of their workforce and what their best recruiting outsourcing strategy might be as a result." Finally, Karsan disclosed problems relating to the Company's assessments solutions business, stating, "we need to improve our day to day sales executions in the international markets in particular."

89.    In response to an analyst question, Karsan admitted that the reason for the significantly lower 3Q07 revenue and decreased FY07 revenue guidance was solely the result of "Kenexa issues," not "market issues." Karsan also disclosed for the first time that certain sales the Company assumed would close during the quarter did not close. As a result, the Company missed its projected 3Q07 total revenue. Karsan also disclosed that the canceled EPO contract contributed to the Company's disappointing organic growth for the quarter.

90.    Analysts were shocked by the Company's 3Q07 revenue miss and readjusted FY07 guidance. For example, a November 8, 2007 ThinkEquity Partners LLC analyst report stated, "*[w]e certainly did not see this coming*." The report also questioned why "Kenexa chose not to pre-release the revenue miss, *as the Company knew of these developments well before the end of the quarter*." Similarly, a November 8, 2007 Brean Murray Carret & Co. report pondered, "[a]ssessment business slips, *can something else be going on*?" The report also noted that while Kenexa reported a sharp deceleration in organic growth, the Company's competitors reported *acceleration* in year-over-year organic growth.

91.    As a result of Kenexa's 3Q07 revenue miss and lowered FY07 guidance, the price of Kenexa common stock fell $11.23 per share, or 40%, to close on November 8, 2007 at $16.61 per share, on unusually heavy trading volume.

## ADDITIONAL SCIENTER ALLEGATIONS

92.    As alleged herein, defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Kenexa, their control over, and/or receipt and/or modification of Kenexa's allegedly materially misleading misstatements and/or their associates with the Company which made them privy to confidential proprietary information concerning Kenexa, participated in the fraudulent scheme alleged herein.

**Defendants' Knowledge of Facts Rendering
Their Class Period Statements False**

93.    Before issuing FY07 total revenue guidance on May 8, 2007, defendants knew that Kenexa's largest EPO client was suffering from a significant deterioration in its business that would eventually lead to the cancellation of its contract with Kenexa.  Defendants' knowledge is evidenced by the fact that Kenexa began downsizing the number of employees working on the biotechnology company account in early spring of 2007.  This downsizing occurred because the biotechnology company was experiencing a slowdown and Kenexa's EPO services would no longer be needed.

94.    Defendants also would have known that the EPO client was experiencing issues due to weekly forecasts submitted by the Program Director in charge of the biotechnology company account and information obtained during Quarterly Business Review meetings.  The weekly forecasts were submitted to defendants and included the quarterly "run rate," or money guaranteed for the quarter, as well as a projection of the total number of new requisitions and the number of new hires that would begin employment within the next three months.  According to CW5 and CW6,

these forecasts would have indicated that the biotechnology company was facing serious issues. At the Quarterly Business Review meetings, Volk and the Program Director in charge of the biotechnology company account would have discussed the results of the previous quarter, the current quarter's projections and the overall health of the customer relationship. During the meetings, defendants usually questioned the Program Directors directly, particularly if the actual number of new hires for the previous quarter varied from the forecasted number of new hires.

95.    Moreover, on November 7, 2007, after shocking investors by announcing significantly reduced FY07 total revenue guidance, Karsan admitted that, "it's only because we manage the recruitment process of a portion of our [EPO] customers that *we know first hand what pains our customers are going through* . . . ." Defendants' tacit admission at the end of the Class Period is further evidence that defendants had actual knowledge of the severe problems facing Kenexa's largest EPO client at the time those problems first occurred before the start of the Class Period and before issuing FY07 total revenue guidance.

96.    Defendants also knew that Kenexa's revenue was not "highly visible" and that organic growth of 30%-35% could not be achieved due to lengthening EPO sales cycles and problems with the Company's international assessments sales. Kenexa was having difficulty closing EPO deals in the pipeline and losing sales to competitors. According to CW11, Kenexa's international assessment sales were "soft" and as corroborated by CW10, Kenexa did not make the necessary change from U.K. revenue recognition practices to U.S. GAAP practices, thereby impacting Kenexa's FY07 total revenue guidance. Indeed, by the end of the Class Period, Volk was no longer reassuring investors that the Company's revenue was "highly visible" and the Company began eliminating any incremental EPO sales from its forecasts.

97.    In addition, on November 8, 2007, only one day after reporting disastrous 3Q07 results and significantly reduced FY07 guidance, defendants announced a common stock repurchase

plan providing for the purchase of up to 2 million shares of the company's common stock. Not coincidentally, the stock repurchase plan was announced in close proximity to negative news about the Company's 3Q07 results and FY07 guidance in order to soften the blow to the price of Kenexa common stock, which defendants knew would fall precipitously following the Company's November 7, 2007 announcement.

**Defendants' Insider Trading**

98.    Karsan's insider sales during the Class Period, as well as the sales of other Kenexa insiders, were suspicious in timing and amount and provide additional inference of scienter. Combined, Company insiders sold 271,996 shares of their personally-held Kenexa common stock for gross proceeds in excess of **$9.75 million** during the Class Period, as set forth in the chart below:

| Name | Date | Shares | Price | Proceeds | End of CP Stock Holdings | % Sold | % Sold, Incl. Options |
|------|------|--------|-------|----------|--------------------------|--------|------------------------|
| TROY KANTER[3] | 5/15/2007 | 5,117 | $34.70 | $177,560 | | | |
| | 5/15/2007 | 5,087 | $34.75 | $176,773 | | | |
| | 5/15/2007 | 1,672 | $34.60 | $57,851 | | | |
| | 5/15/2007 | 1,270 | $35.00 | $44,450 | | | |
| | 5/15/2007 | 992 | $34.74 | $34,462 | | | |
| | 5/15/2007 | 800 | $34.71 | $27,768 | | | |
| | 5/15/2007 | 700 | $34.80 | $24,360 | | | |
| | 5/15/2007 | 500 | $34.84 | $17,420 | | | |
| | 5/15/2007 | 500 | $34.73 | $17,365 | | | |
| | 5/15/2007 | 400 | $34.89 | $13,956 | | | |
| | 5/15/2007 | 400 | $34.76 | $13,904 | | | |
| | 5/15/2007 | 300 | $34.78 | $10,434 | | | |
| | 5/15/2007 | 300 | $34.54 | $10,362 | | | |
| | 5/15/2007 | 201 | $35.41 | $7,117 | | | |
| | 5/15/2007 | 200 | $35.44 | $7,088 | | | |
| | 5/15/2007 | 200 | $34.90 | $6,980 | | | |
| | 5/15/2007 | 200 | $34.57 | $6,914 | | | |
| | 5/15/2007 | 200 | $34.82 | $6,964 | | | |
| | 5/15/2007 | 200 | $34.75 | $6,950 | | | |
| | 5/15/2007 | 200 | $35.40 | $7,080 | | | |
| | 5/15/2007 | 197 | $35.05 | $6,905 | | | |
| | 5/15/2007 | 103 | $35.05 | $3,610 | | | |

---

[3]    Kenexa's President, COO and a member of the Board of Directors.

| Name | Date | Shares | Price | Proceeds | End of CP Stock Holdings | % Sold | % Sold, Incl. Options |
|---|---|---|---|---|---|---|---|
| | 5/15/2007 | 100 | $35.04 | $3,504 | | | |
| | 5/15/2007 | 100 | $34.99 | $3,499 | | | |
| | 5/15/2007 | 100 | $34.59 | $3,459 | | | |
| | 5/15/2007 | 100 | $34.55 | $3,455 | | | |
| | 5/15/2007 | 100 | $34.95 | $3,495 | | | |
| | 5/15/2007 | 100 | $34.91 | $3,491 | | | |
| | 5/15/2007 | 100 | $34.80 | $3,480 | | | |
| | 5/15/2007 | 100 | $34.77 | $3,477 | | | |
| | 5/15/2007 | 100 | $35.35 | $3,535 | | | |
| | 5/15/2007 | 99 | $35.07 | $3,472 | | | |
| | 5/15/2007 | 99 | $35.24 | $3,489 | | | |
| | 5/15/2007 | 97 | $35.06 | $3,401 | | | |
| | 5/15/2007 | 72 | $35.10 | $2,527 | | | |
| | 5/15/2007 | 32 | $35.11 | $1,124 | | | |
| | 5/15/2007 | 28 | $34.61 | $969 | | | |
| | 5/17/2007 | 18,030 | $35.00 | $631,050 | | | |
| | 5/30/2007 | 15,000 | $38.24 | $573,600 | | | |
| | 5/31/2007 | 8,000 | $39.02 | $312,160 | | | |
| | | **62,096** | | **$2,249,460** | **21,475** | **74.30%** | **74.30%** |
| | | | | | | | |
| RUDY KARSAN | 5/11/2007 | 25,000 | $33.31 | $832,750 | | | |
| | 5/14/2007 | 27,400 | $35.00 | $959,000 | | | |
| | 5/14/2007 | 8,200 | $36.02 | $295,364 | | | |
| | 5/21/2007 | 29,300 | $36.05 | $1,056,265 | | | |
| | 5/31/2007 | 37,500 | $39.00 | $1,462,500 | | | |
| | 7/2/2007 | 25,000 | $37.85 | $946,250 | | | |
| | 10/1/2007 | 25,000 | $31.08 | $777,000 | | | |
| | 10/3/2007 | 12,500 | $33.01 | $412,625 | | | |
| | | **189,900** | | **$6,741,754** | **1,001,630** | **15.94%** | **15.94%** |
| | | | | | | | |
| DONALD VOLK | 5/30/2007 | 20,000 | $38.24 | $764,800 | | | |
| | | **20,000** | | **$764,800** | **40,024** | **33.32%** | **22.72%** |
| | | | | | | | |
| | **Total:** | **271,996** | | **$9,756,014** | | | |

99.    These sales were unusual and suspicious in amount, percentages and timing. During the Class Period, Karsan sold 189,900 shares of Kenexa stock, representing almost 16% of his holdings, for proceeds of over $6.7 million. Yet during the entire year preceding the Class Period, Karsan made not *one* sale of Kenexa stock. Volk and insider Troy Kanter, Kenexa's President, COO and a member of the Board of Directors, sold significant amounts as well.

100.    The timing of these sales was also highly suspicious, as they were timed to take maximum advantage of the artificial inflation caused by defendants' misrepresentations. For

- 38 -

example, on May 7, 2007, as described herein, Kenexa stock closed at $31.48. After the close of trading on that date, Kenexa issued a press release announcing its results for 1Q07 and providing guidance for 2Q07 and FY07. On May 8, 2007, Kenexa stock closed at $31.94. As analysts repeated defendants' positive forecasts over the next several days, the price of Kenexa stock continued to climb. On May 11, 2007, the price of Kenexa stock closed at $34.72; Karsan sold 25,000 shares of his Kenexa stock for $33.31 per share, for proceeds of $832,750. On May 14, 2007, the price of Kenexa stock closed at $35.63. That same day, Karsan sold 35,600 for proceeds of over $1.25 million. On May 21, 2007, the price of Kenexa stock closed at $36.27. That same day, Karsan sold 29,300 shares of Kenexa stock at $36.05 for proceeds of $1,056,265. By May 31, 2007, Kenexa stock had climbed to $39.01. On that day, Karsan sold 37,500 shares of Kenexa stock at $39.00 for proceeds of $1,462,500.

101.     At the end of September 2007, Kenexa hosted its World User Conference. Karsan was the keynote speaker and analysts were among the attendees. On October 1, 2007 Wedbush Morgan Securities issued a positive report based on the conference, stating that they were "incrementally more positive on [Kenexa] shares" following the conference and that "negative sentiment since the Q2 earnings call is mostly unwarranted." Subsequently, the price of Kenexa stock rose from $30.78 on September 28, 2007 to $31.78 on October 1, 2007 and continued to climb thereafter, surpassing the $32.00 per share mark for the first time in nearly two months. On October 1, 2007, Karsan sold 25,000 shares of Kenexa stock at $31.08 for proceeds of $777,000. On October 3, 2007, Karsan sold 12,500 shares of Kenexa stock at $33.01 for proceeds of $412,625.

102.     Prior to the Class Period, on February 20, 2007, Karsan adopted a trading plan pursuant to Rule 10b5-1 of the Exchange Act through which he sold his personally owned Kenexa stock. On May 11, 2007, Karsan entered into a new trading plan, pursuant to which many of his Class Period sales were made. As alleged elsewhere herein, Karsan had knowledge of numerous

materially adverse, non-public facts at the time he entered into his May 11, 2007 trading plan. Thus, any trades made pursuant to this plan are not protected under Rule 10b5-1.

## LOSS CAUSATION/ECONOMIC LOSS

103.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Kenexa's stock price and operated as a fraud or deceit on purchasers of Kenexa stock by misrepresenting the Company's present and future operational and financial performance.    When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Kenexa common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Kenexa's common stock during the Class Period, Lead Plaintiff and other class members suffered economic loss, *i.e.*, damages under the federal securities laws.

104.    By issuing false or misleading projections for Kenexa's future financial performance and failing to disclose the significant problems facing Kenexa's largest EPO client, lengthening EPO sales cycles, weakness in the Company's international assessment sales and faltering organic growth, defendants presented a misleading picture of Kenexa's business and prospects.  Defendants' omissions and false and misleading statements caused Kenexa stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $41.00 per share in August 2007.

105.    On August 8, 2007, however, as discussed at ¶¶70-74, Kenexa raised its FY07 total revenue guidance by only a negligible amount, while assuring investors that the Company's organic growth was "solid."   On this partial revelation of previously misrepresented or concealed information, some of the artificial inflation came out of the price of Kenexa stock, which fell sharply from $41.00 on August 8, 2007 to $33.85 on August 9, 2007 and to $28.35 over the next few days, a Company-specific stock decline that damaged prior Class Period purchasers.  The stock price,

however, continued to trade at artificially inflated prices due to defendants' continued misrepresentations, false assurances and false projections through the balance of the Class Period.

106.    On November 7, 2007, defendants finally admitted their prior representations, assurances and forecasts had been false with the shocking revelation that one of Kenexa's largest EPO clients asked to be released from its contract early. In addition to the canceled EPO contract, defendants also admitted to lengthening in the EPO sales cycle and problems with its international assessments sales.

107.    As a direct result of defendants' disclosures on November 7, 2007, the price of Kenexa stock fell precipitously, falling from $27.84 on November 7, 2007 to $16.61 on November 8, 2007. This decline removed the remaining inflation from the price of Kenexa stock, causing real economic loss to investors who had purchased Kenexa common stock during the Class Period.

108.    The 40% decline in the price of Kenexa common stock after defendants' November 7, 2007 revelations was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. Moreover, the timing and magnitude of the price decline in Kenexa common stock negates any inference that the loss suffered by Lead Plaintiff and other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages suffered by Lead Plaintiff and other members of the Class was a direct and proximate result of defendants' fraudulent scheme to artificially inflate the price of Kenexa common stock and the subsequent significant decline in the value of Kenexa stock when defendants' prior omissions, misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

109.    At all relevant times, the market for Kenexa common stock was an efficient market for the following reasons, among others:

(a)    Kenexa's stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)    As a regulated issuer, Kenexa filed periodic public reports with the SEC and the Nasdaq;

(c)    Kenexa regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Kenexa was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

110.   As a result of the foregoing, the market for Kenexa's common stock promptly digested current information regarding Kenexa from all publicly-available sources and reflected such information in the price of Kenexa stock. Under these circumstances, all purchasers of Kenexa common stock during the Class Period suffered similar injury through their purchase of Kenexa common stock at artificially inflated prices. A presumption of reliance therefore applies.

## NO SAFE HARBOR

111.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Kenexa who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

112.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased or acquired Kenexa common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company and its subsidiaries and affiliates, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

113.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. As of March 8, 2007, Kenexa had more than 25.2 million shares of common stock outstanding.

114.    Throughout the Class Period, Kenexa's common stock was actively traded on the Nasdaq under the symbol "KNXA." Record owners and other members of the Class may be identified from records maintained by Kenexa or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

115.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members are similarly affected by defendants' wrongful conduct in violation of federal laws that are complained of herein.

116.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests which conflict with those of the Class.

117.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the financial condition, business, operations and growth of Kenexa;

(c)    whether defendants knew or recklessly disregarded that their statements/omissions were false and misleading;

(d)    whether the price of Kenexa stock was artificially inflated; and

(e)    the extent of damage sustained by Class members and the appropriate measure of damages.

118.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of §10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

119.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

120.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did (a) deceive the investing public, including Lead Plaintiff and other class members, as alleged herein; (b) artificially inflate and maintain the market price of Kenexa common stock; (c) enable the Individual Defendants and other insiders to sell their personally-held shares of Kenexa common stock for gross proceeds in excess of $9.75 million; and (d) cause Lead Plaintiff and other members of the Class to purchase Kenexa common stock at inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct defendants took the actions set forth in this Amended Complaint.

121.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     engaged in acts, practices and a course of business which operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchase of Kenexa common stock during the Class Period.

122.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth in this Amended Complaint, or acted with reckless disregard of the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

- 45 -

123.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Kenexa common stock were artificially inflated during the Class Period.  In ignorance of the fact that market prices of Kenexa's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and other members of the Class acquired Kenexa's common stock during the Class Period at artificially high prices and were damaged thereby.

124.    At the time of defendants' misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff, other members of the Class and the marketplace known of the true financial condition and business prospects of Kenexa, which were not disclosed by defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Kenexa common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

125.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's stock during the Class Period.

## COUNT II

### Violations of §20(a) of the Exchange Act Against All Defendants

126.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

127.    The Individual Defendants acted as controlling persons of Kenexa within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, business

expertise and their participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

128.    In particular, each of the Individual Defendants had direct and/or supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants culpably participated in the commission of the wrongs alleged herein.

129.    As set forth above, Kenexa and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Amended Complaint. By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED:  October 26, 2009

LAW OFFICES BERNARD M. GROSS, P.C.
DEBORAH R. GROSS


_____
DEBORAH R. GROSS

John Wanamaker Building, Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

Liaison Counsel

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
LAURA M. ANDRACCHIO
JONAH H. GOLDSTEIN
MAUREEN E. MUELLER
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

SUGARMAN & SUSSKIND
HOWARD S. SUSSKIND
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiffs

S:\CasesSD\Kenexa\CPT00062524_ Amended.doc

## CERTIFICATE OF SERVICE

I certify that on October 26, 2009 a true and correct copy of the Amended Complaint For

Violations Of The Federal Securities Laws was served on the below listed counsel by email.


Gay Barlow Parks Rainville, Esquire
**PEPPER HAMILTON LLP**
Email: rainvilleg@pepperlaw.com



                                    __/s/ Deborah R. Gross – DG639_____
                                      DEBORAH R. GROSS