## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BUILDING TRADES UNITED PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION<br>NO. 09-CV-2642-JS |
| KENEXA CORPORATION, NOORUDDIN S. KARSAN and DONALD VOLK, | : |
| Defendants. | : |

## ORDER

AND NOW, this ____ day of _____, 2010, upon consideration of Defendants' Motion to Dismiss Amended Complaint for failure to state a claim upon which relief can be granted, and any opposition and replies thereto, it is hereby ORDERED that Defendants' Motion is GRANTED. It is further ORDERED that the Amended Complaint is DISMISSED WITH PREJUDICE.


BY THE COURT:


_____
Juan R. Sánchez
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| BUILDING TRADES UNITED PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 09-CV-2642-JS |
| | : | |
| KENEXA CORPORATION, NOORUDDIN S. KARSAN and DONALD VOLK, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANTS' MOTION TO DISMISS
## AMENDED COMPLAINT

Defendants Kenexa Corporation, Nooruddin S. Karsan, and Donald Volk, by their undersigned counsel, respectfully move this Court to dismiss with prejudice plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) ("PSLRA") for the reasons set forth below and in the accompanying memorandum of law:

      1.    Plaintiff's Amended Complaint fails to state a claim under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder because defendants are immune from liability under the PSLRA's safe harbor;

      2.    The Amended Complaint fails to meet the PSLRA's heightened pleading requirements for alleging a "strong inference of scienter;" and

3.      Plaintiff's claims under Section 20(a) of the Exchange Act are purely

derivative of plaintiff's Section 10(b) claims and therefore are deficient as a matter of law.

Respectfully submitted,


 /s/ Robert L. Hickok
Robert L. Hickok
Gay Parks Rainville
Thomas T. Watkinson, II
John L. Schweder, II
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103
(215) 981-4000

Attorneys for Defendants
Kenexa Corporation
Nooruddin S. Karsan
Dated:  December 14, 2009                        Donald Volk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BUILDING TRADES UNITED PENSION
FUND, Individually and on Behalf of All
Others Similarly Situated,

        Plaintiff,

      v.

KENEXA CORPORATION, NOORUDDIN
S. KARSAN and DONALD VOLK,

        Defendants.

CIVIL ACTION
NO. 09-CV-2642-JS

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Robert L. Hickok
Gay Parks Rainville
Thomas T. Watkinson, II
John L. Schweder, II
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103
(215) 981-4000

Attorneys for Defendants
Kenexa Corporation
Nooruddin S. Karsan
Donald Volk

Dated: December 14, 2009

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION..................................................................................................1

II. FACTUAL BACKGROUND ................................................................................4

    A.  Kenexa's Business:  General Overview..................................................4

    B.  Kenexa's Employment Process Outsourcing ("EPO") Services ............5

    C.  Kenexa's EPO Contract With "Client B" ..............................................5

    D.  Kenexa's Revenue Sources:  Subscription And Other ..........................6

    E.  Kenexa's Periodic Reporting Of Financial Results ...............................7

        1.  May 8, 2007 Earnings Announcement And Guidance ...............9

        2.  June 8, 2007 Updated Guidance .............................................10

        3.  August 8, 2007 Earnings Announcement And Guidance.........11

        4.  November 7, 2007 Earnings Announcement............................11

III. APPLICABLE PLEADING STANDARDS.........................................................13

    A.  Complaints Whose Factual Allegations Fail To Raise A Right To Relief Above The Speculative Level Must Be Dismissed Under Rule 12(b)(6) ............13

    B.  The PSLRA Mandates The Dismissal Of Complaints That Fail To Comply With Its Heightened Pleading Requirements........................................................14

    C.  When Deciding A Motion To Dismiss Under Rule 12(b)(6) And The PSLRA, A Court May Consider Documents That Are Integral To The Complaint And Matters Of Which It May Take Judicial Notice ........................................15

IV. ARGUMENT .....................................................................................................17

    A.  Plaintiff's Amended Complaint Fails To State A Rule 10b-5 Claim Because Defendants Are Immune From Liability Under The PSLRA's Safe Harbor ........18

        1.  The PSLRA Requires That Courts Dismiss Claims Based On Forward-Looking Statements That Meet The Safe Harbor Criteria..........18

        2.  Because Defendants' Statements Qualify For Safe Harbor Immunity As A Matter Of Law, Plaintiff's Claims Must Be Dismissed..........................................................................................19

(a)    The Statements At Issue Are All Forward-Looking......................20

(b)    Defendants' Forward-Looking Statements Were Identified As Such And Accompanied By Meaningful Cautionary Language ........................................................................................22

(c)    Defendants Are Immune From Liability Under The Safe Harbor For The Separate And Independent Reason That Plaintiff Has Failed To Plead A Strong Inference That Defendants Acted With Actual Knowledge ...................................27

3.    Defendants Had No Duty To Update Their May 8 And August 8, 2007 Forward-Looking Statements ...........................................................27

B.    The Amended Complaint Fails To Meet The PSLRA's Heightened Pleading Requirements For Alleging A Strong Inference Of Scienter .................................28

1.    Plaintiff Has Failed To Plead A Strong Inference That Defendants Acted With Actual Knowledge That Their Revenue Forecasts And Predictions Were Allegedly False Or Misleading ........................................29

(a)    The Amended Complaint Alleges No Facts Showing That, As Of Either May 8 Or August 8, 2007, Defendants Actually Knew Client B Would Seek To Terminate Its EPO Contract ....................................................................................30

(b)    The Amended Complaint Alleges No Facts Showing Defendants Actually Knew That, As Of May 8 Or August 8, 2007, Prospective EPO And Assessments Deals That Were Included In Kenexa's Revenue For The Third Year And Full Year Of 2007 Would Not Close In Those Time Periods ..........................................................................................32

(c)    Plaintiff's Speculative Theory That Kenexa's U.K. Assessments Sales Forecasts Were Not Based On U.S. GAAP Principles Contradicts Public Record Facts And Should Be Disregarded ..................................................................33

2.    Because The Individual Defendants' Stock Sales Were Not Unusual In Either Scope Or Timing They Cannot Support An Inference Of Scienter ................................................................................34

(a)    The Individual Defendants' Stock Sales During The Class Period Were Consistent With Their Previous Stock Sales ...........36

(b)    The Individual Defendants Retained A Majority Of Their Kenexa Holdings ..........................................................................37

(c)    The Amount Of Stock Sold By Each Individual Defendant
Is Not Suspicious .................................................................39

(d)    The Majority Of The Individual Defendants' Stock Sales
Were Made Pursuant To Pre-Scheduled Rule 10b5-1 Plans .........40

(e)    Stock Sales By Non-Defendant Troy Kanter Are Not
Probative Of The Individual Defendants' Alleged
Fraudulent Motive .................................................................41

(f)    The Timing Of The Individual Defendants' Stock Sales Is
Neither Unusual Nor Suspicious ..................................................42

C.    Plaintiff's Section 20(a) Claim Is Purely Derivative Of Plaintiff's Section
10(b) Claim And Must Be Dismissed.................................................43

V.    CONCLUSION ....................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams v. Baker Hughes Inc.*, 292 F.3d 424 (5th Cir. 2002) .......................................37

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (3d Cir. 1995)............................................41

*In re Advanta Corp. Securities Litigation*, 180 F.3d 525 (3d Cir. 1999) ...........................passim

*In re Aetna, Inc. Securities Litigation*, No. 07-4451, 2009 WL 1619636 (E.D. Pa. June 9, 2009)..................................................................................................................19

*In re Alpharma Inc. Securities Litigation*, 372 F.3d 137 (3d Cir. 2004).................15, 35

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ...................................................................13

*In re Astea International Inc. Securities Litigation* No. 06-1467, 2007 WL 2306586 (E.D. Pa. Aug. 9, 2007)..................................passim

*In re Audible, Inc., Securities Litigation*, No.05-1027 (JAG), 2007 WL 4546823 (D.N.J. Dec. 19, 2007) ........................................................................................................43

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...................................................13

*Blum v. Semiconductor Packaging Materials Co. Inc.*, No. 97-7078, 1998 WL 254035 (E.D. Pa. May 5, 1998).....................................................................................28

*In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir. 1997) ...........passim

*California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004)...........................................................................................................15

*California Public Employees' Retirement System v. Chubb Corp.*, No. 00-4285, 2002 WL 33934282 (D.N.J. June 26, 2002) ..................................................................16

*In re Cambrex Corp. Securities Litigation*, No. 03-cv-4896, 2005 WL 2840336 (D.N.J. Oct. 27, 2005) ......................................................................................................39

*In re CDNow, Inc. Securities Litigation*, 138 F. Supp. 2d 624 (E.D. Pa. 2001)...........................44

*In re Century Business Services Securities Litigation*, No. 1:99-CV-02200, 2002 WL 32254513 (N.D. Ohio June 27, 2002) .................................................................41

*In re Cigna Corp. Securities Litigation*, No. 02-8088, 2005 WL 3536212 (E.D. Pa. Dec. 23, 2005)....................................................................................................28

*In re Digital Island Securities Litigation*, 357 F.3d 322 (3d Cir. 2004).................15, 43

Page(s)

*In re Discovery Labs Securities Litigation*, 276 Fed. Appx. 154 (3d Cir. 2008) ................... 15, 19

*In re Discovery Labs Securities Litigation*, No. 06-1820, 2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) ................................................................................................................................ 16

*Elam v. Neidorff*, 544 F.3d 921 (8th Cir. 2008) .......................................................................... 40

*Fener v. Belo Corp.*, 425 F. Supp. 2d 788 (N.D. Tex. 2006) ....................................................... 40

*In re First Union Securities Litigation*, 128 F. Supp. 2d 871 (W.D.N.C. 2001) ......................... 42

*Fishbaum v. Liz Claiborne, Inc.*, No. 98-9396, 1999 WL 568023 (2d Cir. July 27, 1999) .......... 40

*In re Gildan Activewear, Inc. Securities Litigation*, 636 F. Supp. 2d 261 (S.D.N.Y. 2009) ......... 42

*Globis Capital Partners, L.P. v. Stonepath Group, Inc.*, 241 Fed. Appx. 832 (3d Cir. 2007) .................................................................................................................................................. 15

*In re Great Atlantic & Pacific Tea Co., Inc. Securities Litigation*, 103 Fed. Appx. 465 (3d Cir. July 9, 2004) ................................................................................................................... 15

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) ............................... passim

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999) ............................................................. 18, 23

*Hemphill v. Meyerson*, 65 Fed. Appx. 776 (3d Cir. 2003) ......................................................... 15

*In re Immucor Inc. Securities Litigation*, No. 05-Civ.-2276, 2006 WL 3000133 (N.D. Ga. Oct. 4, 2006) ....................................................................................................................... 40

*Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) ........................... passim

*Key Equity Investors, Inc. v. Sel-Leb Marketing Inc.*, 246 Fed. Appx. 780 (3d Cir. 2007) .... 15, 19

*Klein v. Autek Corp.*, 147 Fed. Appx. 270 (3d Cir. 2005) .......................................................... 15

*Limantour v. Cray, Inc.*, 432 F. Supp. 2d 1129 (W.D. Wash. 2006) ........................................... 40

*In re Merck & Co., Inc. Securities Litigation*, 432 F.3d 261 (3d Cir. 2005) ..................... 15, 19, 22

*In re Milestone Scientific Securities Litigation*, 103 F. Supp. 2d 425 (D.N.J. 2000) ................... 38

*Morse v. Lower Merion School District*, 132 F.3d 902 (3d Cir. 1997) ........................................ 14

*In re NAHC, Inc. Securities Litigation*, 306 F.3d 1314 (3d Cir. 2002) ................................... 15, 16

*Nami v. Fauver*, 82 F.3d 63 (3d Cir. 1996) ............................................................................... 14

*Nelson v. Stahl*, 173 F. Supp. 2d 153 (S.D.N.Y. 2001) .............................................................. 16

*In re Nutrisystem, Inc. Securities Litigation*, No. 07-4215, 2009 WL 2776481 (E.D. Pa. Aug. 31, 2009) ............................................................................................19, 22, 40

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ................................................................passim

*Osher v. JSI Corp.*, 302 F. Supp. 2d 1145 (S.D. Cal. 2003) ................................................39

*In re Party City Securities Litigation*, 147 F. Supp. 2d 282 (D.N.J. 2001) ......................42

*Payne v. Deluca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006) ....................................................18

*Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.*, 998 F.2d 1192 (3d Cir. 1993) ..............................................................................................16

*In re RockefellerCenter Properties, Inc. Securities Litigation*, 184 F.3d 280 (3d Cir. 1999) ................................................................................................................16

*In re Rockefeller Center Properites, Inc. Securities Litigation*, 311 F.3d 198 (3d Cir. 2002) ..................................................................................................................15

*In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970 (9th Cir. 1999) ............39

*Steinhardt Group, Inc. v. Citicorp*, No. 96-15-SLR, 1996 WL 790097 (D. Del. Dec. 2, 1996) ..........................................................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ..............................passim

*Western Pennsylvania Electrical Employees Pension Trust v. Plexus Corp.*, No. 07C0582, 2009 WL 604276 (E.D. Wis. Mar. 6, 2009) ..........................................21

*Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102 (N.D. Cal. 2003) ....................40

*Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007) ..............................................15

*In re Yukos Oil Co. Securities Litigation*, No. 04-CV-5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ..............................................................................................17, 33

**STATUTES**

15 U.S.C. § 78j(b) ........................................................................................................13, 17

15 U.S.C. § 78u-4(b) ....................................................................................................13, 28

15 U.S.C. § 78u-5(c) ..................................................................................................3, 22, 23

15 U.S.C. § 78u-5(d) ..........................................................................................................27

15 U.S.C. § 78u-5(e) ..........................................................................................................19

**Page(s)**

15 U.S.C. § 78u-5(i) ..............................................................................20, 21, 27

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-5 .........................................................................passim

17 C.F.R. § 240.12b–2(1) ............................................................................ 8

17 C.F.R. § 249.308a (a)(1) .......................................................................... 8

17 C.F.R. § 249.310(b)(2) ............................................................................. 8

H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 ................................ 14

Mike Cudd, Rakesh Duggal, & Salil Sarkar, *Share Repurchase Motives and Stock Market Reaction* 35 Quarterly Journal of Business and Economcis (1996) .......................................43

Defendants Kenexa Corporation, Nooruddin S. Karsan, and Donald Volk (collectively "defendants"), by their attorneys, hereby submit this memorandum of law in support of their motion to dismiss Lead Plaintiff Building Trades United Pension Fund's Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b).

## I.    INTRODUCTION[1]

Kenexa Corporation ("Kenexa" or "the Company"), headquartered in Wayne, Pennsylvania, provides human resources software and services that help organizations recruit and retain their employees more effectively. Kenexa commenced operations in 1987, and after becoming a publicly-held company in June 2005, issued press releases to announce its quarterly and year-end financial results. In each such "earnings release," the Company also shared its forecast – or "guidance" – for the following quarter's revenue. For eight consecutive quarters – through the second quarter of 2007, Kenexa's actual revenue met or exceeded its revenue forecasts.[2] In the third quarter of 2007, however, one of the Company's clients asked to be released from the last half of its five-year employment process outsourcing ("EPO") contract[3] for reasons specific to that client's business, and Kenexa accommodated the client's request. In addition, certain sales in the EPO and assessments[4] segments of Kenexa's business that the

---

[1]    The Factual Background, Section II below, describes the events outlined in this Introduction in more detail, providing citations to the Amended Complaint and documents the Court may consider on a motion to dismiss. *See infra* Sections II & III.C.

[2]    *See infra* Section II.E.

[3]    "Kenexa's EPO services gives its clients the option of using Kenexa to outsource certain aspects of the client's staffing operations and recruiting campaigns, including the sourcing, recruiting, screening, assessment and on-boarding of employees." (Am. Compl. ¶ 5.)

[4]    "Assessments are used by companies to select and retain employees based on factors such as an employee's experience, skills, abilities and personality." (Am. Compl. ¶ 4.)

Company expected to close in the third quarter, did not close, due to a lengthening of EPO sales cycles and weak sales management in the Company's newly-acquired U.K. assessments business. These events occurred in the third quarter and had a negative effect on the Company's third quarter revenue and its projections for its annual revenue; they were neither knowable nor disclosable at any time prior to the third quarter. On November 7, 2007, when Kenexa announced its financial results for the third quarter, it promptly and accurately reported that these events negatively impacted the Company's revenue, which came in at $46.8 million for the quarter – under Kenexa's guidance of $48 to $50 million, and required that Kenexa lower its revenue forecasts for the entire year to $181.5-$182.5 million (from $188-$192 million).[5] The next day, the price of Kenexa's stock fell from $27.84 to $16.61.[6]

Consistent with its financial performance before the third quarter of 2007, Kenexa has met or exceeded its quarterly revenue guidance in every quarter since.[7] Despite this successful performance, the instant putative securities class action, filed on June 11, 2009, asserts the implausible claim that Kenexa's one-time revenue "miss" was not the result of unexpected events occurring in the third quarter, as the Company reported, but rather the product of a fraudulent scheme devised by defendants for the purpose of deceiving Kenexa's shareholders. Bereft of any factual support, the Amended Complaint, filed by Lead Plaintiff Building Trades United Pension Fund ("plaintiff") on October 26, 2009, fails to state a claim of securities fraud and should be dismissed on two separate and independent grounds.

---

[5] *See infra* Section II.E.4.

[6] *See* Am. Compl. ¶ 28; Exh. 35, Kenexa Historical Stock Prices.

[7] *See* Section II.E.

First, the *only* statements made by defendants that plaintiff contends are fraudulent are Kenexa's May 8 and August 8, 2007 revenue forecasts and predictions of economic performance for the third quarter and full year of 2007.[8]  Because all of these "forward-looking" statements qualify for protection under the "safe harbor" provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-5(c), defendants are immune from any federal securities fraud liability as a matter of law.

Second, the Amended Complaint fails to adequately plead scienter on the part of any defendant, an essential element of a Rule 10(b)-5 claim.  In attempting to plead scienter and avoid the PSLRA's safe harbor for forward-looking statements, plaintiff makes the conclusory assertion that defendants had "actual knowledge" that their revenue forecasts and predictions would not materialize.  Yet, the Amended Complaint does not point to one contemporaneous fact that would support these contentions.  Nor do plaintiff's bare allegations that the individual defendants sold stock during the putative Class Period (May 8, 2007-November 7, 2007) suggest a fraudulent motive.  Indeed, when properly viewed in its entirety – along with the documents contained in defendants' Appendix that the Court may consider when deciding this motion[9] –the Amended Complaint actually supports the opposite inference, *i.e.*, that defendants had a reasonable basis for their third quarter and full year revenue forecasts and that they acted at all times with a nonfraudulent intent.

---

[8] Although the Amended Complaint quotes many statements and portions of statements attributed to defendants during the six-month putative Class Period (*see generally* Am. Compl.), plaintiff does not claim that defendants misrepresented any of the financial results the Company achieved in the first half of 2007.  Nor does plaintiff contend that defendants provided false financial forecasts for the second quarter of 2007; indeed, plaintiff can make no such claim as Kenexa met its revenue forecast for that quarter. *See infra* Sections II.E; IV.A.2.

[9] *See infra* Section III.C

## II.    FACTUAL BACKGROUND[10]

### A.    Kenexa's Business:  General Overview

Kenexa is a Pennsylvania corporation headquartered in Wayne, Pennsylvania. (*See, e.g.,* Exh. 1, 2006 Form 10-K at 4.)  It commenced operations in 1987, and on June 29, 2005, became a publicly-held company by completing an initial public offering ("IPO").  (*See, e.g.,* Exh. 1, 2006 Form 10-K at 4, 40; Am. Compl. ¶¶ 3, 32.)

Kenexa operates in the human resources (or "human capital") management industry by providing companies and other organizations with software, services and proprietary content to enable them to more effectively recruit and retain their employees.  (*See, e.g.,* Exh. 1, 2006 Form 10-K at 3; Am. Compl. ¶ 1.)  The Company's human resources solutions are built around a suite of easily configurable software applications that automate best practices for the processes of talent acquisition[11] and employee performance management.[12]  (Exh. 1, 2006 Form 10-K at 3, 10-13.)  Kenexa's solutions enable clients "to improve the effectiveness of their talent acquisition programs, increase employee productivity and retention, measure key [human resource] metrics and make their talent acquisition and employee performance management programs more efficient."  (Exh. 1, 2006 Form 10-K at 3; Am. Compl. ¶ 2.)

---

[10] This Factual Background is drawn from the Amended Complaint's factual allegations, which are accepted as true solely for purposes of this motion, and from documents contained in the accompanying Appendix, which materials, as explained *infra* Section III.C, the court may consider when deciding defendants' motion to dismiss.

[11] "Talent acquisition" is the sourcing, recruiting, screening and assessment of employees. (Exh. 1, 2006 Form 10-K at 5; *see also* Am. Compl. ¶ 2.) Kenexa's talent acquisition solutions are comprised of two major components:  (1) an applicant tracking system, which automates and streamlines the recruiting process; and (2) testing and assessment solutions, which ensure that candidates have the desired knowledge, skills, behavior and experience necessary to be successful in the desired position.  (*See* Exh. 1, 2006 Form 10-K (filed March 16, 2007) at 8; Am. Compl. ¶ 2.)

[12] "Employee performance management" is the "systematic process by which an organization tracks, monitors and optimizes employee behavior and productivity, and evaluates performance through employee reviews, appraisals and business metrics." (Exh. 1, 2006 Form 10-K at 5; *see also* Am. Compl. ¶ 2.)

**B.    Kenexa's Employment Process Outsourcing ("EPO") Services**

In concert with its talent acquisition and employee performance management solutions, Kenexa provides "employment process outsourcing" or "EPO" services.[13]  When utilizing the Company's EPO services, the client can outsource to Kenexa certain aspects of its staffing operations and recruiting campaigns, such as the sourcing, recruiting, screening, assessment and onboarding[14] of employees.  (Exh. 1, 2006 Form 10-K at 13; Am. Compl. ¶ 5.)  While most of the Company's EPO contracts involve multi-year terms and multi-million dollars in revenue, EPO is actually the smallest component of Kenexa's business and accounts for approximately 15%-20% of Kenexa's total revenue.  (Exh. 33, 11/07/07 Conf. Call Tr. at 3, 14; Am. Compl. ¶ 5.)

**C.    Kenexa's EPO Contract With "Client B"**

In 2005, Kenexa and one of its EPO clients, a biotech company (hereinafter referred to as "Client B")[15] entered into an amendment to their prior EPO agreement, pursuant to which Client B agreed to outsource to Kenexa certain of its on-site and off-site recruitment and staffing operations for a five-year period – April 15, 2005-April 15, 2010.  (*See* Exh. 36, Contract Amend. No. 2 ¶ 1, App. A-2 ¶ 7.)  Client B agreed to pay a subscription fee each month for each Kenexa employee ("resource") assigned to its account.  (*See* Exh. 36, Contract Amend

---

[13] Kenexa currently refers to its employment process outsourcing services as "recruitment process outsourcing" or "RPO" services.

[14] "Onboarding" involves making sure new employees receive, through training and socialization, the information they need to be effective in their jobs.  (Exh. 40, Anne Herman, Ph.D., *Onboarding New Employees: An Opportunity to Build Long-Term Productivity and Retention*, Kenexa Research Institute (2009), *at* http://www.kenexa.com/getattachment/385cbc05-19f9-4fbb-bc36-c5512ade7132/Onboarding-New-Employees-An-Opportunity-to-Build-.aspx.)

[15] Kenexa is contractually bound not to publicly disclose the identity of Client B or any of the financial terms of its EPO contract with Client B, and, therefore, this information has been redacted from the excerpts of the contract appended hereto as Exhibit 36.  Should the Court so order, defendants will file under seal an unredacted copy of the contract.

No. 2, App. A-2 ¶¶ 1, 7.) The amount of these fees varied depending upon the resource's function. (Exh. 36, Contract Amend. No. 2, App. B-2, ¶ 1.)

Under the terms of the contract, Client B could terminate the agreement "for convenience" *only* if it provided Kenexa with *written* notice ninety (90) days prior to April 15, 2008. (Exh. 36,.Contract Amend. No. 2 ¶ 1 (emphasis added).) The contract further provided that both Kenexa and Client B had the right to terminate "a specific Resource assigned to the [Client B] account for any reason, provided the terminating party complie[d] with the [applicable] *written* notice periods." (Exh. 36, Contract Amend. No. 2, App. A-2 ¶ 7 (emphasis added).) The written notice periods applicable to this provision were sixty (60) or ninety (90) days depending upon the resource's function. (Exh. 36, Contract Amend. No. 2, App. A-2 ¶ 7 (emphasis added).) The contract required Client B to pay the subscription fee for any terminated resource until the end of the sixty-day or ninety-day notice period. (Exh. 36, Contract Amend. No. 2, App. B-2 ¶ 1.)

On May 25, 2007, Client B and Kenexa amended their contract, retroactively effective January 1, 2007, in order to expand the geographic scope of their EPO contract to include Client B's operations in Puerto Rico. (*See* Exh. 36, Contract Amend. No. 4 (w/o exhs.) (executed in May 2007).) In June 2007, they expanded the scope of the contract, retroactively effective May 7, 2007, to include employee survey services. (*See* Contract Amend. No. 5 (w/o appendix) (executed in June 2007).

### D.    Kenexa's Revenue Sources:  Subscription And Other

Kenexa derives its revenue primarily from two sources:  (1) subscription revenue for solutions, which includes both (a) subscription fees from clients accessing the Company's on-demand software, consulting services, outsourcing (EPO) services and proprietary content, and (b) support revenue from clients purchasing additional support that is not included in the basic

subscription fee; and (2) other fees for professional services, translation services and reimbursed out-of-pocket expenses. (*See, e.g.*, Exh. 1, 2006 Form 10-K at 42-43, 45; Am. Compl. ¶ 2.)

Kenexa recognizes subscription revenue on a monthly basis over the lives of the contracts. It recognizes revenue when all of the following conditions are met: There is persuasive evidence of an arrangement; the service has been provided to the client; the collection of the fees is probable; and the amount of fees to be paid by the client is fixed or determinable. (Exh. 1, 2006 Form 10-K at 45.) When sold with subscription and support offerings, discrete professional services are accounted for separately since these services have value to the client on a stand-alone basis and there is objective and reliable evidence of fair value of the delivered elements. Revenues from professional services are recognized as the services are rendered. (Exh. 1, 2006 Form 10-K at 45-46.)

That Kenexa recognized revenue in its 2007 financial statements in accordance with GAAP is evidenced by Kenexa's independent, outside auditors' unqualified – or "clean" – opinion, (Exh. 2, 2006 Form 10-K at 98), which certifies that the Company's financial statements fairly presented the Company's financial position in conformity with GAAP.[16]

**E.    Kenexa's Periodic Reporting Of Financial Results**

Since going public on June 29, 2005, Kenexa has filed periodic reports with the SEC, including annual reports on Form 10-K and quarterly reports on Form 10-Q, and, in connection with those reports, issued press releases announcing its financial results for the periods in question ("earnings releases"). During the putative Class Period, Kenexa filed each of

---

[16] *See* Exh. 38, American Institute Of Certified Public Accountants Glossary Of Terms, Acronyms, And Abbreviations (Dec. 2009), *at* http://www.aicpa.org/download/mediacenter/AICPA_Glossary.pdf (defining and "unqualified opinion" as "[a]n auditor's opinion which states that the financial statements present fairly, in all material respects, financial position, results of operations, cash flows in conformity with generally accepted accounting principles.")

its quarterly reports on Form 10-Q within forty (40) days after the end of the fiscal quarter,[17] and

issued an earnings release announcing its financial results for the quarter a day or two before

filing its Form 10-Q with the SEC.[18]  On the same day it issued an earnings release, the

Company also hosted an earnings conference call – open to the public as well as to investment

analysts – during which Kenexa CEO, Rudy Karsan, and CFO, Don Volk, discussed the

Company's financial results.[19]

       In each earnings release and during each earnings conference call, Kenexa

provided its revenue and other forecasts for the next quarter and the full year.  Both before and

after the third quarter of 2007, Kenexa consistently met or exceeded its quarterly revenue

forecasts or "guidance."[20]

---

[17] Beginning with its Form 10-K for fiscal 2006, Kenexa has been subject to the shorter periodic report filing deadlines that apply to "accelerated filers."  Therefore, the Company's deadline for filing its quarterly report on Form 10-Q is forty (40) days after the end of the first three fiscal quarters, and its deadline for filing its annual report on Form 10-K is seventy-five (75) days after the end of the fiscal year.  *See* 17 C.F.R. §§ 240.12b–2 (1), 249.308a (a)(1), 249.310(b)(2).  As was pointed out during the comment period when the SEC was considering shortening the deadline for the quarterly report to thirty (30) days, it generally takes forty days after the end of a quarter for a company to the close its books for the quarter and conduct the review and analysis required for making a complete and accurate Form 10-Q report and earnings announcement.  (*See, e.g.,* Exh. 39, Letter from Amy A. Ripepi, Chair, AICPA SEC Regulations Committee, to Jonathan G. Katz, Secretary, SEC (May 23, 2002), *available at* http://www.sec.gov/rules/proposed/s70802/aaripepil.htm (delineating tasks public companies must complete after quarter end before filing a Form 10-Q).

[18] For example, Kenexa filed its Form 10-Q for the first fiscal quarter of 2007 on May 10, 2007 – within forty days after the quarter ended on March 31, 2007.  Two days earlier, on May 8, 2007, the Company issued its earnings release announcing its financial results for that quarter.  (*See* Exh. 18, 05/08/07 Press Release; Exh. 3, 1Q 2007 Form 10-Q.)

[19] *See, e.g.,* 04/05/07 Press Release (announcing date of first quarter earnings release and conference call).

[20] *See* Exh. 10, 08/08/05 Press Release (projected for 3Q 2005: $16.2 to $16.7 million); Exh. 11, 11/01/05 Press Release (actual for 3Q 2005: $17.2 million; projected for 4Q 2005: $17.2 to $17.8 million); Exh. 12, 02/07/06 Press Release (actual for 4Q 2005: $18.1 million; projected for 1Q 2006: $21.3 to $21.7 million); Exh. 13, 05/01/06 Press Release (actual for 1Q 2006: $23 million; projected for 2Q 2006: $23.5 to $24 million); Exh. 14, 08/01/06 Press Release (actual for 2Q 2006: $24.7 million; projected for 3Q 2006: $25.5 to $26 million); Exh. 15, 11/01/06 Press Release (actual for 3Q 2006: $28 million; projected for 4Q 2006: $28.9 to $29.3 million); Exh. 16, 02/14/07 Press Release (actual for 4Q 2006: $36.4 million; projected for 1Q 2007: $40.6 to $41.7 million); Exh. 18, 05/08/07 Press Release (actual for 1Q 2007: $42.2 million; projected for 2Q 2007: $43 to 44.9 million); Exh. 19, 06/08/07 Press Release (revised projected for 2Q 2007: $43.6 to $45.5 million); Exh. 20, 08/08/07 Press Release (actual for 2Q 2007: $45.2; projected for 3Q 2007: $48 to $50 million); Exh. 21, 11/07/07 Press Release (projected for 4Q 2007: $47.3 to $48.3 million); Exh. 22, 02/07/08 Press Release (actual for 4Q 2007: $47.7 million; projected for 1Q
(continued...)

### 1.     May 8, 2007 Earnings Announcement And Guidance

On May 8, 2007 – the first day of the putative Class Period – Kenexa announced its financial results for the first quarter of 2007 ended March 31, 2007 in an earnings release and during an earnings conference call later the same day.  Kenexa reported, *inter alia*, that its total revenue for the first quarter was $42.2 million, which exceeded the Company's forecast of $40.6 to $41.7 million; and that its first quarter subscription revenue was $34.7 million, which also exceeded Kenexa's forecast of $33 to $34 million.[21]  (*See* Exh. 18, 05/08/07 Press Release; Exh. 31, 05/08/07 Conf. Call Tr. at 4; Am. Compl. ¶¶ 6, 60.)  Kenexa also shared its revenue forecasts for the second quarter ended June 30, 2007, and for the full year.  The Company predicted that its second quarter total revenue would be in the range of $43.0 to $44.9 million and that its second quarter subscription revenue would be $34.9 to $35.9 million.  For the full year, Kenexa stated that it expected total revenue to be $186 million to $189 million, and subscription revenue to be $149 to $152 million.  (Exh. 18, 05/08/07 Press Release; Exh. 31, 05/08/07 Conf. Call Tr. at 6; Am. Compl. ¶¶ 6, 7, 61.)

During the May 8 earnings call, Mr. Volk discussed Kenexa's methodology for estimating the Company's "organic growth" rate, *e.g.*, the rate at which the Company is expanding as a result of increased sales, output or both, as opposed to its acquisition of other

---

(continued...)

2008: $48.2 to $49.2 million); Exh. 23, 05/12/08 Press Release (actual for 1Q 2008: $48.2 million; projected for 2Q 2008: $56 to $57 million); Exh. 24, 08/04/08 Press Release (actual for 2Q 2008: $56.4 million; projected for 3Q 2008: $57 to $59 million); Exh. 25, 09/10/08 Press Release (revised projected for 3Q 2008: $54 to $56 million); Exh. 26, 11/03/08 Press Release (actual for 3Q 2008: $54 million; projected for 4Q 2008: $45 to $47 million); Exh. 27, 02/11/09 Press Release (actual for 4Q 2008: $45.1 million; projected for 1Q 2009: $38 to $41 million); Exh. 28 05/11/09 Press Release (actual for 1Q 2009 $38.8 million; projected for 2Q 2009: $36 to $39 million); Exh. 29, 08/04/09 Press Release (actual for 2Q 2009 $39.5 million; projected for 3Q 2009: $37 to $40 million); Exh. 30, 11/03/09 Press Release (actual for 3Q 2009: $40.3million).

[21] *Compare* Exh. 18, 05/08/07 Press Release *with* Exh. 16, 02/14/07 Press Release.

businesses.[22]  Mr. Volk explained that Kenexa's organic growth rate is determined by subtracting

the revenue "run rate"[23] of companies it had acquired in the past year from the Company's total

revenue from the prior quarter:

> Taking a look at the numbers, our first quarter total revenue came
> in at $42.2 million, an increase of 83% year-over-year and above
> the high end of our guidance.  Similar to our presentation last
> quarter, if we were to subtract $11.2 million from our first quarter
> revenue, the revenue run rate of companies at the time we acquired
> them in the past year, we'd estimate that Kenexa's organic revenue
> growth would have been approximately 35% on a year-over-year
> basis.

(Exh. 31, 05/08/07 Conf. Call Tr. at 2; see also Exh. 32, 08/08/07 Conf. Call at 2, 14 (explaining

calculation Company uses for estimating its organic growth).)

### 2.    June 8, 2007 Updated Guidance

On June 8, 2007, Kenexa issued a press release, announcing its acquisition of

StraightSource, a provider of EPO services, and updating its revenue guidance for the second

quarter ended June 30, 2007 to reflect the expected impact from the acquisition.  (Exh. 19,

06/08/07 Press Release; Am. Compl. ¶¶ 21.)  The Company advised:

> The financial results of StraightSource will be consolidated into
> Kenexa's overall results beginning in the last month of the second
> quarter 2007.  As a result, the Company is updating its second
> quarter guidance to reflect the expected impact from the
> acquisition.  ***The Company now expects revenue to be $43.6 to
> $45.5 million, an increase of $600,000 compared to its original
> guidance of $43.0 to $44.9 million.***

(Exh. 19, 06/08/07 Press Release (emphasis added).)[24]

---

[22] *See* Investopedia.com, http://www.investopedia.com/terms/o/organicgrowth.asp (last visited Dec. 14, 2009) (defining organic growth as "[t]he growth rate that a company can achieve by increasing output and enhancing sales" and as "exclud[ing] any profits or growth acquired from takeovers, acquisitions or mergers").

[23] "Run rate" is "[h]ow the financial performance of a company would look if you were to extrapolate current results out over a certain period of time."  Investopedia.com, http://www.investopedia.com/terms/r/runrate.asp) (last visited Dec. 14, 2009).

### 3.    August 8, 2007 Earnings Announcement And Guidance

In an August 8, 2007 earnings announcement, and during an earnings conference call later that day, Kenexa announced, *inter alia*, that its total revenue for the second quarter ended June 30, 2007 was $45.2 million, which met Kenexa's forecast of $43.6 to $45.5 million; and that its second quarter subscription revenue was $37.0 million, which exceeded Kenexa's forecast of $34.9 to $35.9 million.[25]  (Exh. 20, 08/08/07 Press Release; Exh. 32, 08/08/07 Conf. Call Tr. at 5; Am. Compl. ¶ 70.)  The Company also predicted that its total revenue for the third quarter ended September 30, 2007 would be $48 to $50 million; and that its subscription revenue for the quarter would be $38.4 to $40 million.  Kenexa's forecast for the full year included total revenue in the $188 million to $192 million range and subscription revenue in the $150 to $153 million range.  (Exh. 20, 08/08/07 Press Release; Exh. 32, 08/08/07 Conf. Call at 7; Am. Compl. ¶¶ 22, 71.)

### 4.    November 7, 2007 Earnings Announcement

On November 7, 2007 – the last day of the Class Period – Kenexa announced that its total revenue for the third quarter that ended September 30, 2007 came in at $46.8 million, which was lower than the Company's $48-$50 million guidance, and that its subscription revenue was $38.2 million, just under its forecast of $38.4 to $40 million.[26]  (Exh. 21, 11/07/07 Press Release; Exh. 33, 11/07/07 Conf. Call Tr. at 6; Am. Compl. ¶¶ 25, 86.)  Kenexa also revised its revenue guidance for the full year, lowering it from the $188 million to $192 million

---

(continued...)

[24] Plaintiff does not allege that any of the statements contained in Kenexa's June 8, 2007 Press Release are false and misleading.

[25] *Compare* Exh. 20, 08/08/07 Press Release *with* Exh. 18, 05/08/07 Press Release.

[26] *Compare* Exh. 21, 11/07/07 Press Release *with* Exh. 20, 08/08/07 Press Release.

range to the $181.5 to $182.5 million range.  (Exh. 21, 11/07/07 Press Release; Exh. 33, 11/07/07 Conf. Call Tr. at 7; Am. Compl. ¶¶ 25, 86.)

In its earnings release and during its earnings conference call, Kenexa explained that three events impacted Kenexa's top line performance in third quarter of 2007.

First, Client B faced a company-specific issue which eliminated the need for Kenexa's EPO services, and the Company agreed to relieve the client of its contractual commitments.  (Exh. 21, 11/07/07 Press Release; Exh. 33, 11/07/07 Conf. Call Tr. at 3.)  This cancelled contract had a $1.5 million impact on Kenexa's third quarter revenue, and a $3 million impact on its full year revenue.  (Exh. 33, 11/07/07 Conf. Call Tr. at 9, 10, 20.)

Second, Kenexa's revenue forecast for the third quarter was also based upon the assumption that a particular EPO deal would close in the third quarter, but it did not happen.  (Exh. 33, 11/07/07 Conf. Call Tr. at 10.)  Had Kenexa booked that EPO deal, its third quarter revenue would have been $500,000 to $1 million higher.  (Exh. 33, 11/07/07 Conf. Call Tr. at 10.)

Third, Kenexa's revenue forecasts for the third quarter had assumed that certain consulting arrangements in its European assessments business would close during the third quarter, but they did not.  (Exh. 33, 11/07/07 Conf. Call Tr. at 10.)  Had these arrangements closed, they would have increased Kenexa's third quarter revenue by approximately $500,000 to $1 million.  (Exh. 33, 11/07/07 Conf. Call Tr. at 10.)

## III.    APPLICABLE PLEADING STANDARDS

Because plaintiff's Amended Complaint seeks relief for alleged federal securities fraud under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated by the Securities and Exchange Commission ("SEC"), the Court must determine, not only whether plaintiff's allegations state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), but also whether the averments comply with the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b) (2007), which has replaced Rule 9(b) as the pleading standard for private Rule 10b-5 actions. *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). Both Rule 12(b)(6) and the PSLRA require that the Court "'consider the complaint in its entirety, as well as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Avaya*, 564 F.3d at 252 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

### A.    Complaints Whose Factual Allegations Fail To Raise A Right To Relief Above The Speculative Level Must Be Dismissed Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[27] Thus, factual allegations that fail "to raise a right to relief above the speculative level" or merely state a "conceivable" claim will not suffice. *Id.* And though a court must accept as true a complaint's well-pleaded factual allegations and draw all reasonable

---

[27] *See also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1953 (2009) (confirming that pleading standards delineated in *Twombly* apply to all civil actions).

inferences therefrom in the light most favorable to the plaintiff, *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996), it need not give credence to "bald assertions" or "legal conclusions," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997), or "sweeping legal conclusions in the form of actual allegations," *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997).

### B.    The PSLRA Mandates The Dismissal Of Complaints That Fail To Comply With Its Heightened Pleading Requirements

All complaints seeking relief under the federal securities laws must satisfy the PSLRA's "stringent" pleading requirements, which were intended by Congress to "curtail the filing of meritless lawsuits." H.R. Conf. Rep. No. 104-369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740. *See, e.g.*, *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 1999) (citing H.R. Conf. Rep. No. 104-369, at 28 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 748) (noting the PSLRA is designed to limit: "(1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys.").

Specifically, the PSLRA imposes on plaintiff asserting securities law violations "two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, the complaint must "'specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity.'" *Id.* at 252-53 (quoting *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must, "'with respect to each act or omission alleged to violate this chapter, state with

-14-

particularity facts giving rise to a strong inference that the defendant acted with required state of mind.'" *Id.* at 253 (quoting 15 U.S.C. § 78u-4(b)(2)). For Rule 10b-5 actions, the required state of mind is scienter – "the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976), and citing 15 U.S.C. § 78u-4(b)(1), (2) (2007)).[28]

Where, as here, a complaint fails to comply with the PSLRA's heightened pleading requirements, "the court ***shall***, on the motion of any defendant, dismiss the complaint . . ." 15 U.S.C. § 78u-4(b)(3)(A) (2007) (emphasis added). Indeed, the Third Circuit has consistently upheld the dismissal of federal securities fraud claims that fail to meet the PSLRA's heightened pleading requirements.[29]

**C.    When Deciding A Motion To Dismiss Under Rule 12(b)(6) And The PSLRA, A Court May Consider Documents That Are Integral To The Complaint And Matters Of Which It May Take Judicial Notice**

In assessing whether a Rule 10b-5 complaint complies with the PSLRA's pleading requirements, a court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

---

[28] Although the "with particularity" language of the PSLRA "echoes precisely Fed. R. Civ. P. 9(b) and therefore requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story," the PSLRA's standard for pleading scienter "marks a sharp break with Rule 9(b)," as the plaintiff must plead the defendant's state of mind, *i.e.*, scienter, "with particularity" and not "generally." *Avaya*, 564 F.3d at 253 (quotation marks and internal citations omitted.) *See infra* Section IV.B for a more detailed discussion of the PSLRA's heightened requirements for pleading scienter.

[29] *See Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009); *In re Discovery Labs Sec. Litig.*, 276 Fed.Appx. 154 (3d Cir. 2008); *Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007). *Key Equity Investors, Inc. v. Sel-Leb Mktg. Inc.*, 246 Fed. Appx. 780 (3d Cir. 2007); *Globis Capital Partners, L.P. v. Stonepath Group, Inc.*, 241 Fed. Appx. 832 (3d Cir. 2007); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005); *Klein v. Autek Corp.*, 147 Fed. Appx. 270 (3d Cir. 2005); *Cal. Public Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004); *In re Great Atl. & Pac. Tea Co., Inc. Sec. Litig.*, 103 Fed. Appx. 465 (3d Cir. July 9, 2004); *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004); *GSC Partners CDO Fund v. Wash.*, 368 F.3d 228 (3d Cir. 2004); *In re Digital Island Sec. Litig.*, 357 F.3d 322 (3d Cir. 2004); *Hemphill v. Meyerson*, 65 Fed. Appx. 776 (3d Cir. 2003); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198 (3d Cir. 2002); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997).

documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Accordingly, when deciding a motion to dismiss a Rule 10b-5 complaint, a court may consider any "document[s] integral to or explicitly relied upon in the complaint" without converting the motion into a motion for summary judgment. *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (citations omitted). The Court also may consider other publicly available documents, such as the full text of a defendant company's SEC filings, press releases, investor conference call transcripts, newspaper articles and stock price data not specifically referenced in the complaint. *See, e.g., In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (reviewing three separate categories of documents: (1) documents relied upon in the complaint (company SEC filings and press releases); (2) documents filed with the SEC, but not relied upon in the complaint; and (3) stock price data compiled by the Dow Jones news service); *Cal. Public Employees' Ret. Sys. v. Chubb Corp.*, No. 00-4285, 2002 WL 33934282, at *12-13 (D.N.J. June 26, 2002) (taking judicial notice of news articles and transcripts of investor conference calls); *In re Discovery Labs Sec. Litig.*, No. 06-1820, 2006 WL 3227767, at *8 n.12, *10 n.21, and *12 (E.D. Pa. Nov. 1, 2006) (taking judicial notice of news articles, press releases, and investor conference call transcripts).

In addition, a court may consider a contract or agreement if it is referenced or relied upon in the complaint. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (allowing consideration of contract between defendant and third party); *see also Nelson v. Stahl*, 173 F. Supp. 2d 153, 159 (S.D.N.Y. 2001) (finding stockholders agreement and LLC agreements, which were referenced in the complaint, integral to the complaint and reviewable at the motion to dismiss stage); *Steinhardt Group, Inc. v. Citicorp*, No.

96-15-SLR, 1996 WL 790097, at *2 n.1 (D. Del. Dec. 2, 1996) (considering contractual

documents on motion to dismiss where documents were integral to plaintiffs' claims).

Finally, "[t]he Court need not accept as true any allegations that are contradicted

by documents deemed to be part of the complaint, or materials amenable to judicial notice." *In re*

*Yukos Oil Co. Sec. Litig.*, No. 04-CV-5243, 2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006).

## IV.    ARGUMENT

To state a claim under Section 10(b)[30] and Rule 10b-5,[31] a plaintiff must allege

that the defendant "(1) made a misstatement or omission of material fact (2) with scienter (3) in

connection with the purchase or sale of a security (4) upon which the plaintiff[] reasonably relied

and (5) the plaintiff['s] reliance was the proximate cause of their injury." *GSC Partners CDO*

*Fund v. Wash.*, 368 F.3d 228, 236 (3d Cir. 2004).  The failure to adequately plead any one of

these essential elements necessarily precludes a securities fraud claim. *See In re Advanta Corp.*

*Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 1999).

Here, plaintiff has failed to plead two of the essential elements of its Rule 10b-5

claim against defendants.  First, all of the statements plaintiff has challenged are "forward-

looking" and protected under the PSLRA safe harbor; therefore, plaintiff has failed to allege a

misstatement or omission of material fact.  Second, plaintiff's allegations do not meet the

PSLRA's heightened standards for pleading a strong inference of scienter.  For each of these

separate and independent reasons, plaintiff's Amended Complaint must be dismissed.

---

[30] Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ."  15 U.S.C. § 78j(b).

[31] Under Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

A.    **Plaintiff's Amended Complaint Fails To State A Rule 10b-5 Claim Because Defendants Are Immune From Liability Under The PSLRA's Safe Harbor**

1.    **The PSLRA Requires That Courts Dismiss Claims Based On Forward-Looking Statements That Meet The Safe Harbor Criteria**

To encourage public companies to disclose their own assessment of their future potential without fear of liability should their predictions turn out to be inaccurate, Congress included in the PSLRA a "safe harbor" for forward-looking information. *See Payne v. Deluca*, 433 F. Supp. 2d 547, 560 (W.D. Pa. 2006) (quoting H.R. Conf. Rep. No. 104-369, at 43 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 742 (1995)). *See also Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999) ("Congress enacted the safe-harbor provision in order to loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company.") This safe harbor "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009).[32] Thus, statements meeting any of these

---

[32] Under the safe harbor, a reporting company and its officers, directors and employees may not, as a matter of law, be held liable for any prediction or other forward-looking statement which later prove to be inaccurate *if*:

(1) The forward-looking statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" (15 U.S.C. § 78u-5(c)(1)(A)(i)); *or*

(2) The forward-looking statement is "immaterial" (15 U.S.C. § 78u-5(c)(1)(A)(ii)); *or*

(3) The plaintiff fails to prove the forward-looking statement was made, or approved by an executive officer of the company, with actual knowledge that the statement was false or misleading. (15 U.S.C. § 78u-5(c)(1)(B)).

(continued...)

-18-

criteria, as a matter of law, cannot support a Rule 10b-5 claim, and the complaint, to the extent it is based on any such statements must be dismissed. *See* 15 U.S.C.A. § 78u-5(e) ("On any motion to dismiss based upon subsection (c)(1), the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant.").

In accordance with the PSLRA's mandate, the Third Circuit has consistently upheld the dismissal of Rule 10b-5 claims that are based on forward-looking statements protected by the safe harbor. *See Avaya*, 564 F.3d at 257-58; *In re Discovery Labs. Sec. Litig.*, 276 Fed. Appx. 154, 155 (3d Cir. 2008); *Key Equity Investors, Inc. v. Sel-Leb Mktg. Inc.*, 246 Fed. Appx. 780, 785-86 (3d Cir. 2007); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005); *GSC Partners*, 368 F.3d at 242-43; *Advanta*, 180 F.3d at 536. Thus, following Third Circuit precedent, courts in this District routinely dismiss claims based on forward-looking statements. *See, e.g., In re Nutrisystem, Inc. Sec. Litig.*, No. 07-4215, 2009 WL 2776481, at *16 (E.D. Pa. Aug. 31, 2009); *In re Aetna, Inc. Sec. Litig.*, No. 07-4451, 2009 WL 1619636, at *24-27 (E.D. Pa. June 9, 2009).

### 2. Because Defendants' Statements Qualify For Safe Harbor Immunity As A Matter Of Law, Plaintiff's Claims Must Be Dismissed

Although the Amended Complaint quotes many statements and portions of statements attributed to defendants during the six-month putative Class Period (*see generally* Am. Compl.), plaintiff does not claim that defendants misrepresented any of the financial results the Company achieved in the first half of 2007. Nor does plaintiff contend that defendants

---

(continued...)

*See Avaya*, 564 F.3d at 254 n.18.

provided false financial forecasts for the second quarter of 2007; indeed, as explained in Section II.E., *supra*, Kenexa met its revenue forecast for that quarter.  Instead, plaintiff's Rule 10b-5 claims are based solely on statements made by defendants on May 8, 2007 and August 8, 2007 regarding Kenexa's revenue forecasts and future economic performance for the third quarter and full year of 2007.  (*See, e.g.,* Am. Compl. ¶¶ 67, 81.)[33]  Because each such statement qualifies for safe-harbor protection, defendants are immune from liability and plaintiff's claims must be dismissed.

(a)    <strong>The Statements At Issue Are All Forward-Looking</strong>

The PSLRA's safe harbor defines the term "forward-looking statement" to include, *inter alia*, the following categories of statements:

> (A) a statement containing a ***projection of revenues***, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> . . . . .
>
> (C) a statement of ***future economic performance***, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the ***assumptions*** underlying or relating to any statement described in subparagraph (A) . . . or (C).

15 U.S.C.A. § 78u-5(i)(1)(A), (C), (D) (emphasis added).

---

[33] Plaintiff does not allege that any of the statements contained in Kenexa's June 8, 2007 were false and misleading.  Nor is plaintiff's claim against defendants based upon any of the statements by investment analysts that are referenced in the Amended Complaint.  (*See* Am. Compl. ¶¶ 67, 81 (delineating bases for claim that statements made by defendants on May 8 and August 8, 2007 are allegedly false and misleading).)

Plaintiff's principal claim is that defendants' May 8 and August 8, 2007 statements containing Kenexa's revenue projections for the third quarter and full year[34] violate Rule 10b-5.[35]  Yet, each of these statements is indisputably forward-looking – by definition – under the PSLRA. 15 U.S.C.A. § 78u-5(i)(1)(A).

Plaintiff also challenges defendants' statements containing Kenexa's estimates of its organic revenue growth rate,[36] as well as their statements of belief that Kenexa's revenues for the remainder of the year were "highly visible."[37]  All such statements are predictions of Kenexa's "future economic performance," however, and therefore are deemed forward-looking under the PSLRA.  15 U.S.C.A. § 78u-5(i)(1)(C).  Defendants' discussions of the assumptions underlying and relating to these statements are considered forward-looking as well.  15 U.S.C.A. § 78u-5(i)(1)(D).  *See W. Pa. Elec. Employees Pension Trust v. Plexus Corp.*, No. 07C0582, 2009 WL 604276, at *8 (E.D. Wis. Mar. 6, 2009) (holding that the statement – "Looking to the full year, the strength of new programs won over the last few quarters, coupled with improved *visibility* for end market demand, suggests that our revenue growth will approach 20% *organic growth* for the year" – is forward-looking because it contains the assumptions underlying the corporate defendant's projections, plans and predictions) (emphasis added).[38]

---

[34] *See supra* Section II.E.1, II.E.3 (delineating May 8 and August 8 statements containing revenue projections)..

[35] Am. Compl. ¶ 61 (quoting Exh. 18, 05/08/07 Press Release); ¶ 62 (quoting Exh. 31, 05/08/07 Conf. Call Tr. at 4, 5); ¶ 71 (quoting Exh.20, 08/08/07 Press Release); ¶ 72 (quoting Exh. 32, 08/08/07 Conf. Call Tr. at 2, 5, 7).

[36] *See* Am. Compl. ¶¶ 7, 9, 17, 21, 23, 24, 27, 29, 64, 65, 67(c), 70, 74, 77, 78, 81(c), 96, 104; *see also* Exh. 31, 05/08/07 Conf. Call Tr. at 2, 7, 15-16; Exh. 32, 08/08/07 Conf. Call Tr. at 2, 14, 15, 17, 18-19, 22, 23.

[37] *See* Am. Compl. ¶¶ 7, 9, 16, 17, 67(c), 72, 81(c), 96; *see also* Exh. 31, 05/08/07 Conf. Call Tr. at 4; Exh. 32, 08/08/07 Conf. Call Tr. at 5, 11.

[38] In addition, defendants' optimistic statements about Kenexa's "highly visible" revenue and "really, really solid" organic growth (*see, e.g.*, Am. Compl. ¶ 62 (quoting Exh. 31, 05/08/07 Conf. Call Tr. at 4); ¶ 72 (quoting Exh. 32, 08/08/07 Conf. Call Tr. at 5); ¶ 23 (quoting Exh. 32, 08/08/07 Conf. Call Tr. at 18)) are immaterial vague
(continued...)

**(b)**  **Defendants' Forward-Looking Statements Were Identified As Such And Accompanied By Meaningful Cautionary Language**

As explained above, forward-looking statements qualify for protection under the PSLRA's safe harbor so long as they are identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). Specifically, "[t]he cautionary language should be directly related to the alleged misrepresentations, but it does not have to actually accompany the alleged misrepresentation." *GSC Partners*, 368 F.3d at 243 n.3 (citations and internal quotation marks omitted).  Therefore, a company's earnings releases and conference calls may incorporate by reference cautionary language contained in its SEC filings.  *See, e.g.*, *Avaya*, 564 F.3d at 257 (finding that cautionary statements contained in corporate defendant's Form 10-Q, which were cross-referenced in defendant's conference calls and press releases, were sufficiently extensive and specific); *Merck*, 432 F.3d at 273 n.11 (finding that "[t]he cautionary language was sufficient because the press release incorporated by reference the cautionary statements in Merck's 2000 Form 10-K . . . ."); *Nutrisystem*, 2009 WL 2776481, at *14 ("Cautionary language must be related to the forward-looking statements but need not actually accompany them.").

---

(continued...)

expressions of corporate optimism and, therefore, are not actionable under Rule 10b-5 for this separate and independent reason. *See, e.g., Advanta*, 180 F.3d at 538 ("vague and general statements of optimism 'constitute no more than 'puffery' and are understood by reasonable investors as such.'  Such statements, *even if arguably misleading*, do not give rise to a federal securities claim because they are not material: there is no 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'") (emphasis added); *see also* 15 U.S.C. § 78u-5(c)(1)(A)(ii) (immunizing forward-looking statements that are immaterial).

Moreover, while the cautionary language "must be extensive and specific," *Avaya,* 564 F.3d at 257, a company need not warn against every possible risk or provide "a listing of all factors," *Ivax,* 182 F.3d at 807. As Congress explained, a "failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor." *Id.* (quoting H.R.Rep. No. 104-369, at 44).

Here, all of defendants' May 8 and August 8, 2007 projections and predictions, described *supra* Section IV.A.2.a, were identified as "forward-looking" and accompanied by meaningful cautionary language. Kenexa's May 8 and August 8 earnings releases both explained that the revenue projections contained in the release were "forward looking" under the PSLRA:

> This press release includes certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to, plans, objectives, expectations and intentions and other statements contained in this press release that are not historical facts and statements identified by words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates" or words of similar meaning. These statements may concern, among other things, guidance as to future revenue and earnings, operations, expected benefits from the BrassRing transaction, prospects of the business generally, intellectual property and the development of products.

(Exh. 18, 05/08/07 Press Release; Exh. 20, 08/08/07 Press Release.)

Each press release also contained the following meaningful cautionary language, "identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," 15 U.S.C. § 78u-5(c)(1)(A)(i):

> These statements are based on our current beliefs or expectations and are inherently subject to various risks and uncertainties, including those set forth under the caption "Risk Factors" in Kenexa's most recent Annual Report on Form 10-K as filed with

> the Securities and Exchange Commission and as revised or
> supplemented by Kenexa's quarterly reports on Form 10-Q.
> Actual results may differ materially from these expectations due to
> changes in global political, economic, business, competitive,
> market and regulatory factors, Kenexa's ability to implement
> business and acquisition strategies or to complete or integrate
> acquisitions (including BrassRing).

(Exh. 18, 05/08/07 Press Release; Exh. 20, 08/08/07 Press Release.)

Similarly, at the beginning of the May 8 and August 8, 2007 earnings conference calls, Mr. Volk advised participants that the conference call would contain forward-looking statements:

> Before we begin, let me remind you that this presentation may
> contain forward-looking statements that are subject to risks and
> uncertainties associated with the company's business. These
> statements may concern, among other things, guidance as to future
> revenues and earnings, operations, transactions, prospect,
> intellectual property and the development of products.

(Exh. 31, 05/08/07 Conf. Call. Tr. at 2; Exh. 32 08/08/07 Conf. Call Tr. at 2.)

Mr. Volk also cautioned that "[a]dditional information that may affect the company's business and financial prospects, as well as factors that would cause Kenexa's actual performance to vary from our current expectations is available in the company's filings with the Securities and Exchange Commission." (Exh. 31, 05/08/07 Conf. Call. Tr. at 2; Exh. 32 08/08/07 Conf. Call Tr. at 2.)

As permitted in the Third Circuit, *supra*, the cautionary language provided in Kenexa's May 8 and August 8 earnings releases and conference calls also incorporated by reference the detailed list of risk factors contained in the Company's 2006 Annual Report on Form 10-K ("2006 Form 10-K" or "Form 10-K"), filed with the SEC on March 16, 2007. The "Risk Factors" section of the 2006 Form 10-K specifically warned investors that Kenexa "operate[d] in a market environment that involves significant risks, many of which are beyond

[its] control," and identified some of the risk factors that "may adversely impact [the Company's] results of operations, cash flows and the market price of [its] common stock. (Exh. 1, 2006 Form 10-K at 20.)[39]

The cautionary language contained in Kenexa's 2006 Form 10-K was "extensive and specific" and "directly related" to the alleged defects in defendants' revenue projections. *GSC Partners*, 368 F.3d at 243 n.3. Plaintiff claims that defendants' revenue forecasts were false and misleading because they did not take into account the risk that Client B would cancel its EPO contract. (*See* Am. Compl. ¶ 67 (a), ¶ 81 (a).) Yet, Kenexa's Form 10-K specifically warned investors that if the Company's "clients terminate their agreements, fail[ed] to renew their agreements, renew their agreements upon less favorable terms to [Kenexa] or fail[ed] to purchase new solutions from [the Company], [its] revenue may decline or [the Company's] future revenue growth may be constrained." (Exh. 1, 2006 Form 10-K at 20.) Kenexa further cautioned that its "clients ha[d] the right to terminate their contracts under certain circumstances and [were] not obligated to renew their subscriptions for [the Company's] solutions after the expiration of the initial terms of their subscription agreements." (*Id.* at 20-21.) Thus, Kenexa's cautionary language is sufficiently meaningful under the PSLRA's safe harbor because it is "substantive, extensive and tailored to the future-looking statements they reference." *Avaya*, 564 F.3d at 258 (citation and internal quotation marks omitted).

Plaintiff also contends that defendants' revenue projections and future organic growth estimates violated Rule 10b-5 because they allegedly were "unachievable due to lengthening in the EPO sales cycles and weakness in the Company's international assessments

---

[39] These risk factors were incorporated by reference in Kenexa's quarterly financial reports filed with the SEC on Form 10-Q. (*See, e.g.*, Exh. 3, 1Q 2007 Form 10-Q at 30; Exh. 4, 2Q 2007 Form 10-Q at 31.)

sales." (Am. Compl. ¶ 67 (c), ¶ 81 (c).) Kenexa's 2006 Form 10-K specifically warned of these risks:

> **Our financial performance may be difficult to forecast as a result of our focus on large clients and the long sales cycle associated with our solutions.**
>
> Our sales cycles are generally up to nine months and in some cases even longer. *This long sales cycle impedes our ability to accurately forecast the timing of sales in a given period which could adversely affect our ability to meet our forecasts for that period.* We focus our sales efforts principally on large organizations with complex talent acquisition and employee performance management requirements. Accordingly, in any single quarter the majority of our revenue from sales to new clients may be composed of large sales made to a relatively small number of clients. Our failure to close a sale in any particular quarter may impede revenue growth until the sale closes, if at all. As a result, substantial time and cost may be spent attempting to close a sale that may not be successful. The period between an initial sales contact and a contract signing is relatively long due to several factors, including:
>
> - the need to educate potential clients about the uses and benefits of our solutions and the on-demand delivery model;
>
> - the discretionary nature of our clients' purchase and budget cycles;
>
> - the competitive evaluation of our solutions;
>
> - fluctuations in the talent acquisition and employee performance management requirements of our prospective clients;
>
> - potential economic downturns and reductions in corporate IT spending;
>
> - [a]nnouncements or planned introductions of new products or services by us or our competitors; and
>
> - the lengthy purchasing approval processes of our prospective clients

(Exh. 1. 2006 Form 10-K at 24-25 (emphasis added).)

Because Kenexa's cautionary language is sufficiently "meaningful" under the PSLRA, defendants are immune from liability under Rule 10b-5.

> **(c)    Defendants Are Immune From Liability Under The Safe Harbor For The Separate And Independent Reason That Plaintiff Has Failed To Plead A Strong Inference That Defendants Acted With Actual Knowledge**

Even in the absence of meaningful cautionary language, a forward-looking statement is not actionable under Rule 10b-5 where, as here, the plaintiff's allegations fail to show that the defendant had "actual knowledge" that the statement, when made, was false or misleading. 15 U.S.C. § 78u-5(i)(1)(A); *see Avaya*, 564 F.3d at 274 (recognizing that liability for forward-looking statements "attaches only upon proof of knowing falsity"). As explained in Section IV.B.1, *infra*, plaintiff's conclusory assertions that defendants "knew" the alleged falsity of Kenexa's revenue forecasts for the third quarter and full year of 2007 (*see, e.g.,* Am. Compl. ¶¶ 9. 16-18, 93-97, 121, 122) fail to meet this actual knowledge standard, which is even stricter than the "recklessness" scienter pleading requirement for statements of current fact. *See Avaya*, 564 F.3d at 259 n.29, 274. Thus, defendants are immune from liability for their forward-looking statements on this separate and independent ground.

> **3.    Defendants Had No Duty To Update Their May 8 And August 8, 2007 Forward-Looking Statements**

Once a company or its officers have made a forward-looking statement, they have no duty to update it. 15 U.S.C.A. § 78u-5(d) ("Nothing in this section shall impose upon any person a duty to update a forward-looking statement."). Moreover, the Third Circuit has consistently held that that "the voluntary disclosure of an ordinary earnings forecast does not trigger any duty to update." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1433 (3d

Cir. 1997); *accord Advanta*, 180 F.3d at 536 (holding that the company had no duty to update a previously made forward-looking statement because it subsequently changed its business strategy); *In re Cigna Corp. Sec. Litig.*, No. 02-8088, 2005 WL 3536212, at *4 (E.D. Pa. Dec. 23, 2005) (holding that "the law does not impose a duty to update forward-looking statements such as earnings estimates with all relevant material information . . . .").

Equally well settled is the principle that companies are not obligated to update the public as to the state of the quarter in progress. *Burlington*, 114 F.3d at 1432; *see also Blum v. Semiconductor Packaging Materials Co. Inc.*, No. 97-7078, 1998 WL 254035, at *2 (E.D. Pa. May 5, 1998) (holding that the failure to update the public in a mid-quarter press release that fourth quarter earnings would be below expectations, while the fourth quarter remained in progress, cannot give rise to a cause of action for securities fraud).

Thus, even assuming, hypothetically, that Kenexa knew before the close of the third quarter of 2007 that it would not be able to meet its revenue forecast for that quarter, the Company had no duty to update its prior guidance. Indeed, Kenexa advised investors in its August 8, 2007 press release that the Company did "not undertake any obligation to update any forward-looking statements contained in [that] document as a result of new information, future events or otherwise." (Exh. 20, 08/08/07 Press Release.)

**B.** **The Amended Complaint Fails To Meet The PSLRA's Heightened Pleading Requirements For Alleging A Strong Inference Of Scienter**

The PSLRA requires that a Rule 10b-5 complaint "state with particularity facts giving rise to a strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2), which the Supreme Court has defined as the intention "'to deceive, manipulate, or defraud,'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)). When applied to alleged false statements of current fact, "[t]his scienter

standard requires plaintiffs to allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'" *Institutional Investors Group v. Avaya*, 564 F.3d 242, 267 (3d Cir. 2009)(quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534-35 (3d Cir. 1999)) (footnote omitted); *see also id.* at 274.[40]  Where, as here, the alleged false statements are forward-looking, a plaintiff must comply with the even stricter "actual knowledge" standard and plead facts supporting a strong inference of "***knowing*** falsity." *Id.* at 274 (emphasis added).[41]

To qualify as "strong" under the PSLRA, "an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  This pleading requirement "obliges courts to weigh the 'plausible nonculpable explanations for the defendant's conduct' against the 'inferences favoring the plaintiff.'" *Avaya*, 564 F.3d at 267 (quoting *Tellabs*, 551 U.S. at 324).  Accordingly, the court must ask: "when the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326.

> **1.    Plaintiff Has Failed To Plead A Strong Inference That Defendants Acted With Actual Knowledge That Their Revenue Forecasts And Predictions Were Allegedly False Or Misleading**

In the Amended Complaint, plaintiff posits three theories in support of its contention that defendants had "actual knowledge" that their revenue forecasts for the third quarter and full year of 2007 were allegedly false and misleading:  (1) that defendants allegedly ***knew*** before the third quarter of 2007 that Client B would ask to be relieved of its contractual

---

[40] The Supreme Court has not decided whether "recklessness" is sufficient to satisfy the scienter standard. *see Tellabs*, 551 U.S. at 319 n.3.

[41] As the Third Circuit explained in *Avaya*:  "[T]he scienter requirement for forward-looking statements is stricter than that for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." 564 F.3d at 274.

obligations; (2) that Kenexa's methodology for forecasting its EPO and assessments revenue for the third quarter and full year included sales that defendants allegedly *knew* would not close in the third quarter; and (3) that defendants allegedly *knew* that Kenexa allegedly failed to properly recognize revenue from its U.K. assessments sales according to U.S. GAAP. (*See* Am. Compl. ¶¶ 67, 81, 93-97, 121, 122.)[42]  Yet, none of plaintiff's theories supports a plausible inference, much less a cogent or compelling inference, that defendants had actual knowledge of the alleged falsity of Kenexa's revenue forecasts.  The only alleged "facts" plaintiff pleads in support of its theories are vague statements from eleven anonymous sources who allegedly once worked for Kenexa ("confidential witnesses"). (*See* Am. Compl. ¶¶ 46-59.)  *None* of the bits of information plaintiff received from these confidential witnesses, however, even when cobbled together, shows that defendants *actually knew* – as of either May 8 or August 8, 2007 – that Kenexa's revenue forecast for the full year of 2007 was unachievable, or that defendants *actually knew* – as of August 8, 2007 – that the Company's revenue for the third quarter would not meet its guidance.

> **(a)      The Amended Complaint Alleges No Facts Showing That, As Of Either May 8 Or August 8, 2007, Defendants Actually Knew Client B Would Seek To Terminate Its EPO Contract**

Plaintiff cites no "facts" in support of its assertion that defendants *knew* before the third quarter of 2007 that Client B would ask to be relieved of its contractual obligations.  At most, plaintiff has averred that, based on information received from CW1, CW2 and CW3, Kenexa reduced the number of its employees assigned to Client B's account during the first and

---

[12] Not only is plaintiff required to plead a strong inference of "actual knowledge" instead of "recklessness," its Amended Complaint does not purport to plead facts showing that defendants acted "recklessly." (*See generally* Am. Compl.)  In the event that plaintiff attempts to argue in its opposition brief that its mere insertion of the boilerplate phrase "or recklessly disregarded" in the boilerplate allegations of the Amended Complaint (*see*, e.g., Am. Compl. ¶ 92), defendants reserve the right to address that argument in their reply brief.

second quarters of 2007. (Am. Compl. ¶¶ 47-50.) Yet, the fact that Kenexa met both its first

quarter and second quarter revenue guidance shows that the Company properly included those

staff reductions in its forecasts. (*See supra* Section II.C.) Moreover, nothing in the Amended

Complaint – not even the vague statement by Mr. Karsan that "we know first hand what pains

our customers are going through" (Exh. 33, 11/07/07 Conf. Call. Tr. at 3, *cited in* Am. Compl.

¶¶ 67(a), 81(a)) upon which plaintiff so heavily relies – shows that defendants had any reason to

believe that the staff reductions in the first half of 2007 would be permanent or that Client B

would seek to terminate the agreement altogether. Indeed, *none* of the confidential witnesses

who allegedly had some familiarity with the Client B account (CW1, CW2, CW3, CW4) claims

to have *any* knowledge of communications between Client B and Kenexa at the executive level

regarding their contract, much less any knowledge of whether Client B ever gave the ninety-day

written notice it was contractually required to provide if it intended to terminate the agreement.

(*See supra* Section II.C.) Furthermore, not one of plaintiff's confidential witnesses had

responsibility for forecasting revenue for the Client B account at any time during his or her

employment with Kenexa.

The implausibility of plaintiff's claim that defendants *knew* Client B would ask to

cancel its contract with Kenexa is further demonstrated by the fact that, in late May and again in

June 2007 – *after* most of the staff reductions referenced by CW1, CW2 and CW3 had taken

place – Client B *expanded* the scope of EPO services it received from Kenexa to include Client

B's Puerto Rico operations and the receipt of Kenexa's employee survey services. (*See supra*

Section II.C.) Indeed, Client B did not even publicly announce that it planned to reduce its own

headcount until August 15, 2007, which was *after* Kenexa issued its third quarter guidance. (*See*

Exh. 37, Client B's 08/15/07 Press Release (w/client identifying information redacted).)

Finally, even if – hypothetically speaking – defendants somehow had been clairvoyant and "knew" in advance of the third quarter of 2007 that Client B would attempt to terminate its EPO agreement during that quarter, such alleged knowledge, alone, is not sufficient to show that defendants also "knew" what, if any, impact that cancellation would have on the Company's third quarter or full year revenue.  If, for example, defendants still believed the prospective EPO and assessments deals would close in the third quarter, then defendants would not necessarily have expected that a cancellation of Client B's EPO contract, by itself, would cause Kenexa to miss its revenue guidance.  Indeed, plaintiff has alleged no facts suggesting that defendants even knew before Kenexa closed its books for the third quarter in October 2007[43] what impact the cancelled EPO contract would have on the Company's revenue for the third quarter and full year.[44]

> **(b)** **The Amended Complaint Alleges No Facts Showing Defendants Actually Knew That, As Of May 8 Or August 8, 2007, Prospective EPO And Assessments Deals That Were Included In Kenexa's Revenue For The Third Year And Full Year Of 2007 Would Not Close In Those Time Periods**

Plaintiff claims that Kenexa's methodology for forecasting its third quarter and full year revenue from EPO and assessments sales was unreasonable because the Company included in its forecasts sales that had not yet closed.  But as explained by plaintiff's own Confidential Witnesses (CW8 and CW9), Kenexa utilized the *same* forecasting methodology in quarters when the Company met or exceeded its revenue forecasts, both before and after the third quarter of 2007.  (*See* Am. Compl. ¶¶ 56-57; *see also supra* Section II.E.)  Moreover, neither

---

[43] *See supra* III.E & n.17.

[44] As explained *supra* Section II.A.3, even assuming *arguendo* that defendants learned before the close of the third quarter that Kenexa would not meet its revenue guidance, they had no legal duty to update the Company's prior guidance in any event.

CW8 or CW9 claims to have any knowledge of *specific* deals that allegedly were inappropriately included in the Company's forecasts. Nor do any of the confidential witnesses (CW5, CW6, CW7, CW8, CW9) who claim to have some familiarity with Kenexa's sales forecasting process profess to have information showing that defendants "knew" at the time they gave Kenexa's revenue guidance that one or more of the prospective EPO and assessments deals included in the forecasts would not, in fact, close in the third quarter.

> ### (c)    Plaintiff's Speculative Theory That Kenexa's U.K. Assessments Sales Forecasts Were Not Based On U.S. GAAP Principles Contradicts Public Record Facts And Should Be Disregarded

Plaintiff's theory that Kenexa failed to properly recognize revenue from its U.K. assessments sales according to U.S. GAAP is utterly belied by the Amended Complaint when viewed in its entirety. Kenexa acquired its U.K. assessments business when it acquired the assessments company, Psychometric Services Limited ("PSL"), in November 2006. As plaintiff admits, revenue from this new business was consolidated with Kenexa's financial statements no later than the first quarter of 2007. (Am. Compl. ¶ 20.) Yet, plaintiff does not (and cannot) claim that the Company improperly recognized any of its revenue in either the first or second quarter. Indeed, Kenexa's outside, independent auditors issued a "clean" opinion on the Company's 2007 financial statements,[45] and at no time has Kenexa ever restated any of those financial statements. Thus, the fact that Kenexa's actual revenue in the first half of 2007, which complied with GAAP, *met* the Company's revenue forecasts undermines plaintiff's groundless speculation that Kenexa's projections of U.K. assessments revenue were not based on GAAP. Because plaintiff's allegations contradict public record facts, they should be disregarded. *In re*

---

[45] *See infra* Section II.D (explaining that Kenexa's independent, outside auditors certified that Kenexa's 2007 financial statements fairly presented the Company's financial position in conformity with GAAP).

*Yukos Oil Co. Sec. Litig.*, No. 04-CV-5243, 2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006) ("The Court need not accept as true any allegations that are contradicted by documents deemed to be part of the complaint, or materials amenable to judicial notice.").

Furthermore, the alleged statements of CW10 and CW11 that Kenexa did not apply GAAP in its revenue forecasts for the U.K. assessments business are completely unreliable. As Mr. Karsan explained during the November 7, 2007 earnings conference call, weak sales management in the Company's U.K. assessments business contributed to the revenue miss. To correct this problem, Kenexa made certain management changes, including the ultimate termination of both CW10 and CW11.[46]

### 2. Because The Individual Defendants' Stock Sales Were Not Unusual In Either Scope Or Timing They Cannot Support An Inference Of Scienter

Having failed to plead facts showing that defendants actually knew Kenexa would miss its revenue guidance in the third quarter of 2007, plaintiff attempts to fill this scienter void with allegations that individual defendants Rudy Karsan and Donald Volk sold some of their Kenexa stock during the putative Class Period. Yet, motive allegations, alone, are no longer sufficient for pleading a strong inference of scienter. *Avaya*, 564 F.3d at 277 (citing *Tellabs*, 551 U.S. at 324). Indeed, even where (unlike here) a plaintiff does allege facts suggesting a defendant's knowledge, additional allegations showing a plausible motive for fraud will not "bolster scienter" if the complaint, in its entirety, fails to support an inference that the defendant was "at least as likely as not to have acted on that motive and actually committed fraud." *Id.* at 278 (finding that the plaintiffs' motive allegations did not strengthen the inference of scienter).

---

[46] *See* Exh. 33, Conf. Call Tr. at 4, 12-13.

Furthermore, stock sales may support an inference of scienter only if such sales were "unusual in scope or timing." *Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000) (citing *Advanta*, 180 F.3d at 540). This is because "'[a] large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events.'" *Advanta*, 180 F.3d at 541 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997)). Therefore, to allege a plausible motive for fraud, a plaintiff must aver more than "'the mere fact that some officers sold stock'" during the putative class period. *Advanta*, 180 F.3d at 540 (quoting *Burlington*, 114 F.3d at 1424). Instead, a plaintiff "must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter." *Burlington*, 114 F.3d at 1424.

Plaintiff avers that, during the putative Class Period, individual defendant Rudy Karsan sold 189,900 shares of his Kenexa stock, and individual defendant Don Volk sold 20,000 shares. (*See* Am. Compl. ¶¶ 98-99.) Nowhere in its Amended Complaint, however, does plaintiff delineate Messrs. Karsan and Volk's stock trading patterns in periods prior to the Class Period; nor does plaintiff state the amount of the individual defendants' total holdings[47] at the beginning of the Class Period. Without such information, it is impossible to determine whether Messrs. Karsan's and Volk's stock sales during the Class Period were unusual in scope or timing. *See, e.g., In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 152 (3d Cir. 2004) (affirming dismissal and noting that complaint failed to allege that the sales of three individual defendants

---

[47] Total stock holdings includes common shares and stock options held by corporate executives. *See, e.g., Avaya*, 564 F.3d at 279 n.55 (noting total shares owned by individual defendants included, for scienter purposes, common shares owned, stock options held, shares due under deferred compensation plans, and shares due upon termination).

were unusual in scope as compared to their previous trading patterns or size of previous sales);

*Burlington*, 114 F.3d at 1423 (holding no inference of scienter where "for two of the officer-defendants . . . we do not even have information as to their total BCF stock holdings, and we therefore have even less of a basis to infer that their sales were unusual or suspicious.").

> **(a)    The Individual Defendants' Stock Sales During The Class Period Were Consistent With Their Previous Stock Sales**

The public record facts show that Mr. Karsan and Mr. Volk actually sold ***more*** shares of their Kenexa stock in time periods prior to the putative Class Period than they did during the Class Period.[48]  In March 2006 alone, Mr. Karsan sold more stock (200,000 shares) than he sold during the entire Class Period (189,000 shares).[49]  Additionally, on November 15, 2006, he entered into a Variable Prepaid Forward Contract to deliver up to 200,000 of his shares by November 15, 2011, the maturity date of the contract.[50]  Similarly, Mr. Volk sold 55,356 shares of his Kenexa stock during the eleven-month period between March 13, 2006 and February 2, 2007, which is nearly three-times the 20,000 shares of stock he sold during the six-month Class Period.[51]

Where, as here, a corporate officer sells similar amounts of his company stock "year-over-year," his stock sales during the alleged class period "do not marginally increase the

---

[48] The Amended Complaint misleadingly alleges that "during the entire year preceding the Class Period, Mr. Karsan made not one sale of Kenexa stock." (Am. Compl. ¶ 99.)

[49] *See* Exh. 34, Summary Chart of Stock Transactions (hereinafter "Summary Chart") at 1, 2; Exh. 6, Forms 3 and Forms 4 for Nooruddin S. Karsan (2005-2007) (hereinafter "Forms 4-Karsan").

[50] *See* Exh. 34, Summary Chart at 2 n.5; Exh. 6, Forms 4-Karsan.

[51] *See* Exh. 34, Summary Chart at 1, 3; Exh. 7, Forms 3 and Forms 4 for Donald F. Volk (hereinafter "Forms 4-Volk". In addition, Troy Kanter, a non-defendant officer, whose Class Period stock sales plaintiff inappropriately includes in the Amended Complaint, sold 116,792 shares of his Kenexa stock between March 13, 2006 and November 13, 2006, which is more than twice the 62,096 shares he sold during the Class Period. *See* Exh. 34, Summary Chart at 1, 3; Exh. 8, Forms 3 and Forms 4 for Troy A. Kanter (hereinafter "Forms 4-Kanter").

likelihood that [he] made knowingly false or misleading statements out of a desire for personal gain." *Avaya*, 564 F.3d at 279 (finding no plausible motive where, *inter alia*, individual defendants sold more stock in periods prior to class period); *accord Oran*, 226 F.3d at 290 (declining to infer fraudulent intent where "all seven of the defendants sold similar numbers of shares in the previous year."); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 435 (5th Cir. 2002) (pre-class period sales may support an inference that there was nothing unusual about a defendant's class period sales).

### (b)    The Individual Defendants Retained A Majority Of Their Kenexa Holdings

The Amended Complaint also fails to make any reference to the total number of shares and vested stock options held by Messrs. Karsan and Volk prior to the Class Period – providing the Court with no context for evaluating whether the scope of their sales during the Class Period were unusual or suspicious. This deficiency alone is fatal to plaintiff's motive allegations. *See Oran*, 226 F.3d at 289 (rejecting plaintiffs' scienter allegations based on alleged insider trading where the complaint did "not allege the total number of shares held by each of the officers . . . .").

Including this information in the Amended Complaint would not have saved plaintiff's motive allegations, however. As a matter of public record, Messrs. Karsan and Volk each retained a majority of their total Kenexa holdings,[52] which fact "weakens any inference of motive to commit fraud." *In re Astea Int'l Inc. Sec. Litig.*, No. 06-1467, 2007 WL 2306586, at

---

[52] Mr. Karsan retained 86% of his total Kenexa holdings by the end of the Class Period, and Mr. Volk retained 77% of his total holdings. *See* Exh. 34, Summary Chart at 1; Exh. 6, Forms 4-Karsan; Exh. 7, Forms 4-Volk.

*14 & n.19 (E.D. Pa. Aug. 9, 2007) (granting dismissal and noting that plaintiffs failed to include executives' total holdings in allegations of scienter).

The individual defendants' low aggregate sales and large retained aggregate holdings during the Class Period further defeat any finding of a "cogent" and "compelling" inference of scienter. At the beginning of the Class Period, Messrs. Karsan and Volk collectively held 1,513,554 shares and vested options of Kenexa stock. During the Class Period, they sold in the aggregate 209,900 shares of Kenexa stock. Thus, the individual defendants sold approximately 14% of their total holdings during the Class Period.[53] Far from supporting a "strong inference" that they had a motive to capitalize on artificially inflated stock prices, the individual defendants' aggregate retention of more than 86% of their Kenexa holdings actually negates any inference of scienter. *See, e.g., Avaya*, 564 F.3d at 279 (finding stock sales "do not marginally increase the likelihood" of fraud where each individual defendant retained a large percentage of his common stock holdings); *Advanta*, 180 F.3d at 540-41 (holding that where individual defendants retained a sizeable amount of the company's stock, "[f]ar from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, these facts suggest that they had every incentive to keep [the company] profitable.");[54] *Astea*, 2007 WL 2306586, at *14 (dismissing complaint and holding that "low aggregate sales and large retained aggregate holdings rebut an inference of motive, even where some defendants have sold

---

[53] Mr. Kanter also retained the great majority of his total holdings during the Class Period. He sold 62,096 shares and vested options during the Class Period while retaining over 77% of his total holdings. *See* Exh. 34, Summary Chart at 1; Exh. 8, Forms 4-Kanter.

[54] Furthermore, the Amended Complaint fails to mention that all of Mr. Volk's sales involved the exercise of stock options, which were part of each executive's compensation package. Exh. 34, Summary Chart at 3. The Third Circuit has recognized that it is expected, not unusual or suspicious, that individuals will trade securities accumulated as part of their compensation "in the normal course of events" and has declined to infer scienter where stock sale "proceeds were the result of accumulated stock options and were an intended part of [the defendant's] overall compensation package." *Advanta*, 180 F.3d at 541; *see also Astea*, 2007 WL 2306586, at *14; *In re Milestone Scientific Sec. Litig.*, 103 F. Supp. 2d 425, 471 (D.N.J. 2000).

significant percentages.") (quoting *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 315 (D.N.J. 2001)); *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 987-88 (9th Cir. 1999) (finding that individual defendants' sales of 43.6% and 75.3%, respectively, failed to give rise to a strong inference of scienter where defendants collectively retained 90% of their shares).

**(c)    The Amount Of Stock Sold By Each Individual Defendant Is Not Suspicious**

During the Class Period, Mr. Karsan sold less than 14% of his stock and Mr. Volk sold approximately 23% of his stock for an aggregate total of $6,914,432 million in proceeds[55], ***not profits***, during the Class Period.[56] The Third Circuit has held that sales of between 46.8% and 90.71% of the defendants' holdings were not shown to be other than "routine," and that $40 million in sales at a profit of $25 million were not shown to be unusual or suspicious and "do not demonstrate any concerted insider effort to dispose of shares during the [c]lass [p]eriod." *Oran*, 226 F.3d at 289-90; *see also Avaya*, 564 F.3d at 279 (finding no marginal increase in inference of scienter where individual defendants sold 1.7% and 17.7% of their holdings, respectively, for proceeds of $5,188,594); *Astea*, 2007 WL 2306586, at *14 and n.20 (finding individual sales of 5.6%, 18.9%, 20%, and 43.5% of company stock by company insiders "weakens any inference of motive to commit fraud"); *In re Cambrex Corp. Sec. Litig.*, No. 03-cv-4896, 2005 WL 2840336, at *10-11 (D.N.J. Oct. 27, 2005) (finding no inference of scienter based on accumulated sales of 47.22% of stock); *Osher v. JSI Corp.*, 302 F. Supp. 2d 1145, 1165-66 (S.D. Cal. 2003) (finding no motive based on sales of 98.8%, 98.4 %, and 85.44% of stock), *aff'd in*

---

[55] Proceeds equals the amounts received for the sale of stock minus the cost of stock options exercised. *See* Exh. 34, Summary Chart at 1.

[56] Likewise, Mr. Kanter's individual sales of 23% of his stock for approximately $2 million in proceeds, not profits, are not unusual in size or scope under Third Circuit jurisprudence. *See* Exh. 34, Summary Chart at 1.

*relevant part*, 183 Fed. Appx. 604 (9th Cir. May 12, 2006).  Here, the percentages sold were substantially less than those held insufficient in *Oran*.

> **(d)    The Majority Of The Individual Defendants' Stock Sales Were Made Pursuant To Pre-Scheduled Rule 10b5-1 Plans**

Rule 10b5-1 was promulgated by the SEC in 2000 to provide company executives and insiders with a means to plan future trades of shares in their company's stock without incurring insider-trading exposure. *See* 17 C.F.R. 240.10b5-1.  Rule 10b5-1 trading plans therefore "raise an inference in Defendants' favor that the sales may not be suspicious" and offer a more compelling exculpatory reason for the insiders' actions. *See Limantour v. Cray, Inc.*, 432 F. Supp.2d 1129, 1151 n.9 (W.D. Wash. 2006); *see also Avaya*, 564 F.3d at 279 (finding defendants' stock sales of 240,000 shares during the Class Period pursuant to Rule 10b5-1 trading plans did "not marginally increase the likelihood" of fraud); *In re Nutrisystem, Inc. Sec. Litig.*, No. 07-4215, 2009 WL 2776481, at *12 (E.D. Pa. Aug. 31, 2009) (finding plaintiffs' inference of scienter is not compelling and noting that each of defendants' stock sales was made pursuant to Rule 10b5-1 plans).[57]  Plaintiff's theory that the individual defendants' stock sales were driven by their desire to take advantage of alleged inside information is refuted by a stronger, non-culpable explanation for the sales: they were made at pre-arranged times and

---

[57] *See also Fishbaum v. Liz Claiborne, Inc.*, No. 98-9396, 1999 WL 568023, at *4 (2d Cir. July 27, 1999) (insider trades not unusual because, among other reasons, two defendants' stock sales were made pursuant to periodic divestment plans); *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) ("Rule 10b-5 plans can raise an inference that the sales were prescheduled and not suspicious); *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) (allowing fact that defendants sold shares under individual Rule 10b5-1 trading plans to "raise an inference that the sales were pre-scheduled and not suspicious."); *In re Immucor Inc. Sec. Litig.*, No. 05-Civ.-2276, 2006 WL 3000133, at *18 n.8 (N.D. Ga. Oct. 4, 2006) ("[T]he 10b5-1 plan here required [the defendant] to sell his stock at certain prescribed intervals and in certain prescribed amounts.  This, on its face, does not appear to be the kind of behavior evidencing that [the defendant] was trying to benefit personally from trades made based on inside information."); *Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 814 (N.D. Tex. 2006) (finding that stock sales pursuant to Rule 10b5-1 trading plan undercut strong inference of scienter).

amounts pursuant to Rule 10b5-1 trading plans. Specifically, all of Mr. Volk's sales and over 66% of Mr. Karsan's sales during the Class Period were made pursuant to such plans.[58]

### (e)    Stock Sales By Non-Defendant Troy Kanter Are Not Probative Of The Individual Defendants' Alleged Fraudulent Motive

Plaintiff attempts to bolster its motive allegations by pointing to stock sales made by Kenexa executive Troy Kanter during the Class Period. (Am. Compl. ¶¶ 98-99.) Because Mr. Kanter is not a named defendant in this action, however, his stock sales are not probative of whether the individual defendants had any fraudulent motive. *See, e.g., In re Century Bus. Servs. Sec. Litig.*, No. 1:99-CV-02200, 2002 WL 32254513, at *7 n.18 (N.D. Ohio June 27, 2002) ("As additional evidence of scienter, plaintiffs allege that vice-presidents Stout and Feighan sold 120,000 and 60,000 shares, respectively, on February 6, 1998 . . . and that vice-president Burdick sold 27,000 shares on August 13, 1998. Since these individuals are non-defendants under the Consolidated Complaint, however, the Court does not consider these sales probative of the defendants' scienter.").

Moreover, by cherry-picking the only other Kenexa officer who sold stock during the Class Period, plaintiff fails to mention that two of Kenexa's five officers did not sell any of their Company holdings during the Class Period.[59] In the Third Circuit, the fact that other insiders did not sell stock during the Class Period undercuts any inference of fraudulent motive on the part of the individual defendants. *See, e.g., Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (3d Cir. 1995) ("The fact that [other insiders] did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so they could

---

[58] *See* Exh. 34, Summary Chart at 1; Exh. 6, Forms 4-Karsan; Exh. 7, Forms 4- Volk.

[59] *See* Exh. 9, 2007 Proxy Statement.

sell their stock at a huge profit.'") (citations omitted); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271-72 (S.D.N.Y. 2009) (same); *In re First Union Sec. Litig.*, 128 F. Supp. 2d 871, 899 (W.D.N.C. 2001) ("[M]any key First Union executives not named as defendants . . . did not sell a single share. This fact alone is fatal to Plaintiffs' effort to establish scienter through stock sales.").

### (f)    The Timing Of The Individual Defendants' Stock Sales Is Neither Unusual Nor Suspicious

All of the stock shares sold by Mr. Volk, as well as the majority (67%) of the stock sold by Mr. Karsan, after the beginning of the Class Period, took place in May 2007[60] – during a quarter when Kenexa *met* its revenue forecast.[61] Mr. Karsan's post-May stock sales occurred pursuant to a Rule 10b5-1 plan that was set up in May 2007 as well.[62] In addition, all of Mr. Volk's May stock sales and a portion of Mr. Karsan's May stock sales took place pursuant to Rule 10b5-1 plans that were set up in February 2007 – three months before the Class Period. The earnings announcement that marks the end of the Class Period did not occur until November 7, 2007, and plaintiff has not alleged that defendants expected a drop in Kenexa's stock price in the first part of the Class Period. As courts in this Circuit have consistently recognized, such a "broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter." *Party City*, 147 F. Supp. 2d at 313 (concluding sales of three, four, twelve months before the disclosure of bad news to be too attenuated to draw an inference of scienter); *see also Astea*, 2007 WL 2306586, at *15 (holding that "a lapse of five months [after the sales] weakens the inference that the individual defendants were motivated to cash out

---

[60] *See* Exh. 34, Summary Chart at 1-3; Exh. 6, Forms 4- Karsan; Exh. 7, Forms 4-Volk.

[61] *See supra* Section II.E.

[62] *See* Exh. 34, Summary Chart at 1-2; Exh. 6, Forms 4-Karsan.

before the company disclosed its restatement."); *In re Audible, Inc., Sec. Litig.*, No.05-1027

(JAG), 2007 WL 4546823, at *2-3 (D.N.J. Dec. 19, 2007) (denying motion to reconsider earlier

dismissal of complaint and noting that stock sales that had been scheduled six months in advance

pursuant to Rule 10b5-1 plans were not in sufficiently "close proximity" to announcement to

support strong inference of scienter).

**********

In sum, plaintiff's allegations fail to plead a plausible motive for fraud, much less

bolster any inference of scienter. *See Avaya*, 564 F.3d at 277-78. Indeed, "it is just as

reasonable, if not more so, to infer that [defendants sold stock] when the company was doing

well in order to reap the rewards of their hard work, rather [than] inferring they sold their stock

options as part of scheme to defraud investors." *Audible*, 2007 WL 4546823, at *2 n.5; *see also*

*In re Digital Island Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004); *Astea*, 2007 WL

2306586, at *12.[63]

### C.    Plaintiff's Section 20(a) Claim Is Purely Derivative Of Plaintiff's Section 10(b) Claim And Must Be Dismissed

Plaintiff asserts a claim under Section 20(a) of the Exchange Act against Messrs.

Karsen and Volk. (Am. Compl. ¶¶ 126-29.) To maintain its claim under Section 20(a), plaintiff

must establish: (1) an underlying violation by a controlled person or entity; (2) that the

defendants are controlling persons; and (3) culpable participation in the fraud by the controlling

---

[63] Plaintiff's theory that defendants intentionally inflated Kenexa's stock price so that they could repurchase 2 million shares of the Company's stock after the stock price fell is equally unavailing and utterly implausible. (Am. Compl. ¶ 97.) First, plaintiff's theory does not suggest a viable (let alone unusual and suspicious) motive for the individual defendants to *inflate* the Company's stock price during the Class Period. It is the announcement of bad news, not good news, that can cause a stock price to drop. Second, stock repurchase programs are not initiated to "soften the blow" of a weak share price, as plaintiff suggests. Rather, multiple motivations may support any given stock repurchase program, including "dividend substitution", "leverage", "reissuing of stock", "wealth transfer" and "signaling management's favorable information not known to the market". Mike Cudd, Rakesh Duggal, & Salil Sarkar, *Share Repurchase Motives and Stock Market Reaction*, 35 Q.J. Bus. & Econ. 66, 67 (1996).

persons "'in some meaningful sense.'"  *See, e.g., In re CDNow, Inc. Sec. Litig.*, 138 F. Supp. 2d 624, 644 (E.D. Pa. 2001).

Claims asserted under Section 20(a) are purely derivative.  *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).  Therefore, absent an underlying violation of the securities laws, there can be no controlling person liability.  *Id.* at 280.   Because plaintiff has failed to prove a claim under Section 10(b), its derivative claim under Section 20(a) against Messrs.  Karsan and Volk must also fail.  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999) ("claims under Section 20(a) are derivative, requiring proof of a separate underlying violation of the Exchange Act.").

## V.    CONCLUSION

For all of the above reasons, plaintiff's Amended Complaint should be dismissed with prejudice.

Respectfully submitted,


 */s/ Robert L. Hickok*
Robert L. Hickok
Gay Parks Rainville
Thomas T. Watkinson, II
John L. Schweder, II
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103
(215) 981-4000

Attorneys for Defendants
Kenexa Corporation
Nooruddin S. Karsan
Donald Volk

Dated:  December 14, 2006

## CERTIFICATE OF SERVICE

I, Thomas T. Watkinson, II, hereby certify that on December 14, 2009, I caused true and correct copies of Defendants' Motion to Dismiss Amended Complaint, Memorandum of Law in Support, and Appendix to be served upon counsel for plaintiff as indicated below:

### VIA ECF & FEDERAL EXPRESS

Deborah R. Gross
LAW OFFICES BERNARD M. GROSS, P.C.
Suite 450, Wanamaker Building
Juniper and Market Streets
Philadelphia, PA 19107

-and-

Laura M. Andracchio
Jonah H. Goldstein
Maureen E. Mueller
COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101


*/s/ Thomas T. Watkinson, II*
Thomas T. Watkinson, II