UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BUILDING TRADES UNITED PENSION TRUST FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Civil Action No. 2:09-cv-02642-JS |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| | ) | PLAINTIFFS' OPPOSITION TO |
| vs. | ) ) | DEFENDANTS' MOTION TO DISMISS |
| KENEXA CORPORATION, et al., | ) ) | |
| Defendants. | ) ) ) | |
| | ) | |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF FACTS ..................................................................................6

III.   ARGUMENT ....................................................................................................12

    A.     Legal Standard for Motions to Dismiss under the PSLRA ....................................12

    B.     The Standard for Pleading Scienter .....................................................................13

        1.     Recklessness v. Actual Knowledge ........................................................13

        2.     Inference Drawing: Ties Go to the Plaintiff ................................................14

    C.     Plaintiffs Allege Both Forward-Looking and Non-Forward Looking
        Statements ........................................................................................................15

    D.     Plaintiffs Adequately Allege Falsity and Scienter for Defendants' *Non-
        Forward Looking* Statements ...............................................................................16

        1.     Karsan's and Volk's Knowledge of Client B's Problems, Declining
            Revenue and Cancellation of Its Contract Supports Falsity and a
            Strong Inference of Recklessness ..............................................................17

        2.     Defendants' Reliance on Heavily Redacted Extrinsic Evidence
            Outside the Pleadings Is Both Improper and Meritless ............................23

        3.     Defendants' Knowledge of Kenexa's GAAP Violations in
            Connection with Its U.K. Acquisition Support Falsity and Scienter ........27

        4.     Defendants' Knowledge of Slowdowns in EPO Sales and Risky
            Sales Cycle Practices Reinforces Falsity and Scienter ............................28

        5.     Defendants' Omission of Material Adverse Facts about Kenexa's
            Business Give Rise to Liability .................................................................30

        6.     Defendants' Statements Do Not Qualify as Immaterial "Puffery"............32

    E.     Plaintiffs Adequately Allege Falsity and Scienter for Defendants'
        Forward-Looking Statements...............................................................................36

        1.     Defendants Are Not Shielded from Liability by the PSLRA's Safe
            Harbor ......................................................................................................38

        2.     Defendants' Purported "Cautionary Language" Was Neither
            Specific nor Meaningful ............................................................................39

                                                                                        **Page**

        3.      Plaintiffs Allege Actual Knowledge of Adverse Facts that
                Rendered Their Forecasts Misleading .......................................................42

    F.  Defendants' Insider Selling Reinforces the Already Strong Inference of
        Scienter ........................................................................................................44

        1.      Insider Stock Sales During the Class Period Bolster Plaintiffs'
                Showing of a Strong Inference of Scienter .................................................44

        2.      The Insider Sales Are Unusual and Suspicious in Scope and
                Timing ........................................................................................................44

        3.      Trading Pursuant to a Rule 10b5-1 Trading Plan Does Not Negate
                a Strong Inference of Scienter ....................................................................47

    G.  Plaintiffs Adequately Allege Liability Under Section 20(a) .................................50

IV.  CONCLUSION ........................................................................................................50

479466_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*ABC Arbitrage v. Tchuruk*,
    291 F.3d 336 (5th Cir. 2002) ........................................................................20

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008).........................................................................14

*Adams v. Kinder-Morgan, Inc.*,
    340 F.3d 1083 (10th Cir. 2003) .................................................................22

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    No. 03-1519, 2007 U.S. Dist. LEXIS 5410
    (D.N.J. Jan. 22, 2007) ...............................................................................36

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002)..................................................................24, 28

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) .........................................................38, 41, 42

*Backe v. Novatel Wireless, Inc.*,
    642 F. Supp. 2d 1169 (S.D. Cal. 2009)......................................................49

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) .........................................................22, 32, 33

*Blum v. Semiconductor Packaging Materials Co.*,
    1998 U.S. Dist. LEXIS 6868
    (E.D. Pa. May 5, 1998) ..............................................................................32

*Cal. Pub. Emples. Ret. Sys. v. Chubb Corp.*,
    No. 00-4285, 2002 U.S. Dist. LEXIS 27189
    (D.N.J. June 25, 2002)
    *aff'd*, 394 F.3d 126 (3d. Cir. 2004).......................................................15, 20

*Casella v. Webb*,
    883 F.2d 805 (9th Cir. 1989) .....................................................................34

*Central Laborers' Pension Fund v. Integrated Elec. Servs.*,
    497 F.3d 546 (5th Cir. 2007) ................................................................47, 49

*Chiarella v. United States*,
    445 U.S. 222 (1980)...................................................................................31

**Page**

*Craftmatic Sec. Litig. v. Kraftsow*,
  890 F.2d 628 (3d Cir. 1989)..................................................................31, 33

*D'Aiuto v. City of Jersey City*,
  No. 06-6222 (JAG), 2007 U.S. Dist. LEXIS 57646
  (D.N.J. Aug. 8, 2007)..........................................................................16

*Eckstein v. Balcor Film Investors*,
  8 F.3d 1121 (7th Cir. 1993) .................................................................42

*EP Medsystems, Inc. v. EchoCath, Inc.*,
  235 F.3d 865 (3d Cir. 2000)..................................................................38

*Frank v. Dana Corp.*,
  547 F.3d 564 (6th Cir. 2008) ...............................................................14

*Freedom Med., Inc. v. Gillespie*,
  No. 06-3195, 2007 U.S. Dist. LEXIS 63720
  (E.D. Pa. Aug. 29, 2007).....................................................................26

*Gargiulo v. Demartino*,
  527 F. Supp. 2d 384 (E.D. Pa. 2007) ...................................................43

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004).................................................................40

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002).................................................................39

*Harvey M. Jasper Ret. Trust v. Ivax Corp.*,
  920 F. Supp. 1260 (S.D. Fla. 1995) .....................................................36

*Hayley v. Parker*,
  No. SA CV 01-69 DOC (EEx), 2001 U.S. Dist. LEXIS 23255
  (C.D. Cal. Aug. 31, 2001)....................................................................45

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) (*en banc*) ............................................ *passim*

*Hoxworth v. Blinder, Robinson & Co.*,
  903 F.2d 186 (3d Cir. 1990).................................................................34

*Huddleston v. Herman & MacLean*,
  640 F.2d 534 (5th Cir. 1981)
  *aff'd*, 459 U.S. 375 (1983) ...................................................................39

**Page**

*In re Able Labs. Sec. Litig.*,
  No. 05-2681 (JAG) 2008 U.S. Dist. LEXIS 23538
  (D.N.J. Mar. 24, 2008) ..................................................................................13, 36

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) .......................................................................34

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) ...........................................................35, 39, 43

*In re Aetna Inc. Sec. Litig.*,
  34 F. Supp. 2d 935 (E.D. Pa. 1999) .............................................................36

*In re Alpharma Sec. Litig*,
  372 F.3d 137 (3rd. Cir. 2004) .....................................................................24

*In re Amylin Pharms., Inc. Sec. Litig.*,
  No. 01cv1455 BTM (NLS), 2003 U.S. Dist. LEXIS 7667
  (S.D. Cal. May 1, 2003) ..............................................................................40

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) .........................................................15

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) .....................................................................37

*In re AT&T Corp. Sec. Litig.*,
  No. 00-5364 (GEB), 2002 U.S. Dist. LEXIS 22219
  (D.N.J. Jan. 30, 2002) ...........................................................................27, 33

*In re ATI Tech. Sec. Litig.*,
  No. 05-4414, 2007 U.S. Dist. LEXIS 57610
  (E.D. Pa. Aug. 8, 2007) ...............................................................................36

*In re Biogen Idec, Inc.*,
  No. 05-10400-WGY, 2007 U.S. Dist. LEXIS 98076
  (D. Mass. Oct. 25, 2007) ..............................................................................48

*In re BP Prudhoe Bay Royalty Trust Sec. Litig.*,
  No. C06-1505 MJP, 2007 U.S. Dist. LEXIS 83007
  (W.D. Wash. Oct. 26, 2007) .........................................................................38

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ............................................................. *passim*

**Page**

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) ........................................................................20

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) .........................................................22, 32

*In re Cardinal Health. Inc. Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ....................................................40, 48

*In re Cell Pathways, Inc.*, *Sec. Litig.*,
   No. 99-752, 2000 U.S. Dist. LEXIS 8584
   (E.D. Pa. June 21, 2000) .......................................................................15, 44

*In re Cendant Corp. Litig.*,
   60 F. Supp. 2d 354 (D.N.J. 1999) ...............................................................27

*In re CIGNA Corp Sec. Litig.*,
   2005 U.S. Dist. LEXIS 35524
   (E.D. Pa. Dec. 23, 2005) ...........................................................................32

*In re Countrywide Fin. Corp. Deriv. Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) .........................................................49

*In re Cray Inc. Deriv. Litig.*,
   431 F. Supp. 2d 1114 (W.D. Wash. 2006)......................................................48

*In re Daou Sys.*,
   411 F.3d 1006 (9th Cir. 2005) ...............................................................18, 20

*In re Discovery Labs. Sec. Litig.*,
   No. 06-1820, 2006 U.S. Dist. LEXIS 79823
   (E.D. Pa. Nov. 1, 2006).............................................................................40

*In re Fannie Mae Sec. Litig.*,
   503 F. Supp. 2d 25 (D.D.C. 2007) ...............................................................49

*In re Home Health Corp. of Am. Sec. Litig.*,
   No. 98-834, 1999 U.S. Dist. LEXIS 1230
   (E.D. Pa. Jan. 28, 1999) ...........................................................................32

*In re Honeywell Int'l Sec. Litig.*,
   182 F. Supp. 2d 414 (D.N.J. 2002) ..............................................................35

Page

*In re InfoSonics Corp. Deriv. Litig.*,
    No. 06cv1336 BTM (WMc), 2007 U.S. Dist. LEXIS 66043
    (S.D. Cal. Sept. 4, 2007) .................................................................48

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) .........................................28

*In re Lucent Techs., Inc. Sec. Litig.*,
    217 F. Supp. 2d 529 (D.N.J. 2002) ...................................17, 32, 35

*In re Merck & Co. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005).....................................................30, 36

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ..................................................42

*In re Nash Finch Co. Sec. Litig.*,
    502 F. Supp. 2d 861 (D. Minn. 2007).............................................42

*In re Omnivision Techs.*,
    No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009
    (N.D. Cal. July 29, 2005).................................................................45

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ....................................................48

*In re Par Pharm. Sec. Litig.*,
    No. 06-cv-3226 (PGS), 2009 U.S. Dist. LEXIS 90602
    (D.N.J. Sept. 30, 2009) ...............................................20, 21, 22, 36

*In re Penn Treaty Am. Corp. Sec. Litig.*,
    202 F. Supp. 2d 383 (E.D. Pa. 2002) .............................................35

*In re Providian Fin. Corp. Sec. Litig.*,
    152 F. Supp. 2d 814 (E.D. Pa. 2001) .............................................31

*In re Ravisent Techs., Inc. Sec. Litig.*,
    No. 00-CV-1014, 2004 U.S. Dist. LEXIS 13255
    (E.D. Pa. July 12, 2004)..................................................................12

*In re Reliance Sec. Litig.*,
    91 F. Supp. 2d 706 (D. Del. 2000)..................................................15

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)..............................................................30

- vii -

**Page**

*In re Secure Computing Corp. Sec. Litig.,*
    184 F. Supp. 2d 980 (N.D. Cal. 2001) ...........................................................................46

*In re SeeBeyond Techs. Corp. Sec. Litig.,*
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) .........................................................................45

*In re Suprema Specialties Inc. Sec. Litig.,*
    438 F.3d 256 (3d Cir. 2006)................................................................................ *passim*

*In re Time Warner Sec. Litig.,*
    9 F.3d 259 (2d. Cir. 1993).............................................................................................32

*In re U.S. Interactive, Inc. Sec. Litig.,*
    No. 01-CV-522, 2002 U.S. Dist. LEXIS 16009
    (E.D. Pa. Aug. 23, 2002)...............................................................................................35

*In re Unisys Corp. Sec. Litig.,*
    No. 99-5333, 2000 U.S. Dist. LEXIS 13500
    (E.D. Pa. Sept. 21, 2000) ..............................................................................................13

*In re UTStarcom, Inc. Sec. Litig.,*
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ..........................................................................48

*In re Veritas Software Corp. Sec. Litig.,*
    No. 04-831-SLR, 2006 U.S. Dist. LEXIS 32619
    (D. Del. May 23, 2006)...................................................................................27, 37, 43

*In re Viropharma, Inc., Sec. Litig.,*
    No. 02-1627, 2003 U.S. Dist. LEXIS 5623
    (E.D. Pa. Apr. 3, 2003) .................................................................................13, 14, 40, 42

*In re Westell Techs., Inc. Sec. Litig.,*
    No. 00C 6735, 2001 U.S. Dist. LEXIS 17867
    (N.D. Ill. Oct. 26, 2001)................................................................................................46

*In re Westinghouse Sec. Litig.,*
    90 F.3d 696 (3d Cir. 1996).........................................................................38, 41, 42

*Instit. Inv. Group v. Avaya, Inc.,*
    564 F.3d 242 (3d Cir. 2009)............................................................................... *passim*

*Jackson v. Rohm & Haas Co.,*
    No. 06-3682, 2007 U.S. Dist. LEXIS 71858
    (E.D. Pa. Sept. 26, 2007) ..............................................................................................26

479466_1

**Page**

*Laborers' Int'l Union v. Foster Wheeler Corp.*,
   26 F. 3d 375 (3d Cir. 1994)........................................................................16

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ....................................................................38

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ....................................................................14

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ....................................................................22

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007)
   *aff'd*, 312 Fed. Appx. 400 (2d Cir. 2009) ...............................................50

*Marsden v. Select Med. Corp.*,
   No. 04-4020, 2006 U.S. Dist. LEXIS 16795
   (E.D. Pa. Apr. 6, 2006) .............................................................................15

*Mississippi Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*,
   523 F.3d 75 (1st Cir. 2008)........................................................................50

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).................................................................20, 35

*Novinger Group, Inc. v. Hartford Ins., Inc.*,
   514 F. Supp. 2d 662 (E.D. Pa. 2007) ........................................................26

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000)........................................................24, 31, 32, 33

*Payne v. DeLuca*,
   433 F. Supp. 2d 547 (W.D. Pa. 2006)........................................................35

*Pirraglia v. Novell, Inc.*,
   339 F.3d 1182 (10th Cir. 2003) .................................................................24

*Plotkin v. I.P. Axess, Inc.*,
   407 F.3d 690 (5th Cir. 2005) .....................................................................30

*Possi v. Smith*,
   No. 95-1454, 1995 WL 723191
   (E.D. Pa. Dec. 5, 1995) .................................................................40, 41, 42

**Page**

*Ravens v. Republic N.Y. Corp.*,
No. 99-4981, 2002 U.S. Dist. LEXIS 12162
(E.D. Pa. Apr. 24, 2002) ................................................................. 13

*Register v. PNC Fin. Servs. Group, Inc.*,
477 F.3d 56 (3d Cir. 2007) ............................................................. 12

*Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.*,
42 F. Supp. 2d 423 (D. Del. 1999) .................................................. 13

*Rolo v. City Inv. Co. Liquidating Trust*,
155 F.3d 644 (3d Cir. 1998) ........................................................... 27

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ........................................................... 39

*Schlagel v. Learning Tree Int'l*,
No. CV98-6384 ABC (Ex), 1998 U.S. Dist. LEXIS 20306
(C.D. Cal. Dec. 29, 1998) ............................................................... 46

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000) ........................................................... 34

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992) .................................................. *passim*

*Shaw v. Digital Equip. Corp.*,
82 F.3d 1194 (1st Cir. 1996) ........................................................... 38

*Simmons v. City of Philadelphia*,
947 F.2d 1042 (3d Cir. 1991) ......................................................... 16

*South Ferry LP v. Killinger*,
542 F.3d 776 (9th Cir. 2008) .......................................................... 22

*Steiner v. MedQuist Inc.*,
No. 04-5487 (JBS), 2006 U.S. Dist. LEXIS 71952
(D.N.J. Sept. 29, 2006) ............................................................ 34, 37

*Stocke v. Shuffle Master, Inc.*,
615 F. Supp. 2d 1180 (D. Nev. 2009) ............................................. 49

*Takara Trust v. Molex Inc.*,
429 F. Supp. 2d 960 (N.D. Ill. 2006) .............................................. 45

**Page**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ................................................................................ *passim*

*TSC Indus., Inc. v. Northway, Inc.*,
 426 U.S. 438 (1976) ........................................................................... 33, 34

*Virginia Bankshares, Inc. v. Sandberg*,
 501 U.S. 1083 (1991) ............................................................................. 35

*Voit v. Wonderware Corp.*,
 977 F. Supp. 363 (E.D. Pa. 1997) ......................................................... 45

*Wallace v. Sys. & Computer Tech. Corp.*,
 No. 95-cv-6303, 1997 U.S. Dist. LEXIS 14677
 (E.D. Pa. Sept. 23, 1997) .................................................................. 32, 33

*Weiner v. Quaker Oats Co.*,
 129 F.3d 310 (3d Cir. 1997) .............................................. 30, 32, 33, 35

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
 §78u-4(b)(1)(B) ...................................................................................... 16
 §78u-4(b)(1)(2) ...................................................................................... 12
 §78u-4(b)(2) ........................................................................................... 13
 §78u-5(c)(1)(A)(i) .................................................................................. 39
 §78u-5(c)(1)(B) ................................................................................. 13, 39

17 C.F.R.
 §240.10b-5 ...................................................................... 13, 16, 31, 32
 §240.10b-5(b) ........................................................................................ 16
 §240.10b5-1 ..................................................................................... 48, 49
 §240.10b5-1(c) ...................................................................................... 49

Federal Rules of Civil. Procedure
 Rule 9(b) ................................................................................................ 13
 Rule 12(b)(6) ................................................................................. *passim*
 Rule  12(d) .......................................................................... 5, 6, 24, 27
 Rule 56 ..................................................................................................... 5

## I.    INTRODUCTION

Defendants' Motion to Dismiss the Amended Complaint ("Motion" or "Mot.") may be labeled as a motion under Federal Rule of Civil Procedure 12(b)(6), but it has all the hallmarks of a motion for summary judgment.  Weighing in at 45 pages, with 63 footnotes and 40 exhibits, defendants' brief is nearly as long as plaintiffs' entire Complaint, yet it curiously ignores many of the crucial false statements, particularized facts and compelling inferences alleged by plaintiffs against Kenexa Corporation ("Kenexa" or the "Company") and the Individual Defendants.[1]

Kenexa is a human capital management ("HCM") company that provides software, services and solutions to help organizations recruit, retain, assess and manage the performance of employees. ¶1.[2]  Beginning in early 2007 and continuing throughout the Class Period, defendants learned that one of Kenexa's largest and most important customers for its Employment Process Outsourcing ("EPO") services – a huge biotech company kept anonymous from the public and now referred to as "Client B" – was having major financial problems due to studies showing that two of Client B's most popular drugs caused heart problems and patient deaths during clinical trials.  ¶10.  In March 2007, Client B received a "black box warning" from the U.S. Food and Drug Administration ("FDA") concerning the safety of its drugs.  *Id.*  The FDA warning was followed up by an investigation by the Securities and Exchange Commission ("SEC") into Client B's handling of news concerning the postponement of one of its clinical trials due to patient deaths.  ¶11.

As a result of Client B's financial and regulatory problems in early 2007, it began to rapidly

---

[1]    The "Individual Defendants" are CEO Nooruddin "Rudy" S. Karsan ("Karsan") and CFO Donald Volk ("Volk").  The Individual Defendants and Kenexa are collectively referred to as "defendants."

[2]    All "¶" references are to the Amended Complaint for Violations of the Federal Securities Laws ("Complaint"), filed October 26, 2009.

cut back the number of Kenexa employees or "resources" working onsite at Client B's facilities. ¶¶47-49. According to numerous former Kenexa employees who personally worked onsite at Client B (and who were subsequently terminated), the layoffs began in *early 2007*, prior to the Class Period, and accelerated into May and June 2007 until there were only a few Kenexa employees left at Client B.

This news was devastating to Kenexa. The Company only had 13 EPO accounts and Client B was one of its largest. According to defendants, Client B paid a "subscription fee each month for *each* Kenexa employee or 'resource'" assigned to its account, and the "amount of these fees varied" depending on each "resource's function." Mot. at 5-6.[3] Thus, Client B's financial problems and its massive terminations of Kenexa employees directly impacted Kenexa's revenues in 3Q07 and FY07 and eventually resulted in the cancellation of the contract altogether. ¶¶47-52.

According to numerous former Kenexa employees who worked onsite at Client B, defendants Karsan and Volk received detailed reports, forecasts, financial results and other real-time information concerning every EPO client, including Client B, on a *weekly* basis. ¶¶51-55. The witnesses also confirm that Karsan and Volk personally monitored every EPO account and participated in detailed discussions and meetings questioning the financial details of each EPO account. *Id.*

Despite being aware of Client B's financial deterioration and rapid layoffs of Kenexa employees during the Class Period, defendants Karsan and Volk deliberately concealed this material adverse information from investors. On May 8 ,2007, the first day of the Class Period, defendants represented to investors that "momentum" in the business led them to "*raise* [the Company's] growth and profitability outlook for the full year 2007 . . . ." and to *increase* Kenexa's earnings and

---

[3]     All emphasis herein has been added and internal citations omitted unless otherwise noted.

revenue projections for FY07.  ¶7.  Defendant Volk falsely represented that "[o]ur revenue continues to be *highly visible* . . . ." and "we are currently *ahead* of where we would target at this point in the year."  ¶62.  Defendant Karsan told investors that the "*[m]arket demand is strong and interest is growing* . . . ."  ¶60.  Never once did defendants qualify or temper their bullish statements or give investors any warning about the massive revenue-impacting layoffs and undisclosed problems with Client B.

Just three days after the false May 8, 2007 statements, CEO Karsan began suspiciously unloading his Kenexa stock, selling 127,400 shares during a three week period for *$4.6 million* in illicit insider trading proceeds.  ¶¶66, 98.  Karsan sold another *$2.1 million* in Kenexa stock later in the Class Period before finally disclosing the facts about Client B to investors.  During the same three-week period, Kenexa's President and Chief Operations Officer ("COO"), Troy Kanter ("Kanter"), sold over *74%* of his Kenexa shares for *$2.25 million*.  ¶98.  Defendant Volk also sold over *33%* of his Kenexa stock on a single trading day (May 30, 2007) for $764,800 in illicit proceeds before the bad news was disclosed.  Average investors were not so lucky.

On August 8, 2007, months after Client B had already terminated many of Kenexa's onsite employees, defendants continued to mislead investors about Kenexa's current financial condition and future results and again *increased* its FY07 revenue guidance.  ¶¶70-72.  Defendants falsely represented that "[w]e continue to benefit from our participation in an attractive market that is experiencing *strong demand* and growing awareness," and "[w]e are pleased with the *high level of execution across all our global organization*."  ¶72.  CEO Karsan touted Kenexa's "*solid organic and acquisitive revenue growth*" and told investors that "*[m]arket demand is strong* and Kenexa's brand recognition continues to grow . . . ."  ¶¶70, 72.  CFO Volk falsely stated that "[o]ur revenue continues to be *highly visible* as a result of our diverse customer base, *long-term contracts, renewal rates* that continue to be in the 90% plus range and the *growing number of new customers* that we

- 3 -

are adding to our overall customer base." ¶72. Never once did defendants raise any issues or warnings about Client B or its impact on the Company's current and future revenues.

In fact, during the question-and-answer portion of the August 8, 2007 investor conference call, skeptical analysts asked defendants pointedly if they were seeing any slowdown in business. Rather than telling investors the truth about Client B or trying to temper expectations about the potential revenue impact, defendant Karsan responded unequivocally: "*We don't feel it*. I don't feel like a slow down . . . I just feel like it's movement. *I'm not feeling like it is a slow down* in organic [growth], in fact I'm feeling like *it's really, really solid*." ¶74.

On September 16, 2007, defendants again met with Wall Street analysts, who noted that investors were increasingly worried that the weakening U.S. economy might impact job growth and, therefore, Kenexa's core HCM business. ¶82. Defendants again falsely represented that there was no slowdown in Kenexa's business. ¶82 ("For its part, *Kenexa is not seeing any sign of slowdown at this time*.").

On November 7, 2007, defendants abruptly announced that Client B had cancelled its multi-million-dollar contract with Kenexa and that the Company's financial results for 3Q07 and FY07 would be far lower than represented. ¶¶86-89. The Company missed its 3Q07 guidance by $2 million and decreased FY07 guidance by more than $7 million. ¶86. Tellingly, defendant Karsan finally admitted for the *first time* that the revenue miss was due primarily to Client B's problems: "Our top line performance was impacted by *a single contract* with a customer that faced a company-specific business issue in addition to longer sales cycles in the EPO and assessments components to our business." *Id*. Karsan admitted that the financial problems affecting Client B "eliminated the need of Kenexa's outsourced services" and that FY07 was also impacted by Client B's contract: "One of the primary reasons we adjusted our full year revenue forecast is related to *one of our larger EPO customers*." ¶87.

- 4 -

On the news of this sudden, belated and unexpected disclosure, Kenexa's stock price collapsed – dropping **$11.23 per share**, or over **40%** of its value, in a single trading day. Given defendants' repeatedly bullish and unequivocal statements prior to the sudden disclosure, analysts were shocked and publicly criticized Kenexa's failure to disclose the news earlier. One analyst noted that "***[w]e certainly did not see this coming***" and questioned why "Kenexa chose not to pre-release the revenue miss, as ***the Company knew of these developments well before the end of the quarter***." ¶90. Another analyst observed that while Kenexa reported a sharp deceleration in growth, the Company's competitors actually reported ***acceleration*** in growth. *Id*. The analyst openly questioned Kenexa's management: "***can something else be going on?***"

Defendants' false representations to investors and concealment of adverse facts had a devastating impact on Kenexa's shareholders. The Company's stock price has never fully recovered and currently trades at around $10.50 per share, a small fraction of the inflated $42 price it reached during the Class Period. Unlike average investors, however, defendants profited handsomely from their misstatements, pocketing over $9.75 million in insider-trading proceeds.

Defendants' Motion ignores many of the false statements and contemporaneous facts, reports and meetings summarized above. Defendants also ignore the bedrock principle of law that extrinsic evidence outside the pleadings is not permitted on a motion to dismiss – or it converts the motion into one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d). Defendants' entire defense is crafted around a single unauthenticated, incomplete and heavily redacted version of what purports to be parts of the "contract" between Kenexa and Client B that was cancelled during the Class Period. Defs' Ex. 36. Defendants improperly attempt to use this incomplete and redacted document to raise factual questions about the timing and circumstances surrounding the termination of Client B's contract. Most notably, defendants not only redact Client B's name for purposes of anonymity, they redact all of the most relevant financial terms, estimates and fee schedules for

- 5 -

Kenexa's services – the very essence of the contract itself.  Defs' Ex. 36 at 3, 5.  Not only are these tactics wholly improper under Rule 12(d) and well-settled principles of Rule 12(b)(6) jurisprudence, but, at best, the contract gives rise to numerous factual disputes that cannot be resolved on a motion to dismiss.  Now that defendants have injected the Client B contract into the case, the only proper resolution is to deny defendants' motion and allow discovery of the circumstances surrounding the Client B contact.  Anything less would be prejudicial to plaintiffs and shareholders who have properly stated a claim.  Defendants' Motion should be denied.

## II.    STATEMENT OF FACTS

Kenexa is an HCM company that provides software, services and solutions to help organizations recruit, retain, assess and manage the performance of employees.  ¶1.  The Company's solutions include "talent acquisition" (recruiting), "employee performance management" (monitoring and assessing employees) and EPO services which allow clients to outsource human resource systems and functions.  ¶2.

The Company derives revenue primarily from two sources: subscription fees for its solutions and fees for discrete professional services.  ¶¶1-2.  During the Class Period, the Company's EPO business relied on a limited number of multi-year, multi-million-dollar contracts, which accounted for approximately 15%-20% of Kenexa's total revenue.  ¶5.  At the beginning of the Class Period, Kenexa had only *13 EPO accounts*.  ¶5.  The Company closely monitored each EPO client on a weekly, monthly and quarterly basis to determine the current and future status of the revenues generated from each EPO client.  ¶¶14-15, 51-55.

Because the HCM market is highly competitive with many large and well capitalized companies, Kenexa executives knew they needed to grow aggressively in order to compete.  ¶3.  After the Company's IPO in June 2005, it began to implement a strategy of aggressive growth through acquisition.  ¶¶3-4.  From January 2006 through August 2007, Kenexa acquired seven

- 6 -

different companies, including a U.K.-based company, Psychometric Services Limited ("PSL"), that specialized in employee assessments. *Id*. Kenexa represented that the PSL acquisition would allow it to tap into British and other international customers and fuel growth. ¶4. Defendants' growth-by-acquisition strategy helped Kenexa stock increase ***350%*** from its $12.00 IPO price to over $42.00 per share during the Class Period. ¶¶3, 8, 26 (illustrative stock chart).

On May 8, 2007, the first day of the Class Period, Kenexa announced its 1Q07 financial results and its forecasts for 2Q07 and FY07. ¶¶60-62. On the surface, the Company's acquisition strategy appeared to yield positive results – $42.2 million in revenues in 1Q07 and 83% growth over 1Q06. ¶¶6, 60. CEO Karsan told investors that "market demand ***is strong*** and interest ***is growing***" for Kenexa's solutions. ¶60. CFO Volk told investors that "we are ***currently ahead*** of where we would target at this point in the year . . . ." ¶62.

Equally important for forward-thinking investors, CEO Karsan and CFO Volk represented that the Company's acquisitions and "momentum" in the business "have led us to ***raise our growth and profitability outlook for the full year 2007*** . . . ." and increase FY07 revenue projections to ***$186-$189 million***. ¶¶60-62. Defendant Volk told investors that Kenexa's revenue was "***highly visible***" as a result of the Company's "diverse customer base," "long-term contracts" and the "growing number of new customers that we are adding to our overall customer base." ¶62. Defendant Karsan stated that the Company's organic revenue growth was not likely to differ materially from 35% year over year. ¶7.

Defendants' representations and increased guidance for FY07 had the desired inflationary effect on Kenexa's stock price. Wall Street analysts latched onto and repeated defendants' false representations by issuing reports to investors stating, *inter alia*, that Kenexa "is ***growing faster than the market with solid execution***." ¶64. Defendants' representations caused Kenexa's stock price to increase from $31.94 on May 8, 2007 to a high of $34.58 on May 9, 2007 and continued to climb to

- 7 -

over $39.00 at the end of May 2007.

Only three days after defendants' false May 8, 2007 statements, defendant Karsan suspiciously began selling Kenexa stock to capitalize on the artificial inflation of Kenexa's stock price. Over a short three-week period in May 2007, Karsan sold 127,400 shares for proceeds of over **$4.6 million**. ¶¶66, 98. He sold another $2.1 million in stock before the end of the Class Period. ¶98. President and COO Kanter also sold 62,096 shares of Kenexa stock in the three-week period following the May 8, 2007 disclosures for proceeds of nearly **$2.25 million**. Defendant Volk sold over 33% of his shares on May 30, 2007 for proceeds of $764,800. *Id*.

On June 8, 2007, Kenexa announced the acquisition of StraightSource, a provider of recruitment process outsourcing services. ¶68. Following the acquisition, Kenexa updated its guidance for 2Q07 to reflect the expected revenue from the acquisition. Though the Company did not change its FY07 guidance, analysts following Kenexa predicted approximately $4-$7 million in additional total year revenue from the acquisition. *Id*. On this news, Kenexa's stock rose from $35.88 on Jun 7, 2007 to $37.25 on June 8, 2007. ¶69.

Only a few months later, on August 8, 2007, Kenexa announced its 2Q07 financial results and projections for 3Q07 and FY07. ¶70. Defendants issued guidance for 3Q07 and **increased** total revenue guidance for FY07 to **$188-$192 million** (from previous guidance of $186-$189 million). Analysts and investors were surprised by the minimal increase in FY07 revenue guidance because, prior to the release of 2Q07 results, analysts predicted Kenexa would raise its FY07 total revenue guidance by $4-$7 million to account for revenue derived from the StraightSource acquisition. By raising FY07 guidance by only $2.8 million, Kenexa provided its first subtle indication that defendants knew the Company's growth was not nearly as strong as previously represented. ¶73.

However, defendants continued to mislead investors by downplaying the significance of the lower-than-expected increase and concealing known adverse facts and risks. Karsan and Volk cited

- 8 -

to "solid organic and acquisitive revenue growth, profitability and cash flow" and falsely told investors that "*[m]arket demand is strong* and Kenexa's brand recognition continues to grow . . ." and that they were "pleased with the *high level of execution* across *all* [Kenexa's] global organization." ¶¶70-72. CFO Volk reaffirmed that *"[o]ur revenue continues to be highly visible* as a result of our diverse customer base, long-term contracts, renewal rates that continue to be in the 90% plus range and the growing number of new customers that we are adding to our overall customer base." ¶72.

During the August 8, 2007 conference call, defendants provided no indication whatever of any problems with the Company's revenue projections, its major clients, its EPO business or its business prospects. In fact, when asked directly by a concerned analyst about lower-than-expected growth, Volk falsely reassured investors that there was no reason to be concerned: "*We don't feel it. I don't feel like a slow down* . . . . I just feel like it's a movement. I'm not feeling like it is a slow down in organic [growth], *in fact I'm feeling like it's really, really solid*." ¶74.

Kenexa's stock dropped on the news, removing a small fraction of the artificial inflation that had built up in the stock price due to defendants' false representations and misleading forecasts. Kenexa's stock price remained inflated, however, because defendants continued to falsely assure investors about the Company's performance, financial condition and FY07 revenue guidance and concealed known adverse facts.

Unbeknownst to investors, beginning in early 2007, defendants became aware of undisclosed adverse material problems with Client B. ¶9 n.2; Mot. at 5. Based on reports from numerous former Kenexa employees working directly on the Client B account, defendants learned, beginning in *early 2007* and continuing into summer 2007, that Client B was having major financial and regulatory problems and that Kenexa was in serious danger of losing its contract with Client B and the millions in revenue generated under the contract. ¶¶47-50.

- 9 -

Defendants learned that in March 2007, Client B received a "black box warning" (the most severe warning) from the FDA for two of its popular drugs due to patient deaths during clinical trials and negative studies linking Client B's drugs to heart problems and deaths of cancer patients. ¶¶10-11. The two drugs at issue comprised nearly 50% of Client B's total sales. ¶10. News of the negative studies and the black box warning sent Client B's shares tumbling, dropping $16 per share. Indeed, the FDA black box warning was expected to cause as much as a 10% decline in Client B's sales. Defendants also learned in early 2007 that Client B was being investigated by the SEC for its handling of news that a Danish trial involving the drugs had been postponed due to unexpected patient deaths. ¶11.

As a result of Client B's regulatory and financial problems and the SEC and FDA investigations, its staffing needs began to slow in anticipation of the loss of funding. ¶¶12, 47-49. Client B began to rapidly downsize the number of onsite Kenexa employees working on its EPO account beginning in early 2007. ¶¶47-49. Client B continued downsizing through spring and summer 2007 until there were only four remaining Kenexa employees onsite. ¶¶47-49.

In addition to the problems threatening one of Kenexa's largest EPO accounts, defendants also learned during the Class Period that the FY07 revenue guidance lacked any reasonable basis due to a slowdown of EPO sales. According to CWs, and as discussed in detail at ¶¶55-57, the Company's financial projections included sales that had only a 50% chance of closing. Kenexa's EPO sales were also taking longer to close and the Company was losing EPO deals to competitors. Indeed, by the end of the Class Period, Kenexa had ***eliminated*** all incremental EPO sales from its financial forecasts. ¶67(b).

In November 2006, Kenexa acquired PSL, a U.K.-based company specializing in employee assessments. ¶¶18-19. At the time of the acquisition, PSL recognized more of its international assessments sales revenue up front, as allowed under U.K. accounting principles, which are much

- 10 -

more flexible than U.S. GAAP. *Id.* In contrast, under U.S. GAAP, Kenexa was required to delay revenue recognition on significant portions of PSL's assessments sales revenue and instead recognize it over a longer period of time.

According to two former Kenexa employees, including a *senior vice president* of Kenexa's U.K. operations, Kenexa failed to timely switch its U.K. revenue recognition practices to comply with U.S. GAAP. ¶¶58-59. Defendants knew that the required change would reduce the amount of revenue Kenexa generated from PSL, thereby reducing its future revenues. The two witnesses acknowledged that failure to timely switch to U.S. GAAP was a contributing factor to Kenexa's 3Q07 revenue miss and its reduced FY07 revenue guidance. *Id.*

Despite defendants' knowledge of adverse facts and serious risks related to the Client B contract and future revenues, they never disclosed the adverse information to investors. They actively concealed the truth by repeatedly reaffirming and even *increasing* guidance throughout the Class Period and telling investors that "market demand is strong," that there was no slowdown in their business ("We don't feel it"), that revenues were "highly visible" and that there were no facts that undermined the accuracy or reliability of their 3Q07 and FY07 financial guidance.

On November 7, 2007, Kenexa abruptly announced results for 3Q07 that were millions short of Kenexa's own revenue projections. Defendants also significantly lowered guidance for FY07 by nearly $7 million. On that day, the Company also revealed to investors that the revenue miss and significantly reduced guidance was due to the cancellation of Client B's EPO contract, lengthening EPO sales cycles and problems with the Company's international assessments sales – problems that were well known to defendants during the Class Period but concealed from investors. On the news of the previously undisclosed facts, Kenexa's stock crashed *40% in one trading day*, dropping $11.23 per share.

## III.    ARGUMENT

### A.    Legal Standard for Motions to Dismiss under the PSLRA

The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Register v. PNC Fin. Servs. Group, Inc.*, 477 F.3d 56, 61 (3d Cir. 2007) (on a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims"); *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-CV-1014, 2004 U.S. Dist. LEXIS 13255, at *9 (E.D. Pa. July 12, 2004).

Under the PSLRA, 15 U.S.C. §78u-4(b)(1)(2), to state a §10(b) fraud claim, plaintiffs must allege both falsity and a strong inference of scienter with particularity. When plaintiffs' allegations are stated with particularity, the court must consider them in totality to assess whether they "collectively" plead falsity and a strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *In re Suprema Specialties Inc. Sec. Litig.*, 438 F.3d 256, 281-82 (3d Cir. 2006).

In *Tellabs*, the Supreme Court set forth three "prescriptions" for assessing motions to dismiss in PSLRA cases:

> (i)    Courts must "***accept all factual allegations . . . as true***." *Id*. at 322.
>
> (ii)    "[C]ourts must consider the complaint ***in its entirety***" and "the inquiry . . . is whether all of the facts alleged, ***taken collectively***, give rise to a strong inference of scienter, ***not whether any individual allegation, scrutinized in isolation***, meets that standard." *Id*. at 322-23.
>
> (iii)    "The court must take into account ***plausible*** opposing inferences" but they must "follow[] from the ***underlying facts***" and be "***rationally drawn from the facts alleged***."

*Id*. at 314, 323; *accord Instit. Inv. Group v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009). Courts in this District have "cautioned that the PSLRA 'was not intended to create an insurmountable pleading hurdle for plaintiffs in such cases.'" *Ravens v. Republic N.Y. Corp.*, No.

99-4981, 2002 U.S. Dist. LEXIS 12162, at *22 (E.D. Pa. Apr. 24, 2002) (quoting *In re Unisys Corp. Sec. Litig.*, No. 99-5333, 2000 U.S. Dist. LEXIS 13500, at *2 (E.D. Pa. Sept. 21, 2000)).  Indeed, "neither the Reform Act nor Rule 9(b) requires plaintiffs to plead all of the evidence and proof thereunder supporting their claim."  *Unisys*, 2000 U.S. Dist. LEXIS 13500, at *10; *Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 441 (D. Del. 1999) (same).

### B.    The Standard for Pleading Scienter

#### 1.    Recklessness v. Actual Knowledge

To state a claim under Rule 10b-5, a plaintiff must plead facts raising a strong inference that misrepresentations were made with the "required state of mind," or scienter.  15 U.S.C. §78u-4(b)(2).  The standard for pleading scienter under the PSLRA differs for forward-looking and non-forward looking statements.  15 U.S.C. §78u-5(c)(1)(B).  For forward-looking statements, plaintiffs must plead that the statement "was made with actual knowledge . . . that the statement was false or misleading."  *Id*.  For non-forward looking or "current" statements, plaintiffs can raise a strong inference of scienter by alleging facts that constitute strong circumstantial evidence of "*recklessness*."  *Avaya*, 564 F.3d at 267; *Suprema*, 438 F.3d at 276.

Recklessness is defined as an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that *is either known to the defendant or is so obvious that the actor must have been aware of it*."  *Avaya*, 564 F.3d at 267 n.42; *accord In re Viropharma, Inc., Sec. Litig.*, No. 02-1627, 2003 U.S. Dist. LEXIS 5623, at *30 (E.D. Pa. Apr. 3, 2003); *In re Able Labs. Sec. Litig.*, No. 05-2681 (JAG), 2008 U.S. Dist. LEXIS 23538 (D.N.J. Mar. 24, 2008).  Plaintiffs may establish recklessness by alleging, *inter alia*, that defendants had "*access to information which contradicted their public statements*."  *Viropharma*, 2003 U.S. Dist. LEXIS 5623, at *31-*32.

### 2.    Inference Drawing: Ties Go to the Plaintiff

In determining scienter, "courts must consider the complaint in its entirety" and "assess all the allegations holistically." *Tellabs*, 127 S. Ct. at 2509, 2511.  A strong inference of scienter arises "[w]hen the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter *at least as strong* as any opposing inference." *Id*. at 2511.

Plaintiffs' showing of scienter need not foreclose every competing factual possibility.  "The inference that the defendant acted with scienter *need not be irrefutable, i.e., of the 'smoking gun' genre*, or even the 'most plausible of competing inferences.'" *Id*. at 2510; *accord Avaya*, 564 F.3d at 269.  "[W]here two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint *should be permitted to move forward*." *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008).  In other words, "*Tellabs now awards the draw to the plaintiff*." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) ("tie favors the plaintiff.").[4]

> As the Third Circuit recently observed:
>
> [The scienter inquiry] will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, *accepting the whole factual picture* painted by the Complaint, it is *at least as likely as not* that defendants acted with scienter."

*Avaya*, 564 F.3d at 269.

---

[4]    Defendants' inclusion of a lengthy string cite of PSLRA cases in the Third Circuit in which plaintiffs "fail[ed] to meet the PSLRA's heightened pleading requirement" is unhelpful and does not advance their case.  In fact, in the very first case they cite, *Avaya*, 564 F.3d 242, the Third Circuit held that plaintiffs *did* meet the heightened PSLRA pleading standards for false statements that are similar to the present case.  *Id.* at 280 ("With respect to the March pricing statements, the Complaint *successfully* 'state[s] with particularity facts *giving rise to a strong inference' that the defendants acted consciously or recklessly in making false statements*.").

### C.    Plaintiffs Allege Both Forward-Looking and Non-Forward Looking Statements

Contrary to defendants' assertion (Mot. at 3), plaintiffs' Complaint separately alleges numerous **non**-forward looking statements concerning the **current** performance, **then-existing** facts and the **present** state of Kenexa's business condition at the time the statements were made. ¶¶60, 62, 72. Statements of past or present performance or business condition, or omissions of material facts, are **not** forward looking as a matter of law. *See In re Cell Pathways, Inc.*, *Sec. Litig.*, No. 99-752, 2000 U.S. Dist. LEXIS 8584, at *42 (E.D. Pa. June 21, 2000) ("'allegations based upon omissions of existing facts or circumstances do not constitute forward looking statements'") (citation omitted); *Marsden v. Select Med. Corp.*, No. 04-4020, 2006 U.S. Dist. LEXIS 16795, at *24-*25 (E.D. Pa. Apr. 6, 2006) (statements not forward looking because "Plaintiffs challenge these statements on the basis that Defendants withheld present information"); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 721 (D. Del. 2000) (CEO's assurance to investors of company's current financial integrity ruled not to be forward-looking statement); *Cal. Pub. Emples. Ret. Sys. v. Chubb Corp.*, No. 00-4285, 2002 U.S. Dist. LEXIS 27189, at *33 (D.N.J. June 25, 2002), *aff'd*, 394 F.3d 126 (3d. Cir. 2004) ("purposeful omissions of existing facts or circumstances do not qualify as forward-looking statements"); *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) ("The statements are not contingent on future events, nor are they projections about AOL's financial future; rather, they are statements of the Company's existing financial condition.").

Inexplicably, defendants deliberately chose not to substantively address plaintiffs' non-forward looking statements in their motion. Instead, they appear to argue that they can "reserve the right" to wait until their reply brief to address certain statements. Mot. at 30 n.42. This is improper under Rule 12(b)(6). Defendants cannot wait for a reply brief to establish grounds for dismissal, and the court should deny their motion on that basis. *D'Aiuto v. City of Jersey City*, No. 06-6222 (JAG), 2007 U.S. Dist. LEXIS 57646, *10 n. 1 (D.N.J. Aug. 8, 2007) (citing *Laborers' Int'l Union v. Foster*

- 15 -

*Wheeler Corp.*, 26 F. 3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief." ); *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1066 (3d Cir. 1991) ("a passing reference to an issue in a brief will not suffice to bring that issue before this court").

In any event, plaintiffs adequately plead falsity and scienter for the non-forward looking statements.  In accordance with the PSLRA, the Complaint specifically identifies each statement alleged to have been misleading, the reasons why the statement is misleading and the facts giving rise to a strong inference of scienter.  15 U.S.C. §78u-4(b)(1)(B).  *See, e.g.*, ¶¶60-85, 92-97.  This is sufficient to state a claim under the PSLRA.  *Suprema Specialties*, 438 F.3d at 276.

## D.    Plaintiffs Adequately Allege Falsity and Scienter for Defendants' *Non-Forward Looking* Statements

As set forth above, SEC Rule 10b-5 makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. §240.10b-5(b).  In addition to providing misleading forecasts (which are addressed in §III.E, *infra*), the first series of false statements and material omissions of current fact was made on May 8, 2007 in connection with Kenexa's 1Q07 financial results.

**May 7, 2007 Statements:**

- "Market demand *is strong* and interest *is growing* . . . ."  ¶60.

- "*[o]ur revenue continues to be highly visible* . . . ."  ¶62.

- "we are *currently ahead* of where we would target at this point in the year."  ¶62.

- "Kenexa *is benefiting* from these trends due to [the Company's] differentiated value proposition, *proven ability* to deliver tangible business benefits for our customers . . . ."  ¶60.

The second series of false statements of current fact occurred on August 8, 2007 in connection with Kenexa's announcement of its 2Q07 results.

- 16 -

**August 8, 2007 Statements:**

- "*Market demand is strong* and Kenexa's brand recognition continues to grow . . . ." ¶70.

- "*We don't feel it.  I don't feel like a slow down* . . . I just feel like it's movement. I'm not feeling like it is a slow down in organic, *in fact I'm feeling like it's really, really solid*."  ¶74.

- "We *continue to benefit* from our participation in an attractive market that is *experiencing strong demand* and growing awareness.  We are pleased with the *high level of execution* across *all* our global organization."  ¶72.

- "*Our revenue continues to be highly visible* as a result of our diverse customer base, long-term contracts, renewal rates that continue to be in the 90% plus range and the growing number of new customers that we are adding to our overall customer base." ¶72.

Defendants virtually ignore these statements in their motion.  Mot. at 17 ("*[A]ll of the statements* plaintiff has challenged are 'forward-looking.'")  The statements are not forward-looking projections, guidance or statements of opinion.  They were *present-tense* statements about Kenexa's *current* and then-existing performance and the financial condition of the Company *at the time* the statements were made.  Thus, as a matter of law, the PSLRA safe harbor – upon which most of defendants' Motion is based – does not apply.  *See In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 557 (D.N.J. 2002) ("[S]ince these statements depict, in part, the Company's past and current performance, safe-harbor protections are inapplicable.").  Accordingly, these statements are actionable if plaintiffs adequately allege they were made "recklessly" and omitted material facts necessary to make the statements not misleading.  In fact, plaintiffs go even further – establishing defendants' "actual knowledge" of material undisclosed facts, as set forth below.

1.    **Karsan's and Volk's Knowledge of Client B's Problems,
        Declining Revenue and Cancellation of Its Contract Supports
        Falsity and a Strong Inference of Recklessness**

Falsity and scienter are "generally strongly inferred from the same set of facts."  *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005).  Karsan's and Volk's statements on May 8, 2007 and

August 8, 2007 were unequivocal and unqualified.  ¶¶60-62, 70-74.  They did not disclose any actual or potential problems with Client B or the massive cutbacks of revenue-generating Kenexa employees made by Client B throughout 2007.  They did not warn investors about the Company's slowing EPO sales or any deterioration or risk in Kenexa's business.  Instead, defendants *raised* FY07 revenue projections, presented a false picture of Kenexa's financial condition, deliberately concealed the problems with Client B throughout the Class Period, sold millions in Kenexa stock and suddenly hit investors with the bad news all at once – causing Kenexa's stock price to crash $11.23 or *40% in a single day*.

Plaintiffs allege particularized detail from multiple Kenexa employees demonstrating that defendants had actual knowledge throughout the Class Period that Client B was suffering from major financial problems and had rapidly pulled Kenexa employees off its projects, which jeopardized the revenue generated from Client B and led to the cancellation of the contract altogether.  Indeed, according to three former On-Site Recruiters at Client B (CW1, CW2 and CW3), Client B began to cut Kenexa employees in *early and mid-2007* around the same time that Client B learned of its problems with the FDA and its problematic patient studies and began to anticipate a loss of funds.  ¶¶47-48.  All three witnesses had firsthand knowledge of Client B's problems and stated that the Kenexa cutbacks continued throughout 2007.  CW1 confirmed that 50 additional Kenexa employees (including CW1) were let go in late April-early May 2007 as a result of Client B's layoffs.  ¶47.  CW2 stated that Client B had three or four rounds of terminations of Kenexa employees between early 2007 and May or June 2007.  ¶48.  This was corroborated by CW3, who stated that the cutbacks continued until June 2007, at which point only four Kenexa employees remained at Client B.  ¶49.  CW2 noted that he/she and other Kenexa employees expressed their concern to the Kenexa Program Director at Client B during weekly meetings in 2007.  These layoffs began *months before* defendants' false May 8, 2007 and August 8, 2007 statements, and defendants do not dispute those

- 18 -

facts.

The Complaint also alleges that Karsan and Volk closely monitored Client B and were well aware of the details surrounding the forecasts, results and problems with Client B on a weekly, monthly and quarterly basis. Indeed, Karsan and Volk received detailed forecasts for each EPO account, including Client B, on a weekly basis. ¶51. According to CW5, a former Kenexa Program Director for EPO accounts, all EPO Program Directors were required to prepare and submit three-month rolling forecasts on a weekly basis *every Thursday* by the close of business. ¶51. Kenexa's Director of Finance and Business Analytics consolidated the EPO reports into one report that was *sent directly to Volk and Karsan*. *Id*. CW5 provided firsthand knowledge of the particularized information contained in the reports, including updated revenue guaranteed for each EPO contract, the number of new hires and requisitions and, importantly, the "run rates," which defendants define as "[h]ow the financial performance of a company would look if you were to extrapolate current results out over a certain period of time." Mot. at 10 n.23. Thus, Karsan and Volk had specific contemporaneous information about Client B's forecasts, performance and cutbacks of employees on a weekly basis.

CW5 also stated that the status of each EPO client was discussed at Quarterly Business Review meetings, which both CW5 and *defendant Volk personally attended*. ¶52. At the meetings, management discussed historical and current projections for each EPO client and the overall health of the customer relationship. CW5 stated that each Program Director also had to prepare a *two-page document for each EPO client* that included detailed information on current forecasts. *Id*. This information was corroborated by another former Kenexa EPO Program Director, CW6, who confirmed that both *Karsan and Volk received the mandatory EPO forecasting reports on a weekly basis*. ¶53. CW6 also confirmed that the Individual Defendants attended the Quarterly Business Review meetings and participated in 20- to 30-minute discussions with individual EPO Program

- 19 -

Directors about their particular clients and any variance between actual and forecasted results. ¶54.

CW7, a former President of one of Kenexa's subsidiaries, also confirmed that **Karsan and Volk** attended the Quarterly Business Review meetings and said defendants were personally engaged during the meetings and were extremely familiar with the EPO accounts, particularly with respect to the financials. ¶55. CW7 also participated in weekly EPO meetings, held every Tuesday, where all Program Directors and Sales Reps discussed the weekly results and changes in forecasts for each EPO client. ¶55.

Defendants do not dispute the facts or reliability of the information reported by the CWs. Indeed, they cannot – the CWs personally worked at Client B and had personal knowledge of defendants' participation and role in monitoring the EPO clients. *See Avaya*, 564 F.3d at 263 ("Shareholders have adequately described the duration of each CW's employment, the time period during which the CWs acquired the relevant information, and how each CW had access to such information."); *Cal. Public Employees Ret. Sys. v. Chubb*, 394 F.3d 126, 145-47 (3d Cir. 2004); *Avaya*, 564 F.3d at 263 ("plaintiffs have appropriately described the positions formerly held by each of these [confidential witness] sources as well as the basis of the sources' personal knowledge.'") (citation omitted); *accord In re Par Pharm. Sec. Litig.*, No. 06-cv-3226 (PGS), 2009 U.S. Dist. LEXIS 90602, at *22 (D.N.J. Sept. 30, 2009); *see also Daou*, 411 F.3d at 1014; *In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002); *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 352-53 (5th Cir. 2002).

Conceding that plaintiffs adequately allege the reliability of the facts reported by the CWs, defendants assert that those facts do not give rise to a strong inference of recklessness. Mot. at 31. Karsan himself admitted, however, that because Kenexa directly manages the recruitment process of its EPO clients, defendants "**know first hand what pains our [EPO] customers are going through**." ¶81(a). This admission is corroborated by the allegations of CWs who witnessed Karsan and Volk

- 20 -

directly participating in EPO client meetings and confirmed that both defendants received detailed weekly reports on all EPO clients, including Client B, during the Class Period. Because Karsan and Volk were aware of these facts, that knowledge is imputed to defendant Kenexa. *Avaya*, 564 F.3d at 252 ("Liability for these statements if they were fraudulent, can also be imputed to Avaya because a corporation is liable for statements by employees who have apparent authority to make them.").

Defendants' assertion that none of the CWs was specifically in charge of forecasting for Client B is meritless and does not negate scienter. Mot. at 31. The Third Circuit rejected precisely the same argument in *Avaya*, 564 F.3d at 265 (rejecting defendants' argument that "none of the CWs are officers, none worked at headquarters, and none claimed to participate in the forecasting process" and finding that "it is reasonable to infer that the reaffirmed projections of revenue and margins were, by March, no longer sound (and were thus misleading)."). Moreover, defendants' assertion that plaintiff must somehow plead the precise personal conversations between Client B executives and the Individual Defendants surrounding the cancellation of the contract, prior to discovery, is meritless. *See Par Pharm.*, 2009 U.S. Dist. LEXIS 90602, at *24-*27 ("[I]t is not necessary for [CW]2 to be a member of the finance department in order to explain the alleged facts and to reasonably draw conclusions about the inaccuracy of the accounts receivable."); *Avaya*, 564 F.3d at 268-9 ("It is true that Shareholders do not point to any particular document or conversation that would have informed [defendants] of unusual discounting during the class period . . . . But the Supreme Court has made clear that plaintiffs' allegations of scienter 'need not be irrefutable, *i.e.*, of the smoking gun genre.'") (quoting *Tellabs*, 127 S. Ct. at 2510).

In any event, plaintiffs here ***do*** allege contemporaneous reports that defendants personally received and meetings they personally attended that discussed detailed information for each EPO client, including information on current performance, future forecasts and the overall business relationship. *See Par Pharms.*, 2009 U.S. Dist. LEXIS 90602, at *28 (receipt of reports and

attendance at meetings support scienter). Defendants cannot plausibly argue that they were unaware of the massive layoffs of Kenexa employees by Client B – there were only 13 EPO clients, and Client B was one of the largest. Numerous courts have held that it is reasonable to infer that the CEO and CFO of a company are aware of critical facts, large contracts and important core business functions. *South Ferry LP v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (scienter inferred "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986-87 n.5 (9th Cir. 2008) (same); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [company's key products] knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity."); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("[K]nowledge may be imputed to individual defendants when the disclosures involve the company's core business.") (collecting cases); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) (same). The combination of Karsan and Volk's personal involvement in supervising all EPO clients, including Client B, their personal access to reports and meetings regarding Client B and their knowledge of the important contracts and core operations at the Company gives rise to a strong inference of scienter. *Id.*

Additionally, defendants' deliberate decision to conceal the information from investors concerning Client B while making unequivocally positive statements to the market is reckless. When Karsan responded to an analyst's direct question about any slowdowns in growth by stating "***[w]e don't feel it*** . . . . I don't feel like a slowdown . . . . [i]n fact I'm feeling like it's ***really really solid***," while he knew about Client B's slowdown and massive cutback of Kenexa's revenue-generating employees, those statements were reckless and give rise to a strong inference of scienter.

- 22 -

Indeed, the Third Circuit has held that when a corporate executive responds directly to analysts'

questions about the stability and environment of the business and denies any problems or changes,

those denials support a strong inference of scienter. *Avaya*, 564 F.3d at 269-70 ("It is one thing for a

plaintiff to claim that a defendant must have known its earnings projections were false because of the

existence of unusual price reductions . . . .  But it is another thing when a defendant [CFO] is

specifically asked, directly and repeatedly, whether the company's pricing has held steady despite

the competitiveness of the market.").

### 2.    Defendants' Reliance on Heavily Redacted Extrinsic Evidence Outside the Pleadings Is Both Improper and Meritless

Defendants' entire defense to plaintiffs' well pled allegations of knowledge concerning

Client B is molded around a heavily redacted, incomplete copy of what defendants contend is the

"EPO contract with Client B."  Mot. at 5-6, 30; Ex. 36.  Defendants provide subjective and self-

serving interpretations of the "terms" of the contract (even though many of the important terms are

redacted) and improperly ask the Court to make factual findings and draw legal conclusions about

the timing, scope and termination clauses in the contract and determine as a matter of contract law

what each of the terms means.  *Id*.  This attempt to use extrinsic evidence at the pleading stage is

wholly improper and should be summarily rejected.

As plaintiffs articulate in their Motion to Strike (filed herewith), defendants' use of

incomplete, unauthenticated, heavily redacted extrinsic evidence in connection with a motion to

dismiss is patently improper at the pleading stage.  Under Rule 12(d), defendants' use of this

"evidence" and non-judicially noticeable facts outside the pleadings should convert their motion to

one for summary judgment.  Accordingly, the Court should either (a) strike the evidence and the

arguments in their entirety; or (b) convert defendants' motion into one for summary judgment under

Rule 12(d) to allow plaintiffs to take discovery concerning the "contract" with Client B and the

circumstances surrounding is cancellations.

- 23 -

Ironically, defendants' self-serving arguments regarding the terms of the contract actually *support* an inference of recklessness. For example, defendants argue that Client B could not terminate its contract with Kenexa or terminate an employee for any reason unless it provided 60 or 90 days' "notice" and satisfied other unspecified requirements. Mot. at 5-6, 30. Defendants argue they could not have known about the potential for lost revenue from the contract until Client B provided that "notice." *Id.*

As an initial matter, defendants' self-serving interpretations and explanations of extrinsic facts not in the record are improper. As the Third Circuit held, courts "cannot credit defendant's explanations at [the pleading] stage of the litigation." *In re Alpharma Sec. Litig*, 372 F.3d 137, 152 n.9 (3rd. Cir. 2004); *Oran v. Stafford*, 226 F.3d 275, 285 n.5 (3d Cir. 2000). *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (*en banc*) ("Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder."). Most other circuits, including this Court, have held that it is error for the trial court to accept an inference offered by defendants when the inference advanced by plaintiff is reasonable. *See, e.g., Oran v. Stafford*, 226 F.3d at 285; *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 79 (1st Cir. 2002); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1188 (10th Cir. 2003).

Even if that notice requirement was enforceable (and was not subsequently revised or waived at some point), however, there are no facts in the contract or defendants' other documents discussing when that "notice" occurred. In fact, based on the reports from Kenexa's own onsite employees, Client B began laying off Kenexa employees in early 2007 and through May and June 2007. Thus, the only reasonable inference is that Client B gave Kenexa notice long before defendants' May and August 2007 statements were made. At best, the existence and timing of any "notice" requirements are classic questions of fact for the jury.

Defendants also improperly raise factual disputes about the terms, timing and nature of Client

- 24 -

B's "cancellation" of its contract with Kenexa.  Mot. at 5-6.  Defendants assert that Client B allegedly did not "ask[] to be released from the last half of its five-year [EPO] contract" until the "third quarter of 2007," at which time Kenexa allegedly "accommodated the client's request."  Mot. at 1.  But there are no facts in either the Complaint, the documents incorporated into the complaint by reference, or documents subject to judicial notice that would allow defendants to draw an inference about any "request" by Client B.  That is simply defendants' disputed version of the story.

Simply put, the exact timing of Client B's termination of the contract and the negotiations and circumstances surrounding any purported "request" raises factual disputes not resolvable on a motion to dismiss.  As the Third Circuit noted, if there are ambiguities between the parties' factual interpretations, "we are required to credit plaintiffs' allegations rather than defendants' responses." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997); *Avaya*, 564 F.3d at 260 ("we will assume for purposes of this appeal that Shareholders' interpretation is correct.") ("Insofar as Avaya's gross margin percentage and other reported financial results are in tension with the reports of the CWs and analysts, a jury could decide to discredit the latter.  But in reviewing a district court's dismissal under Rule 12(b)(6), we do not resolve factual disputes – even in cases governed by the PSLRA.") (citing *Tellabs*, 127 S. Ct. at 2509).[5]  The only strong inference arising from the ***facts alleged*** in the complaint – as opposed to defendants' unsupported inferences– is that defendants were well aware of Client B's problems and the impact it had on Kenexa's forecasts and FY07 results long before they made their knowingly false and reckless statements to investors on May 7, 2007 and August 8, 2007.

---

[5]     *See, e.g., Jackson v. Rohm & Haas Co.*, No. 06-3682, 2007 U.S. Dist. LEXIS 71858, at *4 (E.D. Pa. Sept. 26, 2007) (deciding issue of fact inappropriate for motion to dismiss); *Freedom Med., Inc. v. Gillespie*, No. 06-3195, 2007 U.S. Dist. LEXIS 63720, at *71 (E.D. Pa. Aug. 29, 2007) (same); *Novinger Group, Inc. v. Hartford Ins., Inc.*, 514 F. Supp. 2d 662, 672 (E.D. Pa. 2007) (same).

Defendants' contention that Client B actually "expanded" the scope of services received from Kenexa in May-June 2007 to include Client B's Puerto Rico operations is also a disputed fact outside the scope of the pleadings and is not judicially noticeable. Defendants provide no information about how much those services cost and what impact that had on Kenexa's revenues for Client B. At best, defendants' argument raises questions of fact regarding the scope, nature and details surrounding contract negotiations between Kenexa and Client B and the revenue-generating impact of the allegedly new "services." Furthermore, the fact that Kenexa still missed its forecasts **despite** the alleged additional revenue from the new "services," demonstrates the severity and impact of Client B's cutbacks of Kenexa's workers.[6]

In sum, neither the Court nor plaintiffs has access to all of the evidence necessary to interpret or make findings concerning the Client B contract. Without all the evidence, e-mails and communications surrounding the contract, it is impossible to make legal determinations about the terms, scope or timing of certain provisions in the contract itself. Moreover, courts in the Third Circuit have cautioned that courts "'should not require plaintiffs to plead issues that may have been concealed by the defendants.'" *In re Veritas Software Corp. Sec. Litig.*, No. 04-831-SLR, 2006 U.S. Dist. LEXIS 32619, at *18 (D. Del. May 23, 2006) (citing *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 368-69 (D.N.J. 1999); *Rolo v. City Inv. Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998)). *See also In re AT&T Corp. Sec. Litig.*, No. 00-5364 (GEB), 2002 U.S. Dist. LEXIS 22219,

---

[6]  Curiously, defendants assert that Client B did not publicly announce that it planned to reduce its own headcount until August 15, 2007, which was after defendants' false August 8, 2007 statements and guidance. Mot. at 31. Client B's press release, however, had nothing to do with its business with Kenexa. It was a general announcement of a 12%-14% company-wide layoff of Client B's **own** employees, not Kenexa's. Defs' Ex. 37. As reported by numerous Kenexa witnesses, the layoffs of **Kenexa-specific employees** began at Client B in **early 2007** and continued in earnest throughout **May and June 2007**, leaving only four remaining employees at Client B as of summer 2007. Thus, defendants knew of these facts long before Client B's August 15, 2007 press release.

at *60 (D.N.J. Jan. 30, 2002) ("'[T]he particularity requirement is relaxed somewhat where the factual information is peculiarly within the defendants' knowledge or control.'  At this stage of the litigation, plaintiffs would not be privy to information that is maintained exclusively by the defendants.") (citation omitted).  This is precisely why Rule 12(d) exists and why courts do not allow a party at the pleading stage to submit self-serving extrinsic evidence that is neither part of the complaint nor subject to judicial notice.  Engaging in factual disputes concerning the meaning, intent and terminology in a heavily redacted contract at the pleading stage undermines the letter and spirit of Rule 12(b)(6).

> **3.    Defendants' Knowledge of Kenexa's GAAP Violations in Connection with Its U.K. Acquisition Support Falsity and Scienter**

Kenexa's 2006 Form 10-K, filed with the SEC on March 16, 2007, stated that the Company's financial statements "have been prepared in accordance with generally accepted accounting principles in the United States . . . ."  ¶19.  According to two independent witnesses, including a **Senior Vice President** of Kenexa's U.K. operations (CW10), Kenexa improperly included revenue in its forecasts from its acquisition of U.K. company DSL that did not comply with U.S. GAAP.  ¶¶58-59.  CW10 stated that at the time of the acquisition of PSL in November 2006, it was known and acknowledged that PSL's revenue recognition practices needed to be changed to comply with U.S. GAAP.  But according to CW10, Kenexa failed to timely make the switch from U.K. accounting practices to U.S. GAAP, which inflated Kenexa's FY07 revenue projections.  ¶58.  This information was corroborated by CW11, a former European Sales Director for assessments, who also confirmed that Kenexa's failure to timely change its revenue recognition practices until much later contributed to Kenexa's revenue shortfall in 3Q07.  ¶59.

Defendants essentially ignore the substantive reports of their own former employees (including one of Kenexa's own Senior Vice Presidents) and argue that because Kenexa's auditor

issued a "clean" audit opinion, it necessarily means Kenexa was not reckless. On the contrary, numerous courts have held that clean audit opinions or the lack of a formal restatement does ***not*** negate well pled allegations of fraud. *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245 (N.D. Cal. 2008) ("lack of a restatement" and "unqualified opinion" of auditor does not negate scienter); *id*. at 1246 ("[O]fficers and directors are not exonerated when their own audit committee finds nothing wrong in the company's accounting practices. To rule otherwise would create a huge fox-guards-the-chicken-house loophole in our private securities fraud enforcement."); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir.2002) (same).

Moreover, auditors do not conduct audits on ***quarterly*** financial results. Indeed, Kenexa's quarterly Forms 10-Q explicitly state the results are "prepared by the Company ***without audit***." Defs' Ex. 3 at 7; Ex. 4 at 7; Ex. 5 at 7. According to the witnesses, Kenexa eventually did change its U.K. revenue recognition policies in order to comply with U.S. GAAP, which contributed to the 3Q07 miss. ¶20. When combined with the facts known to defendants surrounding Client B, these facts contribute to a strong inference of recklessness.

### 4.    Defendants' Knowledge of Slowdowns in EPO Sales and Risky Sales Cycle Practices Reinforces Falsity and Scienter

According to several witnesses, Kenexa's forecasts unreasonably included risky deals that were either still in the pipeline or had only a 50% chance of closing. ¶¶56-57. According to CW 8, a former Kenexa inside sales manager, the Company included in its forecasts deals that were only in "stage four" of a six-stage sales cycle. ¶56. This meant that the potential customer had narrowed it down to Kenexa and another HCM competitor with only a 50% chance of securing the deal. ¶56. Kenexa's inclusion of such risky deals in its forecasts – deals that were essentially subject to the flip of a coin – was unreasonable and unreliable, especially at a time when EPO sales were already slowing and Client B was drastically cutting back on Kenexa's services. The Complaint adequately alleges that defendants knew that Kenexa's EPO sales were taking longer to close and that the

- 28 -

Company was losing EPO deals to competitors. ¶¶9, 17, 56-57, 59, 67(c).  CW11, a former Kenexa European Sales Director, also said that Kenexa's international assessment sales were "soft" during the Class Period and that defendants met regularly with CW9's supervisor to discuss these forecasts. ¶59.  These practices exposed Kenexa to unreasonable risk that was not disclosed to investors.

Defendants admit in their Motion that after the 40% crash in Kenexa's stock price, defendants stated that Kenexa's performance was impacted not only by Client B but also that "***weak sales management in the Company's U.K. assessments business contributed to the revenue miss***." Mot. at 34; ¶88 (admitting problems with international sales).  Defendants also admitted that the revenue miss was due in part to "longer sales cycles associated with the EPO portion of the business" and problems with the Company's "day to day sales executions in the ***international markets*** in particular." ¶88.  Karsan admitted that the problems were "Kenexa issues," not "market issues." ¶89.  This was confirmed by Wall Street analysts, who noted that while Kenexa reported a sharp deceleration of its organic growth, Kenexa's competitors reported ***acceleration*** in year-over-year organic growth. ¶90.  These facts demonstrate that defendants' unreasonable forecasting was one of the causes of Kenexa's earnings and revenue miss.  As this Court has recognized, "[a]ny information" before or after the Class Period "that sheds light on whether class period statements were false or materially misleading is relevant." *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 271-72 (3d Cir. 2005).  Other circuits agree that "later-emerging facts," like defendants' admissions that they "know first-hand" about problems with their customers, serve to support "inferences about an earlier situation" and are not fraud by hindsight. *Plotkin v. I.P. Axess, Inc.*, 407 F.3d 690, 698-99 (5th Cir. 2005); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

Defendants respond to plaintiffs' allegations by asserting that Kenexa used the same sales forecasting methodology in prior quarters when it met or beat expectations and thus was not unreasonably at risk in 3Q07 and FY07.  Mot. at 32.  This "historical basis" argument has been flatly

- 29 -

rejected by the Third Circuit and should be rejected here:

> We are not, however, persuaded by the district court's view that the earnings projections were *per se* reasonable because they were in accord with the company's performance over the previous five years. A *per se* rule immunizing [defendant] from the need to speak truthfully about the future merely because the company had performed well in the past seems to us improvident. It is not difficult to imagine situations in which the management of a company is well aware of circumstances, not previously present, which are very likely to have a grievous (or, for that matter, salutary) impact on future earnings; in such circumstances, a mere repetition of earnings figures for previous years might indeed give rise to liability.

*Weiner v. Quaker Oats Co.*, 129 F.3d 310, 320 n.11 (3d Cir. 1997).

Defendants' "historical basis" argument also ignores the ***combination*** of negative factors that were hitting Kenexa all at once during the Class Period – Client B's problems and cancellation of their contract, the "soft" sales and improper accounting in the Company's international business, and the use of risky forecasting practices. It was the confluence of those negative factors that rendered Kenexa's forecasts and statements about its business condition false and misleading. Just because Kenexa was able to overcome risky forecasting before does not negate the fact that it ultimately came to a head and was a known contributor to Kenexa's miss in 3Q07. Indeed, the fact that the Company terminated all incremental EPO sales from its forecasts after 3Q07 demonstrates the unreasonable risks posed by those practices. ¶67(b).[7]

### 5.    Defendants' Omission of Material Adverse Facts about Kenexa's Business Give Rise to Liability

The Third Circuit imposes a duty to disclose nonpublic averse information where there is either (a) a "statute requiring disclosure"; (b) "*insider trading*"; or (c) "an *inaccurate, incomplete or misleading prior disclosure*." *Oran*, 226 F.3d at 285-86; *Chiarella v. United States*, 445 U.S. 222,

---

[7]    Moreover, the fact that Kenexa's earnings were so smooth and predictable during ***other*** periods actually supports plaintiffs' allegations that defendants would have been on notice of the unique circumstances and red flags surrounding Client B and its impact on Kenexa's financial forecasts.

- 30 -

227-28 (1980) (corporate insiders have duty to disclose or abstain from trading). Here, plaintiffs allege insider trading **and** inaccurate and misleading disclosures, both of which trigger a duty to disclose. Defendants made affirmative false, incomplete and misleading statements concerning the Company's business, forecasts and overall business condition for 3Q07 and FY07. ¶¶60-64. Once defendants chose to speak (or sell Company stock), they had a duty to speak truthfully and provide investors with complete and accurate information about these core areas of the Company's business. *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 641 (3d Cir. 1989) ("Rule 10b-5 impose[s] upon defendants the duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or volunteered, not misleading."); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("[I]f a defendant represents that its lending practices are 'conservative' and that its collateralization is 'adequate,' the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations."); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824 (E.D. Pa. 2001) ("A duty to disclose arises whenever secret information renders public statements materially misleading, not merely when that information completely negates the public statement") (citing *In re Time Warner Sec. Litig.*, 9 F.3d 259, 268 (2d. Cir. 1993)).[8]

Defendants' assertion that they had no "duty to update" their initial forecasts is a red herring. Mot. at 27-28, 32 n.44. The "duty to update" concept is rarely alleged and only arises when

---

[8]    *See also Helwig*, 251 F.3d at 561 (*en banc*) ("a company may choose silence or speech . . . but it may not choose half-truths"); *Berson*, 527 F.3d at 987 (once defendants choose to speak, they must speak truthfully); *Wallace v. Sys. & Computer Tech. Corp.*, No. 95-cv-6303, 1997 U.S. Dist. LEXIS 14677, at *36 (E.D. Pa. Sept. 23, 1997) (liability attaches "where silence would make other statements misleading or false" because "Rule 10b-5 creates a statutory duty to 'speak the **full** truth when a defendant undertakes to say anything.'"); *Campbell Soup*, 145 F. Supp. at 583; *accord Lucent*, 217 F. Supp. 2d at 543 ("[o]nce a defendant makes a disclosure, that defendant must ensure that any disclosure is accurate.").

defendants issue a **single** ordinary forward-looking forecast and are later **silent** as to the forecasts and do not speak or sell stock. *Cf. Burlington*, 114 F.3d at 1432 (explaining the duty to update).[9] That concept is not at issue here. Plaintiffs allege continued and repeated **affirmative** false and misleading statements, knowing omissions of material fact, misleading projections and insider trading. As explained above, when defendants make **affirmative** statements to investors and also sell stock, both acts trigger a duty to speak truthfully and disclose all material adverse facts. *Oran*, 226 F.3d at 285-86. This well-established principle is enshrined in Rule 10b-5 jurisprudence. *Shapiro*, 964 F.2d at 282; *Weiner*, 129 F.3d at 318 (finding statements actionable when omitting material facts that rendered those statements unreliable); *In re Home Health Corp. of Am. Sec. Litig.*, No. 98-834, 1999 U.S. Dist. LEXIS 1230, at *54-*55 (E.D. Pa. Jan. 28, 1999) (finding that defendants' arguments concerning "duty to update" were irrelevant because plaintiffs adequately alleged false statements and material omissions of fact); *AT&T*, 2002 U.S. Dist. LEXIS 22219, at *66 ("the absence of a duty to update does not allow defendants to make knowingly false statements."); *see also Helwig*, 251 F.3d at 561; *Berson*, 527 F.3d at 987; *Craftmatic*, 890 F.2d at 641; *Wallace*, 1997 U.S. Dist. LEXIS 14677, at *36. Thus, defendants' reliance on a "duty to update" defense is inapposite.

### 6.    Defendants' Statements Do Not Qualify as Immaterial "Puffery"

Without providing any materiality analysis whatsoever, defendants contend in a footnote that

---

[9]    Defendants' citation of *In re CIGNA Corp Sec. Litig.*, 2005 U.S. Dist. LEXIS 35524, at *13 (E.D. Pa. Dec. 23, 2005), and *Blum v. Semiconductor Packaging Materials Co.*, 1998 U.S. Dist. LEXIS 6868 (E.D. Pa. May 5, 1998), are similarly misplaced. In both cases, the courts simply repeated the general rule explained in *Burlington*, 114 F.3d at 1433, that for "ordinary" and "run-of-the-mill forecasts," defendants have no subsequent "duty to update" those projections. *Id.* Defendants in those cases neither sold their company stock nor made subsequent affirmative false statements regarding current performance and increased forecasts, both of which trigger a duty to disclose and speak truthfully.

the non-forward looking statements alleged in the Complaint are immaterial "puffery."  Mot. at 21 n.38. As an initial matter, this concession contradicts defendants' earlier assertion that plaintiffs do not allege *any* non forward-looking statements in the entire Complaint.  Mot. at 3, 17.  This concession also dooms their motion under Rule 12(b)(6) because defendants failed to address the non-forward looking statements and the applicable "recklessness" scienter standard while improperly attempting to "reserve" those arguments for reply.  *See supra*, at 17.  In any event, any hypothetical materiality defense fails.

Material information is "information that would be important to a reasonable investor in making his or her investment decision."  *Oran*, 226 F.3d at 282 (citing *Burlington*, 114 F.3d at 1425, and *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)) ("Undisclosed information is considered material if there is a substantial likelihood that the disclosure would be viewed by the reasonable investor as having significantly altered the total mix of information available to that investor.").  Materiality is a "mixed question of law and fact," and "the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact."  *Shapiro*, 964 F.2d at 281 (citing *TSC*, 426 U.S. at 450); *Weiner*, 129 F.3d at 317 ("The emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings."); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274-75 (3d Cir. 2004) (same); *Semerenko v.Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000) (same).  "***Only if*** the alleged misrepresentations or omissions are ***so obviously unimportant*** to an investor that ***reasonable minds cannot differ*** on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law."  *Shapiro*, 964 F.2d at 281; *accord Steiner v. MedQuist Inc.*, No. 04-5487 (JBS), 2006 U.S. Dist. LEXIS 71952, at *43 (D.N.J. Sept. 29, 2006) ("because that information was not so obviously unimportant to investors, the Court must let a jury decide this issue.").

- 33 -

Defendants have failed to demonstrate that their false statements were immaterial "puffery." A statement can be dismissed as "puffery" as a matter of law *only if* it is "immaterial, either because it is so exaggerated ('You cannot lose.') or so vague ('This bond is marvelous.') that a reasonable investor would not rely on it in considering the '"total mix" of [available] information.'" *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200-01 (3d Cir. 1990) (quoting *TSC Ind.*, 426 U.S. at 449); *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) (seemingly innocuous "puffery" may still materially mislead investors). Defendants' statements do not fall within this standard. Defendants' misrepresentations of Kenexa's current performance, core operations and business outlook, made by top corporate officials, were heavily relied upon by analysts and investors. *See* ¶¶64-65 (analysts responded favorably to defendants' bullish statements). Courts in this Circuit have held that such "[s]tatements of opinion by top corporate officials may be actionable if they are made without a reasonable basis" because "investors know that these top officials have knowledge and expertise far exceeding that of the ordinary investor." *Payne v. DeLuca*, 433 F. Supp. 2d 547, 562 (W.D. Pa. 2006); *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090-91 (1991).[10]

Defendants' reliance on *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999), to support their "puffery" argument is misplaced. Mot. at 21-22. In *Advanta*, the court found inactionable statements by a defendant that merely expressed the defendant's confidence with respect to future results on the basis of previous successes. *Id.*, 180 F.3d at 537-38. Unlike *Advanta*,

---

[10]    *See Weiner*, 129 F.3d at 320 (3d Cir. 1997) (finding that defendant's statement that he was "'confident of achieving at least 7% real earnings growth'" was not a "vague expression of optimism," but was the type of "'soft information' from high-ranking corporate officials [that] can be actionable" if made without a reasonable basis); *see also In re Honeywell Int'l Sec. Litig.*, 182 F. Supp. 2d 414, 425-26 (D.N.J. 2002) (holding that where defendants' optimistic statements were "alleged to have been knowing misrepresentations when made, *and as one difficulty followed another and when defendants never so much as tempered this optimism*, it can be inferred that in due course it was no longer misguided optimism – it was deliberate deceit").

defendants' misrepresentations here included factual statements about Kenexa's **current** operations and its **current** business condition and omissions about **current** facts regarding Client B, EPO sales slowdowns and "soft" international sales. *See, e.g.*, ¶74 ("We don't feel it. I don't feel like a slow down . . . . I'm feeling like it's really, really solid."); ¶70 ("Market demand is strong"); ¶72 ("We are pleased with the high level of execution across all our global organization"); ¶72 ("Our revenue continues to be highly visible"). These statements are not puffery. *See, e.g., In re Penn Treaty Am. Corp. Sec. Litig.*, 202 F. Supp. 2d 383, 392-93 (E.D. Pa. 2002) (holding that the statement "[w]e are not in trouble" was not immaterial puffery and "does not appear to be vague or generally optimistic, particularly given its context."); *In re U.S. Interactive, Inc. Sec. Litig.*, No. 01-CV-522, 2002 U.S. Dist. LEXIS 16009, at *49-*50 (E.D. Pa. Aug. 23, 2002) (holding as actionable statements concerning "incredible demand," "robust" demand and "strong" demand.); *Lucent*, 217 F. Supp. 2d at 556 (rejecting puffery defense where defendants denied that problems existed); *Novak*, 216 F.3d at 315 (statements that "the inventory situation was 'in good shape' or 'under control'" not inactionable puffery); *Par Pharm.*, 2009 U.S. Dist. LEXIS 90602, at *32 (statements "are not forward looking or puffery because they misrepresented historical facts."). [11]

Defendants' materiality defense is also negated by the **40% drop** in Kenexa's stock price when defendants suddenly disclosed the adverse facts relating to Client B. *See Merck*, 432 F.3d at

---

[11]    Defendants' reliance on *In re ATI Tech. Sec. Litig.*, No. 05-4414, 2007 U.S. Dist. LEXIS 57610 (E.D. Pa. Aug. 8, 2007), is similarly misplaced. Mot. at 23. In *ATI*, the plaintiffs alleged that the defendants repeatedly told investors that ATI would introduce a product, R520, by a specific date. 2007 U.S. Dist. LEXIS 57610, at *29. The court found that statements expressing "general optimism about the *rest of the fiscal year*" ("'we're excited about our prospects for the rest of 2005 and beyond'") but containing no reference to R520 or its expected release date were immaterial. *Id.* at *10, *29. Unlike *ATI*, defendants' bullish statements were concrete representations of Kenexa's core business condition, its current performance and then-existing business prospects and directly relate to plaintiffs' claims (¶¶70, 72, 74); *see also In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999).

269 ("The *Oran- Burlington* standard holds that the materiality of disclosed information may be measured *post hoc* by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock."); *Able Labs.*, 2008 U.S. Dist. LEXIS 23538, at *52 ("the significant decrease in stock price immediately following the disclosure of the adverse information satisfies the Third Circuit's standard for pleading materiality.").

At best, defendants' materiality defenses raise disputes of fact that cannot be resolved here. *See Harvey M. Jasper Ret. Trust v. Ivax Corp.*, 920 F. Supp. 1260, 1268 (S.D. Fla. 1995) ("Defendants' assertion that its statements were mere puffing raises an issue of fact . . . ."); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-1519, 2007 U.S. Dist. LEXIS 5410, at *9-*10 (D.N.J. Jan. 22, 2007) (same).  Because defendants fail to establish that the misrepresentations or omissions were "so obviously unimportant to an investor that *reasonable minds cannot differ* on the question of materiality," it is inappropriate for the Court to make a finding of immateriality as a matter of law.  *Shapiro*, 964 F.2d at 281; *accord Steiner*, 2006 U.S. Dist. LEXIS 71952, at *43 ("because that information was not so obviously unimportant to investors, the Court must let a jury decide this issue.").

### E.    Plaintiffs Adequately Allege Falsity and Scienter for Defendants' Forward-Looking Statements

"Consistent with Third Circuit case law, an opinion about future events is actionable if it lacks a reasonable basis when made."  *Veritas*, 2006 U.S. Dist. LEXIS 32619, at *20 (citing *Burlington*, 114 F.3d at 1427) ("[I]f a company voluntarily chooses to disclose a forecast or projection, that disclosure is susceptible to attack on the ground that it was issued without a reasonable basis.").  "'Before management releases estimates to the public, it must ensure that the information is reasonably certain.  If it discloses the information before it is convinced of its

certainty, management faces the prospect of liability.'"  *Burlington*, 114 F.3d at 1427 (citation omitted).[12]

As set forth in §III.D.1-5, *supra*, plaintiffs allege with particularity that Kenexa's projections on May 8, 2007 of $186-$189 million for FY07, their increase to those projections to $188-$192 million for FY07, and their projections of $48-$50 million for 3Q07 on August 8, 2007, lacked a reasonable basis.  Defendants had ***actual knowledge*** of adverse material facts tending to "seriously undermine the accuracy of the statement."  *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989) ("A projection or statement of belief contains at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is ***not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement***.").  *Accord Helwig*, 251 F.3d at 557; *In re BP Prudhoe Bay Royalty Trust Sec. Litig.*, No. C06-1505 MJP, 2007 U.S. Dist. LEXIS 83007, at *19 (W.D. Wash. Oct. 26, 2007) ("'A [projection] is actionably false if there is no reasonable basis for the belief or the speaker is aware of undisclosed facts tending to seriously to [sic] undermine the statement's accuracy.'") (citation omitted).  The Complaint meets this standard.  Defendants here had actual knowledge and failed to disclose (a) the problems with Client B and the massive cutbacks and lost revenue; (b) the slowdown in EPO and international assessment sales; and (c) the failure to properly account for Kenexa's U.K. acquisition under U.S. GAAP.  These facts "seriously

---

[12]    Defendants misconstrue *Burlington*.  *Burlington* cites the general standard for when a projection may be actionable.  114 F.3d at 1428-30 (plaintiff must allege specific facts to allow an inference "that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology.").  Unlike plaintiffs here, the plaintiffs in *Burlington* failed to make that showing because they simply concluded that the forecasts were unreasonable without supporting facts.  In other words they "simply mouth[ed] the required conclusion of law."  *Id.* at 1430.  Here, plaintiffs provide numerous facts demonstrating defendants' actual knowledge of adverse facts that rendered their forecasts without reasonable basis.

undermined" the truthfulness of defendants' statements and rendered their forecasts misleading.

### 1.    Defendants Are Not Shielded from Liability by the PSLRA's Safe Harbor

Dismissal on the pleadings under the safe-harbor defense "requires a stringent showing" by defendants. "There must be sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading.'" *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946-48 (9th Cir. 2005) (citation omitted); *accord Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1214 (1st Cir. 1996); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004).

Defendants' repeated false assurances and reiterations of guidance on August 8, 2007 served to neutralize the cautions and preclude resolution of the safe harbor. This Court has recognized that repeat assurances may preclude invocation of the safe-harbor defense as a matter of law because reasonable jurors could differ about whether the warning was meaningful. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 877 (3d Cir. 2000); *see also In re Westinghouse Sec. Litig.*, 90 F.3d 696,707-10 (3d Cir. 1996). This Court has also held that "the safe harbor will not apply if the statement was made with 'actual knowledge' that the statement was false or misleading." *Advanta*, 180 F.3d at 536. A warning that earnings ***may*** differ when, in fact, defendants already know they were decreasing dramatically is not within any safe harbor – it is continuing deception and fraud. *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd*, 459 U.S. 375 (1983) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit"); *accord Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (The safe-harbor provides no protection to someone who warns "there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away").

Here, as witnesses disclosed, and defendants later admitted, defendants already knew when

- 38 -

they made or increased their forecasts that Kenexa's international sales were "soft" and declining, that Client B was cutting back on its revenue-generating Kenexa personnel, that sales cycles for EPO accounts were lengthening, that Kenexa did not properly account for its U.K. acquisition under U.S. GAAP, that Kenexa's forecasts included deals that only had a 50% chance of closing, and that Kenexa could not attain the revenue and earnings increases defendants projected. *See* §III.D.1-5. Thus, defendants cannot seek shelter in the PSLRA safe harbor.

### 2. Defendants' Purported "Cautionary Language" Was Neither Specific nor Meaningful

"Cautionary language in securities offerings is just about universal." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002). Thus, the PSLRA safe harbor only applies when a company's financial projections are accompanied by ***meaningful*** warnings of the risks that "could cause actual results to differ materially" from projections. 15 U.S.C. §78u-5(c)(1)(A)(i). Vague or boilerplate cautions are inadequate. Neither does the safe harbor apply when defendants have actual knowledge that the risks they caution about have already materialized. 15 U.S.C. §78u-5(c)(1)(B); *Advanta*, 180 F.3d at 536. In order for cautionary language to be "meaningful," it must be substantive and "tailored," *i.e.*, "directly related" to the risk that caused plaintiff's loss. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004). Indeed, "vague or blanket (boilerplate) disclaimer[s] which merely warn[] the reader that the investment has risks" are inadequate. *See Possi v. Smith*, No. 95-1454, 1995 WL 723191, at *2 (E.D. Pa. Dec. 5, 1995); *Viropharma*, 2003 U.S. Dist. LEXIS 5623, at *30; *Helwig*, 251 F.3d at 558-60; *In re Amylin Pharms., Inc. Sec. Litig.*, No. 01cv1455 BTM (NLS), 2003 U.S. Dist. LEXIS 7667, at *20 (S.D. Cal. May 1, 2003); *In re Cardinal Health. Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 749 (S.D. Ohio 2006).

Here, defendants' purported cautionary language consists of vague, meaningless boilerplate "Risk Factors" that were cut, pasted and repeated each and every quarter. *See, e.g.*, Mot. at 23-26. In fact, Kenexa's warnings were virtually ***identical*** in 2005, 2006 and 2007 and did not update the

479466_1

language as new facts became known.  *Compare* Defs' Ex. 1 at 20-32 *with* Ex. 1 to the Declaration

of Deborah R. Gross in Support of Plaintiffs' Opposition at 18-31 [2005 10-K] and Gross Decl., Ex.

2 at 18-30 [2007 10-K].  For example, defendants point to Kenexa's Form 10-K, which vaguely

stated that the Company "operate[d] in a market environment that involves significant risks, many of

which are beyond [its] control," and identified general risk factors that "***may*** adversely impact

[Kenexa's] results of operations, cash flows and the market price of [its] common stock.  Mot. at 24-

25.  Similarly, during conference calls, Karsan robotically read from a canned statement, referred

readers to Kenexa's SEC filings, and vaguely asserted that "[t]his presentation may contain forward-

looking statements that are subject to risks and uncertainties associated with the company's

business."  Mot. at 24. [13]

On their face, these so-called risk disclosures are too generic to trigger the safe harbor.

Courts have held that the meaningfulness of risk disclosures cannot readily be determined at the

pleading stage when "***cautionary language remained fixed even as the risks changed***."  *Asher*, 377

F.3d at 733-34 ("any issuer could list its lines of business, say 'we could have problems in any of

these,' and avoid liability for statements implying that no such problems were on the horizon even if

a precipice was in sight.").  Further, the cautionary language did not warn investors about specific,

meaningful risks and adverse facts (*e.g.*, Client B's rapid cutbacks of Kenexa employees and

cancellation of the contract) ***already known*** and concealed by defendants.  The law is clear that

defendants cannot avoid liability by issuing vague warnings that certain risk "may" occur while that

event is already occurring.  *See Westinghouse*, 90 F.3d at 710 ("'to warn that the untoward may

---

[13]     Defendants' citation of *In re Discovery Labs. Sec. Litig.*, No. 06-1820, 2006 U.S. Dist.
LEXIS 79823 (E.D. Pa. Nov. 1, 2006), is misplaced.  Mot. at 15-16, 19.  In *Discovery Labs*, the
court specifically found that the defendants' disclosed risks ***changed over time*** and were
"substantive and tailored."  *Id.* at *50-*51.  As set forth above, defendants here did nothing more
than regurgitate meaningless, boilerplate warnings quarter after quarter.

- 40 -

occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit'") (citations omitted); *Possi*, 1995 WL 723191, at *2 ("[T]he cautionary statements [must] 'discredit the [alleged misrepresentations] so obviously that the risk of real deception drops to nil.'") (citation omitted).

With respect to the known problems surrounding Client B and EPO sales, defendants point to certain generic risk disclosures concerning client contracts that they contend warned investors about the risks related to Client B. Mot. at 25. But those purported "cautionary disclosures" were much too general and boilerplate to invoke the safe harbor. Telling investors that revenue "may" decline if any clients "terminate their agreements, fail to renew their agreements, renew their agreements upon less favorable terns to [Kenexa], or fail to purchase new solutions" is neither specific nor meaningful. Mot. at 25. That is akin to warning investors that "we may not make money if customers do not buy our products." Investors already know that. What investors did not know was that, due to the FDA black box warning, one of Kenexa's largest EPO clients (Client B) was drastically cutting Kenexa employees from its account, which impacted Kenexa's revenue.

Moreover, the purported "warning" disclosures concerning customer contracts were virtually identical from 2005 to 2006 to 2007. In fact, the only recognizable change to the risk disclosures regarding customer contracts from 2005 to 2007 was that in Kenexa's 2006 Form 10-K, the Company inserted the phrase "***under certain circumstances***." *Compare* Gross Decl., Ex. 1 at 19 [2005 10-K] ("Our clients have the right to terminate their contracts and are not obligated to renew their subscriptions for our solutions after the expiration of the initial terms of their subscription agreements.") *with* Defs' Ex. 1 at 20 ("Our clients have the right to terminate their contracts ***under certain circumstances*** and are not obligated to renew their subscriptions for our solutions after the expiration of the initial terms of their subscription agreements."). Warning investors that clients "may" terminate contracts "under certain circumstances" adds nothing meaningful to the mix of

- 41 -

investor information. Such a vague disclosure is neither specific nor "meaningful" and did not warn

or even foreshadow problems that defendants already knew were occurring at Client B. To warn

results "may" differ when defendants already knew their forecasts would miss is deceit. *Asher*, 377

F.3d at 733-34. This is not sufficient to invoke the safe harbor under Third Circuit law. *See*

*Westinghouse*, 90 F.3d at 710; *Possi*¸ 1995 WL 723191, at *2; *Viropharma*, 2003 U.S. Dist. LEXIS

5623, at *29 ("[A] defendant may not use cautionary language to protect himself when he is already

aware that the risks he is cautioning against have come to fruition.").[14]

### 3. Plaintiffs Allege Actual Knowledge of Adverse Facts that Rendered Their Forecasts Misleading

No amount of cautionary language insulates statements made with actual knowledge of their

falsity or misleading nature: "[T]he safe harbor will not apply if the statement was made with 'actual

knowledge' that the statement was false or misleading." *Advanta*, 180 F.3d at 536; *see also*

*Gargiulo v. Demartino*, 527 F. Supp. 2d 384, 389 (E.D. Pa. 2007). "In other words, the safe harbor

provision does not afford corporations a free pass to lie to investors. Further, a purposeful omission

of existing facts or circumstances does not qualify as a forward-looking statement and is not

protected by the safe harbor of the Reform Act." *Veritas*, 2006 U.S. Dist. LEXIS 32619, at *20.

As set forth *supra*, plaintiffs alleged that Client B was one of Kenexa's largest EPO clients,

and defendants were personally aware of Client B's problems beginning in early 2007 and

throughout the Class Period. §III.D.1. Defendants knew that Client B had cut back virtually all of

---

[14]    *See also Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993) ("A prospectus stating a risk that such a thing could happen is a far cry from one stating that this had happened. The former does not put an investor on notice of the latter."); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 930 (D.N.J. 1998) ("Warnings of possible adverse events are insufficient to make omissions of present knowledge of certain future events legally immaterial."); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007) ("This Court concludes that cautionary language cannot be 'meaningful' when defendants know that the potential risks they have identified have in fact already occurred, and that the positive statements they are making are false.").

its Kenexa employees onsite and were having financial problems that resulted in the cancellation of its contract with Kenexa.  Defendants personally received weekly reports and attended frequent meetings discussing each and every EPO client and participated in question-and-answer sessions regarding each of Kenexa's EPO clients.  They knew that Client B had received a black box warning from the FDA and was drastically laying off Kenexa employees *en masse*.  The concealment of Client B's problems (and the corresponding revenue impact) while raising Kenexa's revenue projections and telling investors that "market demand is strong" and revenue was "highly visible" renders Kenexa's forecasts misleading.

Defendants argue that their actual knowledge of Client B's revenue-impacting layoffs did not equate to knowledge that Client B would actually cancel the contract.  Mot. at 31.  As defendants admit in their motion, however, "Client B agreed to pay a subscription fee each month for ***each Kenexa employee*** ('resource') assigned to its account."  Mot. at 5.  They also disclosed that they recognize revenue from such contracts on a monthly basis.  Defs' Ex. 36.  Thus, defendants were well aware that Client B's rapid downsizing of Kenexa employees beginning in early 2007 necessarily impacted their revenue projections and the success of the Client B contract.

Moreover, defendants' attempt to raise factual issues about the timing and defendants' beliefs about the impact of the loss of contract with Client B are improper and should be rejected.  *See In re Cambrex Corp. Sec. Litig.*, No 03-cv-4896 (WJM), 2005 U.S. Dist. LEXIS 25339, at *26 (D.N.J. Oct. 27, 2005) (Rejecting defendants' argument that the effects of losing a contract were uncertain or speculative: "[A]t the pleading stage, the Court is required to give credit to plaintiffs' allegations rather than defendants' responses.  Plaintiffs allege defendants knew the loss of the contract was definite and this made the earnings guidance impossible to achieve.").

### F.    Defendants' Insider Selling Reinforces the Already Strong Inference of Scienter

#### 1.    Insider Stock Sales During the Class Period Bolster Plaintiffs' Showing of a Strong Inference of Scienter

Motive and opportunity "are to be considered along with all the other allegations in the complaint" in assessing whether scienter has been adequately alleged, and, when insider stock sales are "unusual in scope or timing, they may support an inference of scienter." *Avaya*, 564 F.3d at 277-79 (citations omitted). "Whether a sale is unusual in scope depends on factors such as the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." *Suprema*, 438 F.3d at 277 (internal quotation and citation omitted). The court may also consider whether sales are "normal and routine" and whether the insider received substantial profits in comparison to his or her compensation. *Id.* Here, plaintiffs allege that the Individual Defendants' stock sales, as well as the stock sales of insider Kanter, are one of many cogent factors contributing to an inference of scienter.

#### 2.    The Insider Sales Are Unusual and Suspicious in Scope and Timing

First, the sheer magnitude of the insider trading is unusual and suspicious in scope. The Complaint alleges that the CEO (Karsan), CFO (Volk) and COO (Kanter), three of Kenexa's highest-level executives, collectively sold 271,996 shares of Kenexa stock, reaping $9.75 million in proceeds, during the six-month Class Period. ¶¶ 41, 98. Contrary to what defendants suggest, there is no bright-line rule, either in the Third Circuit or elsewhere, governing the percentage of stock that must be sold for insider trading to be deemed unusual or suspicious in scope. The Complaint alleges that Karsan sold almost 16% of his Kenexa holdings during the Class Period for over $6.7 million in proceeds, Volk sold 33.32% of his shares for proceeds of $746,800, and Kanter sold 74.30% of his holdings for proceeds of nearly $2.25 million. ¶¶8, 34-35, 98-99. These amounts and percentages are in line with what courts have found suspicious in other cases. *See Suprema*, 438 F.3d at 277

- 44 -

(two insiders' stock sales for proceeds of $7 million); *Voit v. Wonderware Corp.*, 977 F. Supp. 363,

374 (E.D. Pa. 1997) (finding that $4.6 million in stock sales by three defendants that amounted to

10.6%, 14.9% and 71.9% of each of their holdings supported scienter); *Takara Trust v. Molex Inc.*,

429 F. Supp. 2d 960, 981 (N.D. Ill. 2006) (the fact that stock sales only amounted to 1.9% of the

defendants' holdings does not negate scienter); *In re Omnivision Techs.*, No. C-04-2297 SC, 2005

U.S. Dist. LEXIS 16009, at *14-*15 (N.D. Cal. July 29, 2005) (stock sales amounting to 18% of

holdings supported inference of scienter); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d

1150, 1168-69 (C.D. Cal. 2003) (stock sales amounting to 7.6% of personal holdings supported

scienter); *Hayley v. Parker*, No. SA CV 01-69 DOC (EEx), 2001 U.S. Dist. LEXIS 23255, at *16-

*17 (C.D. Cal. Aug. 31, 2001) (stock sales amounting to 11% of holdings supported scienter).

The stock proceeds were also unusual in comparison to the base salaries earned by these

officers in 2007.  Here, proceeds from the insider stock sales reflected over twice defendant Volk's

base salary, over five times Kanter's base salary, and over 13 times defendant Karsan's base salary.

*Compare* ¶98 (chart reflecting proceeds from insider stock sales) *with* Defs' Ex. 9, 2007 Proxy

Statements at 23 (listing 2007 base salaries of Kenexa executive officers).  *See also Suprema*

*Specialties*, 438 F.3d at 277-78 (finding that one defendant's stock sales earned him over four times

his annual salary to be probative of scienter in light of ratio of profits to compensation).

Second, the insider stock sales were unusual and suspicious in timing as they "occurred on

the heels of optimistic statements," which "constitutes circumstantial evidence that statements were

fraudulent when made."  *Schlagel v. Learning Tree Int'l*,  No. CV98-6384 ABC (Ex), 1998 U.S.

Dist. LEXIS 20306, at *32 (C.D. Cal. Dec. 29, 1998).  Karsan's suspicious stock sales were timed to

take maximum advantage of the artificial inflation caused by defendants' positive

misrepresentations.  ¶100.  For example, Karsan capitalized on the artificially inflated price of

Kenexa stock by selling 127,400 shares for proceeds of more than $4.6 million over a three-week

- 45 -

period in May 2007, after defendants made false statements concerning Kenexa's business and its FY07 forecasts. ¶¶8, 66, 98, 100. Volk and Kanter also sold substantial percentages of their Kenexa holdings that very same month. ¶98. *See In re Westell Techs., Inc. Sec. Litig.*, No. 00C 6735, 2001 U.S. Dist. LEXIS 17867, at *34-*36 (N.D. Ill. Oct. 26, 2001) (finding scienter where defendant "sold a large amount [28% of his holdings]" at same time as co-defendants and had knowledge about a decline in purchases, which, coupled together, "suggest[] both a motive and opportunity to maximize personal gain . . . before that information became public.").

Later in the Class Period, and only a month before disclosing the adverse facts to the public, Karsan again took advantage of the artificial inflation in Kenexa stock, selling a total of 37,500 shares of Kenexa stock on October 1, 2007 and October 3, 2007 for nearly $1.2 million in proceeds. ¶¶27, 85, 98. Such unusual timing of stock sales by high-level insiders clearly supports an inference of scienter. *See In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 989-90 (N.D. Cal. 2001) (holding that timing of stock sales, which occurred shortly after management made optimistic statements to the market, "makes them suspicious"); Hayley, 2001 U.S. Dist. LEXIS 23255, at *16-*17 (C.D. Cal. Aug. 31, 2001) (holding that stock sales that "occurred within days of quarterly reports which reflected fraudulent earnings statements" give rise to a strong inference of scienter).

Without explanation, defendants utilize an inordinately long and irrelevant pre-Class Period time frame – almost three times longer than the six-month Class Period alleged in the Complaint – to establish that the insider sales were "normal and routine." *See* Defs' Ex. 34 (Summary Chart of Transactions) (reflecting stock sales covering 19-month pre-Class Period time period.). However, "prior trading history [of Defendants] need not be pleaded as a *per se* matter; instead, the court looks at the information that is pleaded and determines whether the timing or scope is unusual." *Central Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d 546, 553 (5th Cir. 2007). Here, plaintiffs allege that Karsan's stock sales were inconsistent with his pre-Class Period trades since,

- 46 -

during the entire *year* preceding the Class Period, Karsan did not sell a single share of Kenexa stock. ¶34, 99. Defendants' exhibits actually support this allegation. *See* Defs' Ex. 6 (Forms 4 Karsan) (indicating that in November 2006, Karsan gifted 27,000 shares of Kenexa common stock and also entered into a variable post-paid-forward contract with Credit Suisse First Boston LLC, pledging to deliver 200,000 shares of Kenexa common stock by the expiration of the contract in November 2011).

Additionally, defendants include stock options in their calculation to skew the amounts and percentages of each insider's holdings in hopes of diluting the suspicious nature of the insider sales. *See* Defs' Ex. 34 (Summary Chart of Transactions). Even with the inclusion of stock options, however, the percentages sold by each insider are still suspicious. *See* ¶98. The Court is not required to consider vested stock options when determining whether stock sales support an inference of scienter. Stock options do not carry the same economic risk as actual stock ownership. If a stock price declines, the stockholder suffers a real economic loss of the money paid for the stock. The holder of a stock option, however, does not lose any invested money; rather, the holder suffers a reduced expectancy of profit in the future. Thus, "options are not shares." *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (holding allegations of insider trading, along with other allegations, sufficient to create strong inference of scienter). Furthermore, defendants have not provided any basis for the Court to assess the real worth of the options held by the Individual Defendants. *Id.* at 140 (reasoning that defendants "may have exercised options to buy at a very low price per share, in which case the shares would have been valuable to the defendants even after the stock plummeted").

### 3. Trading Pursuant to a Rule 10b5-1 Trading Plan Does Not Negate a Strong Inference of Scienter

Finally, defendants' suggestion that a Rule 10b5-1 trading plan renders the insider trading "non-suspicious" and automatically negates any inference of scienter is without merit. As a

- 47 -

preliminary matter, numerous courts have refused to consider the impact of a 10b5-1 trading plan at the pleading stage. *See, e.g., In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("[A]lthough evidence of the nondiscretionary nature of Defendants' sales may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales."); *In re InfoSonics Corp. Deriv. Litig.*, No. 06cv1336 BTM (WMc), 2007 U.S. Dist. LEXIS 66043, at *24-*25 (S.D. Cal. Sept. 4, 2007) (refusing to consider impact of Rule 10b5-1 trading plans at pleading stage); *Cardinal Health*, 426 F. Supp. 2d at 734 (same); *In re Cray Inc. Deriv. Litig.*, 431 F. Supp. 2d 1114, 1131 (W.D. Wash. 2006) (same).

Furthermore, defendants' "attempt to use such trading plans as a non-suspicious explanation is undermined, however, when such plans are entered into during the Class Period." *In re Biogen Idec, Inc.*, No. 05-10400-WGY, 2007 U.S. Dist. LEXIS 98076, at *40 (D. Mass. Oct. 25, 2007). Here, the Complaint alleges that Karsan initiated a ***new*** 10b5-1 trading plan on May 11, 2007, only three days after his false statements to investors. ¶¶27, 85, 102. *See Central Laborers'*, 497 F.3d at 554 ("the attempt to use the 10b5-1 Plan as a non-suspicious explanation is flawed because, *inter alia*, Reynolds entered into the Plan during the Class Period"); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) (noting that defendant entered into a 10b5-1 trading plan during the class period and holding that the Court could not "infer from the fact that [a] Defendant . . . entered into a 10b5-1 trading plan as 'strong competing inference against scienter.'"); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1068-69 (C.D. Cal. 2008) (finding defendant's amendments to 10b5-1 trading plan at height of market probative of scienter).

This fact, coupled with allegations that Karsan sold on the heels of optimistic statements about Kenexa's FY07 guidance, further supports an inference of scienter and undermines any positive inferences. *See Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185 (S.D. Cal.

- 48 -

2009) ("Although Defendants traded according to 10b5-1 trading plans, Plaintiff's allegations that the Defendants amended their 10b5-1 plans to allow more stock sales based on their inside information coupled with the unusual pattern of sales supports an inference of scienter.").

Finally, very few facts are known about these trading plans to warrant consideration by the Court at this juncture. SEC regulations require that a 10b5-1 plan specify the amount of the securities to be sold, the date and price of the sales, or a formula for determining the amount, date and price, and that the plan was "entered in good faith." *See* 17 C.F.R. §240.10b5-1(c). At this stage, however, "this Court cannot determine from the face of the pleadings whether these criteria have been sufficiently satisfied to establish this affirmative defense." *In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d 25, 48 (D.D.C. 2007). Besides publicly available materials indicating that Karsan adopted a Rule 10b5-1 trading plan on February 20, 2007 (approximately three months before the Class Period began) and subsequently adopted a new trading plan on May 11, 2007 (after the Class Period began), little else is known as defendants did not provide copies of the trading plans in support of their motion. *See* Defs' Ex. 6 (Forms 4 Karsan); *see also Mississippi Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 92 (1st Cir. 2008) (rejecting defendants' 10b5-1 trading plan argument at the pleading stage because "there is no evidence of when the trading plans went into effect, that such trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were unable to amend these trading plans."); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007), *aff'd*, 312 Fed. Appx. 400 (2d Cir. 2009) (refusing to consider 10b5-1 trading plan as competing inference to scienter on motion to dismiss because "it is questionable whether the trading plans should be considered and because issues of fact remain with regard to the trading plans"). Since the true facts about the contents of the plans are unknown on this motion, they cannot give rise to any non-culpable inference.

- 49 -

### G.    Plaintiffs Adequately Allege Liability Under Section 20(a)

Defendants do not dispute that Karsan and Volk were controlling persons of Kenexa during the Class Period.  Mot. at 43.  Nor do they dispute that Karsan and Volk exercised their power to control and direct Kenexa and its communications with the market.  *Id*.  They simply allege that plaintiffs have not alleged the requisite underlying violation of §10(b).  As set forth throughout this brief, however, plaintiffs have stated a §10(b) claim for Kenexa, Karsan and Volk and have established the Individual Defendants' control of Kenexa and their direct participation in making the false statements and omitting known adverse facts from investors.  Accordingly, plaintiffs have adequately stated a claim under §20(a).

## IV.    CONCLUSION

Based on the foregoing, defendants' motion should be denied.  To the extent the Court deems plaintiffs' allegations insufficient, plaintiffs respectfully request leave to amend.  *See Burlington*, 114 F.3d at 1434-35.

DATED:  February 1, 2010                    Respectfully submitted,


                                    /s/Deborah R. Gross – DG639
                                    DEBORAH R. GROSS

                                    LAW OFFICES BERNARD M. GROSS, P.C.
                                    DEBORAH R. GROSS
                                    John Wanamaker Building, Suite 450
                                    100 Penn Square East
                                    Philadelphia, PA  19107
                                    Telephone:  215/561-3600
                                    215/561-3000 (fax)

                                    Liaison Counsel

- 50 -

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JONAH H. GOLDSTEIN
MAUREEN E. MUELLER
FRANCIS A. DIGIACCO
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

SUGARMAN & SUSSKIND
HOWARD S. SUSSKIND
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiffs

479466_1