## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BUILDING TRADES UNITED PENSION
TRUST FUND, Individually and on Behalf
of All Others Similarly Situated,

        Plaintiff,

        v.

KENEXA CORPORATION, NOORUDDIN
S. KARSAN and DONALD VOLK,

        Defendants.

CIVIL ACTION
NO. 09-CV-2642-JS

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Robert L. Hickok
Gay Parks Rainville
Thomas T. Watkinson, II
John L. Schweder, II
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103
(215) 981-4000

Attorneys for Defendants
Kenexa Corporation
Nooruddin S. Karsan
Donald Volk

Dated:  March 1, 2010

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ................................................................................................. 1

II. PLAINTIFF'S MISREPRESENTATIONS ABOUT THE CLIENT B CONTRACT ....... 2

    A.  Plaintiff Deliberately Ignored Defendants' Offer To Provide An Unredacted Version Of Defendants' Exhibit 36 ........................................................ 2

    B.  The Court Need Not Consider The Kenexa-Client B Contract To Decide Defendants' Motion To Dismiss In Their Favor ....................................... 4

    C.  Plaintiff Misrepresents The Significance Of Kenexa's Contractual Relationship With Client B To Kenexa's Total Revenue .......................... 4

        1.  During The Putative Class Period, The Large Majority Of Kenexa's Revenue Came From *Non*-EPO Clients ........................... 5

        2.  Throughout The Putative Class Period, Kenexa Experienced Continued Growth And Market Demand For Its Non-EPO Products And Services ......................................................................... 6

III. ARGUMENT ..................................................................................................... 9

    A.  All Statements Identified In The Amended Complaint As Allegedly False And Misleading Are Forward-Looking And Meet The Criteria Of The PSLRA's Safe Harbor ...................................................................................... 9

        1.  Plaintiff Concedes That Many Of The Statements It Claims Violate Rule 10b-5 Are Forward-Looking ................................... 11

        2.  Plaintiff Improperly Attempts To Further Amend Its Pleading By Asserting In Its Opposition That Statements *Not* Identified In The Amended Complaint As Allegedly False Or Misleading Are Non-Forward Looking ..................................................... 15

        3.  Kenexa's Revenue Projections Were Accompanied By Meaningful Cautionary Language ................................................... 17

    B.  Even If The Statements Listed On Pages 16-17 Were Deemed Non-Forward Looking As Plaintiff Contends, Plaintiff Has Failed To Plead A Rule 10b-5 Claim ..................................................................................... 18

        1.  Plaintiff's Contention That Kenexa Had A Duty To Disclose Client B's Reduction In EPO Services That Occurred During The First Half Of 2007 Fails To State A Rule 10b-5 Claim ........................... 18

2.      Plaintiff's Allegations Regarding Kenexa's Methodology For
        Projecting EPO Sales Fail To State A Rule 10b-5 Claim ........................ 21

3.      Plaintiff's Speculative Allegations Regarding Kenexa's U.K.
        Assessments Business Fail To Support A 10b-5 Claim............................ 21

C.   The Individual Defendants' Stock Sales Weaken Any Inference Of Scienter ...... 24

        1.      The Scope Of The Individual Defendants' Stock Sales Negates Any
                Inference Of Scienter ............................................................................. 24

        2.      The Timing Of The Individual Defendants' Stock Sales Refutes Any
                Inference Of Scienter ............................................................................. 27

IV.   CONCLUSION ........................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Advanta Corp. Securities Litigation* 180 F.3d 525 (3d Cir. 1999)..........................17, 26, 27

*In re Aetna, Inc. Securities Litigation*, No. 07-4451, 2009 U.S. Dist. LEXIS 48910 (E.D. Pa. June 9, 2009)..............................................................................................................15

*In re Alpharma Securities Litigation*, 372 F.3d 137 (3d Cir. 2004) .......................................21, 23

*In re Astea International Inc. Securities Litigation*, No. 06-1467, 2007 WL 2306586 (E.D. Pa. Aug. 9, 2007) ...........................................................................................27, 28

*In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir. 1997)..............25, 27

*California Public Employees' Retirement System, v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) ....................................................................................................................10, 22

*In re Cybershop.com Securities Litigation*, 189 F. Supp. 2d 214 (D.N.J. 2002)..........................25

*Deutschman v. Beneficial Corp.*, 841 F.2d 502 (3d Cir. 1988) ..................................................28

*Galati v. Commerce Bank Corp.*, 220 Fed. Appx. 97 (3d Cir. 2007) ...........................................20

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) ......................................10

*Harris v. Ivax*, 182 F.3d 799 (11th Cir. 1999) ........................................................................11

*Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009)......................... *passim*

*Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820 (8th Cir. 2003) ...........................................23

*Lentell v. Merrill Lynch*, 396 F.3d 161 (2d Cir. 2005) ...............................................................23

*Marsden v. Select Medical Corp.*, No. 04-4020, 2007 U.S. Dist. LEXIS 9893 (E.D. Pa. Feb. 6, 2007) ...............................................................................................................24

*In re Nutrisystem, Inc. Securities Litigation*, 653 F. Supp. 2d 563 (E.D. Pa. 2009)....................13

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ................................................................19, 20, 26

*In re Party City Securities Litigation*, 147 F. Supp. 2d 282 (D.N.J. 2001) ......................25, 27, 28

*Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173 (3d Cir. 1988) .........................15

*Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.*, 998 F.2d 1192 (3d Cir. 1993).....................................................................................................................3

*In re Safeguard Scientifics*, No. 01-3208, 2004 U.S. Dist. LEXIS 23796 (E.D. Pa. Nov. 23, 2004) ............................................................................................................20

*In re Sawtek, Inc. Securities Litigation*, No. 6:03-CV-294, 2005 U.S. Dist. LEXIS 39223 (M.D. Fla. Oct. 6, 2005).............................................................................................21

*In re Suprema Specialties, Inc., Securities Litigation*, 438 F.3d 256 (3d Cir. 2006)....................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ................................................9

*In re Tellium, Inc. Securities Litigation*, No. 02-cv-5878, 2005 U.S. Dist. LEXIS 26332 (D.N.J. Aug. 26, 2005).................................................................................................23, 24

*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976) ........................................................19

*Voit v. Wonderware Corp.*, 977 F. Supp. 363 (E.D. Pa. 1997)......................................................26

*Western Pennslyvania Electrical Employees Pension Trust v. Plexus Corp.*, No. 07C0582, 2009 U.S. Dist. LEXIS 18123 (E.D. Wis. Mar. 6, 2009).......................................11

## STATUTES

15 U.S.C.A. § 78u-5(i)(1)(D) .................................................................................................. *passim*

Defendants Kenexa Corporation ("Kenexa" or "the Company"), Nooruddin S. Karsan, and Donald Volk (the "individual defendants" and, collectively with Kenexa, "defendants"), by their attorneys, hereby submit this memorandum of law in reply to plaintiff's Opposition to Defendants' Motion to Dismiss ("plaintiff's Opposition" or "Pl.'s Opp.").

## I.    INTRODUCTION

As defendants explained in their Opening Brief, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes a gatekeeping role on district courts at the motion to dismiss stage, and mandates that they dismiss all securities fraud complaints that fail to meet the PSLRA's stringent pleading requirements.  Specifically, the PSLRA requires that district courts dismiss claims based on a public company's forward-looking statements that meet the safe-harbor provision's criteria, as well as claims that fail to "state with particularity facts giving rise to a strong inference" of scienter.  To fulfill its critical gatekeeping role, a court must focus on a complaint's well-pleaded factual allegations and should not give credence to a plaintiff's "bald assertions" or "sweeping legal conclusions in the form of factual allegations."[1]

In its Opposition, plaintiff attempts to divert the Court's attention from the fatal deficiencies of the Amended Complaint with false arguments based on mischaracterizations of plaintiff's own allegations, the grounds for defendants' motion, and the applicable law.  This reply brief exposes plaintiff's diversionary tactics for what they are so the Court can clearly see that, as defendants explained in their Opening Brief, **all** of the statements identified in the Amended Complaint as allegedly false or misleading are, in fact, forward-looking statements that qualify for protection under the PSLRA's "safe-harbor."  Because these statements were

---

[1] *See* Defs.' Open. Br. at 13-14 (citing cases).

accompanied by meaningful cautionary language and because plaintiff has failed to allege any

facts showing that defendants had "actual knowledge" of the alleged falsity of these statements,

defendants are immune from liability as a matter of law.  Moreover, assuming *arguendo* that any

of the statements listed on pages 16-17 of plaintiff's Opposition are, as plaintiff contends, "non-

forward looking," plaintiff nonetheless has failed to satisfy the PSLRA's heightened

requirements for pleading falsity and scienter.  For each of these separate and independent

reasons, the Amended Complaint should be dismissed with prejudice.

## II.     PLAINTIFF'S MISREPRESENTATIONS ABOUT THE CLIENT B CONTRACT

### A.     Plaintiff Deliberately Ignored Defendants' Offer To Provide An Unredacted Version Of Defendants' Exhibit 36

As explained in defendants' Opening Brief, plaintiff avers three theories in

support of its claim that defendants had "actual knowledge" that Kenexa's revenue forecasts for

the third quarter and full year of 2007 were allegedly false and misleading:  (1) that defendants

allegedly knew before the third quarter of 2007 that Client B would ask to terminate its long-

term employment process outsourcing ("EPO") contract with Kenexa; (2) that Kenexa's

methodology for forecasting its EPO and assessments revenue for the third quarter and full year

included sales that defendants allegedly knew would not close in the third quarter; and (3) that

defendants allegedly knew that Kenexa allegedly failed to properly recognize revenue from its

U.K. assessments sales according to U.S. GAAP.  (*See, e.g.,* Defs.' Open. Br. at 29-30 (citing

Am. Compl. ¶¶ 67, 81, 93-97, 121, 122).)

With respect to the first theory, the Amended Complaint purports to describe the

long-term EPO contractual relationship between Kenexa and Client B and misleadingly alleges

that Client B's reduced need for Kenexa's recruitment services during the first half of 2007

inevitably meant that Client B would terminate the contract altogether.  (*See, e.g.*, Am. Compl.

¶¶ 10-13, 47-50, 67(a), 81(a).)  With these averments, plaintiff attempts to make the contractual relationship between Kenexa and Client B – including Client B's termination rights under the contract – an integral part of the Amended Complaint.  Accordingly, defendants appended to their Opening Brief a copy of the Kenexa-Client B contract (with confidential information redacted) so that the Court would have access to the contract's ***actual*** terms, which expressly gave Client B the flexibility to periodically reduce its demand for Kenexa's services without having to terminate the agreement altogether.[2]  *See, e.g.*, *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (allowing consideration of contract between defendant and third party where plaintiff's claims were based on the contract).

When filing defendants' motion to dismiss papers on December 14, 2009, defense counsel expressly offered to make an ***unredacted*** version of the Kenexa-Client B contract available to both the Court and plaintiff's counsel pursuant to a protective order and confidentiality agreement.  (*See* Defs.' Opp. to Pl.'s Mot. to Strike at 3, Exh. A, Letter from R. Hickok to Honorable J. R. Sánchez (Dec. 14, 2009) at 1-2 (offering to "(a) file an unredacted version of the full contract *under seal* and (b) serve a copy on Lead Plaintiff's counsel subject to a confidentiality agreement . . . promptly"); Defs.' Open. Br. at 5 n.15 (referring to Dec. 14, 2009 letter to Court).  Plaintiff's counsel had seven weeks before its February 1, 2010 filing deadline to negotiate a confidentiality agreement with defense counsel and obtain an unredacted copy of the contract for use in its Opposition.  Instead, plaintiff's counsel made the tactical decision to ignore defense counsel's offer so that they could file a motion to strike and inappropriately seek to convert defendants' motion to one for summary judgment on the false ground that "defendants have only supplied portions of the contract which are riddled with redactions [and therefore]

---

[2] *See* Defs.' Open. Br. at 5-6 (describing contract terms).

neither plaintiffs [sic] nor the Court can verify the authenticity of the contract or what the terms mean."  (Pl.'s Mot. to Strike Br. at 3; Pl.'s Opp. at 5-6, 23-27.)

### B.    The Court Need Not Consider The Kenexa-Client B Contract To Decide Defendants' Motion To Dismiss In Their Favor

Plaintiff also misrepresents the significance of the contract between Kenexa and Client B to defendants' motion to dismiss.  Although defendants' Opening Brief, in fact, says very little about the contract (*see* Defs.' Open. Br. at 5-6, 31), plaintiff disingenuously states that "[d]efendants' entire defense is crafted around" the Kenexa-Client B contract (Pl.'s Opp. at 5). Most importantly, the Court does not need to review the Kenexa-Client B contract – or the four paragraphs of defendants' brief that refer to it – to reach the dispositive conclusion that the Amended Complaint should be dismissed.  As explained in defendants' Opening Brief, the Amended Complaint fails to adequately plead a Rule 10b-5 claim for two separate and independent reasons:  (1) the statements at issue are protected under the PSLRA's safe harbor, and (2) plaintiff has not alleged facts that give rise to a strong inference of scienter.  Neither of these grounds for dismissal requires that the Court consider the terms of the contract between Kenexa and Client B.

### C.    Plaintiff Misrepresents The Significance Of Kenexa's Contractual Relationship With Client B To Kenexa's Total Revenue

Plaintiff's Opposition greatly exaggerates the significance of Client B to Kenexa's revenue, and even goes so far as to declare that Kenexa was "devastated" when Client B reduced its demand for EPO services during the first half of 2007 (Pl.'s Opp. at 2) when nothing in the Amended Complaint would support such a bald assertion.  To the contrary, as explained below, the Amended Complaint and public documents referenced therein unequivocally show instead that the aggregate EPO component of Kenexa's business represented only 15-20% of its revenue and that the large majority of the Company's business experienced significant growth throughout

the putative Class Period.  Therefore, the alleged fact that *one* of Kenexa's 13 EPO clients had reduced its demand for the Company's services would not, and did not, have a significant impact on Kenexa's revenue.  Indeed, Kenexa met or exceeded its revenue guidance in the first half of 2007 when most of the Client B staff reductions allegedly took place (*see, e.g.*, Defs.' Open. Br. at 7-11), and plaintiff does not allege any facts showing that the Company's revenue projections for the third quarter did *not* take into consideration those staff reductions.  Thus, plaintiff's unsupported assertion that "Client B's financial problems and its massive terminations of Kenexa employees greatly impacted Kenexa's revenues in *3Q07 and FY07* . . . ." (Pl.'s Opp. at 2 (emphasis added)), is factually baseless and must be disregarded.

### 1.   During The Putative Class Period, The Large Majority Of Kenexa's Revenue Came From *Non*-EPO Clients

The Amended Complaint alleges that, during the putative Class Period, Kenexa had *13* EPO clients who, together, contributed only *15-20%* of the Company's total revenue.  (*See* Pl.'s Opp. at 6 (citing Am. Compl. ¶ 5).)  Hence, the large majority of Kenexa's clients – who generated *80-85%* of the Company's revenue – purchased *non*-EPO services and products.  Indeed, as of the end of 2006, Kenexa had a total of approximately *3,000* active clients, *522* of which had, on average, a two-year subscription contract for Kenexa's talent acquisition and employee performance management solutions.  (*See* Defs.' Exh. 1, 2006 Form 10-K at 16.)  By the end of 2007, the number of Kenexa's active clients had grown from *3,000* to *4,000*, and the number of clients with subscription contracts for talent acquisition and employee performance management solutions had increased from *599* to *3,805*.  (*See* 2007 Form 10-K at 15, appended hereto as Exhibit 41.)[3]

---

[3] The number of Kenexa's Fortune 500 clients also increased from *166* in 2006 to *199* in 2007.  (*Compare* Defs. Exh. 1, 2006 Form 10-K at 16 *with* Defs.' Exh. 41, 2007 Form 10-K at 15.)

During each of the quarterly earnings conference calls, Mr. Karsan described some of the growth metrics the Company was tracking, including, *inter alia*:

- The addition of 40 preferred partner customers in each of the three quarters; and

- A steady increase in the average annual revenue from the Company's "top 80" clients:  from over $800,000 in 2006, to over $1 million annualized by the end of the first quarter of 2007, to over $1.1 million annualized by the end of the second quarter, and to just under $1.2 million annualized by the end of the third quarter of 2007.

(*See* Defs.' Exh. 31, Conf. Call Tr. at 3; Exh. 32, Conf. Call Tr. at 3-4; Exh. 33, Conf. Call Tr. at 6.)

Thus, as explained in more detail below, notwithstanding Client B's reduced demand for Kenexa's EPO business in the first two quarters of 2007 and ultimate cancellation of its EPO contract in the third quarter, Kenexa continued to gain new clients and grow the business of its top 80 clients in its non-EPO business lines throughout the putative Class Period.

## 2. Throughout The Putative Class Period, Kenexa Experienced Continued Growth And Market Demand For Its Non-EPO Products And Services

While Client B's cancellation of its contract – along with certain EPO and assessments deals not closing as expected – caused the Company to "miss" its $48-$50 million revenue projection for the third quarter by $1.2 million,[4] the loss of that contract did ***not*** diminish the market demand for Kenexa's products and services overall.  Indeed, although Client B gradually reduced its demand for Kenexa's services during the first and second quarters of 2007, Kenexa's business otherwise grew significantly during the same periods.

---

[4] Plaintiff falsely states that "[t]he Company missed its 3Q07 guidance by ***$2 million.***" (Pl.'s Opp. at 4 (citing Am. Compl. ¶ 86) (emphasis added).)  In fact, the Company missed its revenue guidance of $48-$50 million by ***$1.2 million***.  (*See* Defs.' Exh. 20, 08/08/07 Press Release (projecting third quarter revenue in range of ***$48*** to $50 million); Defs.' Exh. 21, 11/07/07 Press Release (announcing third quarter revenue of ***$46.8*** million).)

In its May 8, 2007 earnings release, the Company announced that its $42.2 million in revenue for the first quarter "represent[ed] an increase of 83% over the $23.0 million recorded for the first quarter of 2006."  (Defs.' Exh. 18, 05/08/07 Press Release.)  The release included the following quote from Mr. Karsan, describing the Company's quarterly results:

> "We were pleased with the company's first quarter results, which were strong across all key income statement, balance sheet and cash flow metrics.  Market demand is strong and interest is growing for talent management solutions.  Kenexa is benefiting from these trends due to our differentiated value proposition, proven ability to deliver tangible business benefits for our customers and growing brand awareness."

(Defs.' Exh. 18, 05/08/07 Press Release.)

Significantly, this growth in Kenexa's business during the first quarter occurred notwithstanding the reduction in Client B's demand for the Company's services, which plaintiff alleges began in early 2007.  (*See* Am. Compl. ¶¶ 47-50.)  Moreover, as defendants pointed out in their Opening Brief, Kenexa's first quarter revenue results exceeded the Company's forecasts, and plaintiff does not allege that these results were inaccurately reported in any way.  (*See* Defs.' Open. Br. at 3 & n.8, 8 & n.20.)

Similarly, on August 8, the Company reported $45.2 million in total revenues for the second quarter, which "represent[ed] an increase of 83% over the $24.7 million recorded for the second quarter of 2006."  (Defs.' Exh. 20, 08/08/07 Press Release.)  That release, too, included a quote from Mr. Karsan, describing the quarter's financial results:

> "We were pleased with the Company's second quarter results, which were highlighted by solid organic and acquisitive revenue growth, profitability and cash flow.  Market demand is strong, and Kenexa's brand recognition continues to grow as reflected by the growing number of inbound inquiries that we are fielding related to our total solution offerings."

(Defs.' Exh. 20, 08/08/07 Press Release.)

Once again, this growth in Kenexa's business occurred notwithstanding Client B's alleged increased reduction in its demand for the Company's services during the second quarter of 2007.  (*See* Am. Compl. ¶¶ 47-50.)  Furthermore, the second quarter revenue results met the Company's forecasts, and plaintiff does not allege that these results were falsely reported.  (*See* Defs.' Open. Br. at 3 & n.8, 8 & n.20.)

During the August 8, 2007 earnings conference call, Mr. Karsan and Mr. Volk predicted that the demand for Kenexa's products and services would continue to grow through the third quarter.  (*See, e.g.*, Defs.' Exh. 32, Conf. Call Tr. at 5 ("Our revenue continues to be highly visible as a result of our diverse customer base, long-term contracts, renewal rates that continue to be in the 90% plus range and the growing number of new customers that we are adding to our overall customer base.").)  As revealed by the Company's November 7 earnings release, this prediction came true in that Kenexa's total revenue of $46.8 million for the quarter "represent[ed] an increase of 67% over the $28.0 million recorded for the third quarter of 2006." (Defs.' Exh. 21, 11/07/07 Press Release.)  As did the May 8 and August 8 earnings releases, the November 7 release included a quote from Mr. Karsan describing the quarter's results:

> "We were pleased that Kenexa was able to meet our non-GAAP EPS guidance in spite of the fact that revenue came in light during the quarter. Our top line performance was impacted by a single contract with a customer that faced a company-specific business issue, in addition to longer sales cycles in the EPO and assessments components to our business.  ***While we have re-adjusted our 2007 forecast as a result of these factors, we remain confident in the underlying growth profile of the company as we approach 2008 based on Kenexa's differentiated value proposition, significant number of new customers adopting our solutions, growing brand and high profile customer wins across both the hiring and retention segments of the talent management market.***  This confidence is evidenced by our preliminary 2008 forecast of low-to-mid 20% revenue growth, non-GAAP operating margins of 20 plus% and strong cash flow."

(Defs.' Exh. 21, 11/07/07 Press Release (emphasis added).)  Plaintiff does not allege any

inaccuracies in defendants' reporting of Kenexa's third quarter financial results.

The above facts – and those set forth in Section II of defendants' Opening Brief –

provide the full context of the statements plaintiff claims were false and misleading and reveal

just how unfounded and distorted plaintiff's allegations really are.  Because all of these facts

derive from the Amended Complaint and/or documents it incorporates by reference, the Court, as

PSLRA gatekeeper, must consider them when evaluating the adequacy of plaintiff's Rule 10b-5

allegations.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (recognizing

that courts evaluating the adequacy of a complaint's federal securities fraud allegations "must

consider the complaint in its entirety, as well as other sources courts ordinarily examine when

ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the

complaint by reference, and matters of which a court may take judicial notice").

## III.    ARGUMENT

### A.    All Statements Identified In The Amended Complaint As Allegedly False And Misleading Are Forward-Looking And Meet The Criteria Of The PSLRA's Safe Harbor

As defendants explained in their Opening Brief, the ***sole*** basis of plaintiff's

securities fraud claim against defendants is that Kenexa missed its revenue forecasts for the third

quarter and full year of 2007.  Nowhere in the Amended Complaint does plaintiff allege that

defendants misrepresented Kenexa's actual financial results for the first and second quarters of

2007, or that the Company's second quarter revenue projections – which it met – were false or

misleading.  Thus, plaintiff's Rule 10b-5 claim is based solely on forward-looking statements

protected by the PSLRA's safe harbor and ***not*** on any statement of present or historical fact, as

plaintiff disingenuously asserts in its Opposition.  (*See* Pls.' Opp. Br. at 16-17.)

Plaintiff attempts to circumvent the immunizing effect of the PSLRA's safe harbor by challenging the assumptions underlying Kenexa's third quarter guidance and mischaracterizing those assumptions as "non-forward looking" statements.  (*See, e.g.,* Pl.'s Opp. at 15-17.)  Yet, as defendants explained in their Opening Brief, the safe harbor expressly provides that "any statement of the ***assumptions*** underlying or relating to any [forward-looking] statement" is considered "forward-looking" as well.  15 U.S.C.A. § 78u-5(i)(1)(D) (emphasis added).  (*See* Defs.' Open. Br. at 20, 21.)

Moreover, plaintiff does ***not*** claim that the underlying assumptions of Kenexa's third quarter revenue guidance were based on false, manufactured or "cooked" numbers. Instead, plaintiff merely alleges that Kenexa's projections ***should have assumed*** that Client B would terminate its EPO contract, that the EPO deal the Company expected to close in the third quarter would not close, and that weak management of its UK assessments business would lead to poor sales performance.  (*See generally* Pl.'s Opp. at 9-10, 11; Am. Compl. ¶ 25.)  But because plaintiff has averred no facts showing that defendants ***actually knew*** that Client B would terminate its contract with Kenexa, or that the anticipated EPO deal would not, in fact, close, or that the UK assessments business was being poorly managed, plaintiff has alleged nothing more than impermissible "fraud by hindsight."  *See, e.g.*, *Cal. Pub. Employees' Ret. Sys., v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004) ("We have been clear that fraud cannot be inferred merely because at one time the firm bathes itself in a favorable light but later the firm discloses that things are less than rosy.  We have long rejected attempts to plead fraud by hindsight.") (internal quotation marks and citation omitted);  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) ("It is not enough for plaintiff[] to merely allege that defendants

'knew' their statements were fraudulent or that defendants 'must have known' their statements were false.")

### 1. Plaintiff Concedes That Many Of The Statements It Claims Violate Rule 10b-5 Are Forward-Looking

Under the heading "Defendants' Class Period Misrepresentations," the Amended Complaint quotes excerpts from Kenexa's May 8 and August 8, 2007 earnings releases and earnings call transcripts, and highlights in ***bold and italics*** those statements plaintiff claims are false and misleading. (*See* Am. Compl. ¶¶ 61-62, 70-74.)[5] Plaintiff concedes that the following such statements (highlighted in bold and italics) are forward-looking:

**¶ 61:** Full Year 2007: ***The Company expects total revenue to be $186 million to $189 million,*** subscription revenue to be $149 to $152 million and non-GAAP operating income to be $40.7 to $42.8 million. Assuming a 30% effective tax rate and 25.7 million shares outstanding, Kenexa expects its non-GAAP diluted earnings per share to be $1.18 to $1.25.

**¶ 62:** ***For the full year 2007, we are slightly increasing our revenue and profitability guidance. We now expect the following: Total revenue of $186 million to $189 million, subscription revenue to be $149 million to $152 million; non-GAAP operating income of $40.7 million to $42.8 million.***

**¶ 71:** Full Year 2007: ***The Company expects total revenue to be $188 million to $192 million***, subscription revenue to be $150 to $153 million and non-GAAP operating income to be $40.7 to $42.8 million. Assuming a 30% effective tax rate and 25.7 million shares outstanding, Kenexa expects its non-GAAP diluted earnings per share to be $1.18 to $1.25.

**¶ 74:** I think we started this year, we were talking about organic growth at the beginning of the year at 29 to 32% range. That's the range we gave. If I look at it in the first half of the year we've

---

[5] *See Harris v. Ivax*, 182 F.3d 799, 804 (11th Cir. 1999) (observing that complaint quoted passages from press releases with "added emphasis apparently meant to indicate the misleading statements"); *W. Pa. Elec. Employees Pension Trust v. Plexus Corp.*, No. 07C0582, 2009 U.S. Dist. LEXIS 18123, at *16 n.5 (E.D. Wis. Mar. 6, 2009) (assuming "that the underscored statements are those that plaintiff contends are misleading" and noting that "[p]laintiff provides no other explanation for the underscoring").

been about 30 to 35. ***I would say the second half of the year we're going to be in the 30 to 35 range.***

(*See* Am. Compl. ¶ 61 (quoting Defs.' Exh. 18, 05/08/07 Press Release); ¶ 62 (quoting Defs.' Exh. 31, 05/08/07 Conf. Call Tr. at 7); ¶ 71 (quoting Defs.' Exh. 20, 08/08/07 Press Release); ¶ 74 (quoting; Defs.' Exh. 32, 08/08/07 Conf. Call Tr. at 1); Pl.'s Opp. at 16-17 (not identifying statements as non-forward looking).)

Plaintiff does ***not*** agree, however, that the statements <u>underlined</u> in the passages below are forward-looking:

**¶ 62:**  Our clients typically purchase multiyear subscriptions with an average length of approximately two years. ***<u>Our revenue continues to be highly visible</u> as a result of our diverse customer base, long-term contracts, renewal rates that continue to be in the 90%-plus range, and the growing number of new customers that we are adding to our overall customer base.***

**¶ 62:**  As a result of the significant expansion in our sales organization, ***<u>we are currently ahead of where we would target at this point in the year,</u>*** and as such we will be primarily focused on optimizing sales productivity in the near term.

**¶ 72:**  Our clients typically purchase multi-year subscriptions with an average length of approximately two years. ***<u>Our revenue continues to be highly visible</u> as a result of our diverse customer base, long-term contracts, renewal rates that continue to be in the 90% plus range and the growing number of new customers that we are adding to our overall customer base***.

**¶ 74:**  <u>We don't feel it.  I don't feel like a slow down . . . I just feel like it's movement.  I'm not feeling like it is a slow down in organic, **in fact I'm feeling like it's really, really solid**</u>.

(Am. Compl. ¶ 62 (quoting Defs.' Exh. 31, 05/08/07 Conf. Call Tr. at 4, 5); ¶ 72 (quoting Defs.' Exh. 32, 08/08/07 Conf. Call Tr. at 5); ¶ 74 (quoting Defs.' Exh. 32, 08/08/07 Conf. Call Tr. at 18 (bold and italics in original; underlining added); Pl.'s Opp. at 16-17 (listing those statements plaintiff contends are non-forward looking).)

All of the above underlined statements – which plaintiff contends refer to "past or present performance or business condition" (Pl.'s Opp. at 15) – are, in fact, forward-looking. Indeed, as explained above, plaintiff concedes that Mr. Karsan's prediction, made during the August 8 conference call, that Kenexa's organic growth rate[6] would remain in the 30-35% range, is forward-looking.  (*See* Am. Compl. ¶ 74 ("I would say the second half of the year we're going to be in the 30 to 35 range.") (quoting Defs.' Exh. 32, Conf. Call Tr. at 17); Pl.'s Opp. at 16-17 (not identifying this statement as non-forward looking).)  Therefore, Mr. Karsan's reiteration of his belief that the Company's organic growth was "really, really solid" is forward-looking as well.  (*See* Am. Compl. ¶ 74 (quoting Defs.' Exh. 32, 08/08/07 Conf. Call Tr. at 18).)[7]  And to the extent Mr. Karsan's "really, really solid" comment can be read as referring to the Company's then ***current*** organic growth rate, the statement is an underlying assumption for his prediction and, therefore, forward-looking.

The other statements listed above are also forward-looking in that they could not be verified at the time they were made.  *See, e.g., In re Nutrisystem, Inc. Sec. Litig.*, 653 F. Supp. 2d 563, 579 (E.D. Pa. 2009) ("A statement is not forward-looking if its accuracy can be determined at the time it is made.") (citation omitted).  Whether Kenexa's revenue continued to be visible, for example, was not verifiable when Mr. Volk's made the statement, "[o]ur revenue continues to be highly visible," during the earnings conference calls on May 8 and August 8. (*See* Am. Compl. ¶¶ 62, 72; Defs.' Exh. 31, 05/08/07 Conf. Call Tr. at 4; Defs.' Exh. 32, 08/08/07 Conf. Call Tr. at 5.)  In addition, the second part of that statement – "as a result of our

---

[6] As explained in defendants' Opening Brief, Kenexa's organic growth rate is the rate at which the Company is expanding as a result of increased sales, output or both, as opposed to its acquisition of other businesses.  (Defs.' Open. Br. at 9-10 (explaining formula Company uses to calculate rate).)

[7] Plaintiff's Opposition incorrectly attributes these statements to Mr. Volk.  (*See* Pl.'s Opp. at 9.)

diverse customer base, long-term contracts, renewal rates that continue to be in the 90%-plus range, and the growing number of new customers that we are adding to our overall customer base" – is considered forward-looking as well in that it contains the underlying assumptions for the forward-looking assertion.  *See* 15 U.S.C.A. § 78u-5(i)(1)(D) (providing that an assumption underlying a forward-looking statement is also forward-looking).[8]

Plaintiff also contends that the clause – "we are currently ahead of where we would target at this point in the year" – in the following statement refers to Kenexa's current business condition and, therefore, is non-forward looking:  "As a result of the significant expansion in our sales organization, we are currently ahead of where we would target at this point in the year, and as such we will be primarily focused on optimizing sales productivity in the near term."  (*See* Defs.' Exh. 31, 05/08/07 Conf. Call Tr. at 5; Am. Compl. ¶ 62.)  Plaintiff concedes, however, that the statement – "we will be primarily focused on optimizing sales productivity in the near term" – *is* forward-looking.  (See Pl.'s Opp. at 16 (omitting the second part of this statement from list of alleged non-forward looking statements).)  Because the clause in question is an assumption upon which the forward-looking statement is based, the clause itself is forward-looking.

In sum, *all* of the statements identified in the Amended Complaint as allegedly false and misleading are forward-looking.  Moreover, as pointed out in their Opening Brief, defendants' optimistic statements about Kenexa's "highly visible" revenue and "really, really solid" organic growth, are immaterial vague expressions of corporate optimism, or "puffery,"

---

[8] Plaintiff apparently concedes that this second part of the statement is forward-looking.  (*See* Pl.'s Opp. at 16 (omitting the second part of this statement from list of alleged non-forward looking statements).

and, therefore, are not actionable under Rule 10b-5 for this separate and independent reason. (*See* Defs.' Open. Br. at 21 n.38.)[9]

> ### 2. Plaintiff Improperly Attempts To Further Amend Its Pleading By Asserting In Its Opposition That Statements *Not* Identified In The Amended Complaint As Allegedly False Or Misleading Are Non-Forward Looking

In its Opposition, plaintiff makes the irrelevant point that the following underlined statements – which are ***not*** identified in the Amended Complaint as allegedly false and misleading – are not forward-looking. Plaintiff cannot amend its complaint with assertions made in its Opposition to defendants' motion to dismiss, however. *See, e.g., Pa. ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (internal quotation marks and citation omitted). Accordingly, the following underlined statements should not be considered part of plaintiff's claim:[10]

> **¶ 60:**     We were pleased with the company's first quarter results, which were strong across all key income statement, balance sheet and cash flow metrics. <u>Market demand is strong and interest is growing</u> for talent management solutions. <u>Kenexa is benefiting from these trends due to our differentiated value proposition, proven ability to deliver tangible business benefits for our customers</u> and growing brand awareness.

---

[9] Citing no legal authority, plaintiff baldly asserts that defendants' identification of these statements as immaterial puffery in their Opening Brief constitutes a "concession" that the statements are not forward-looking. (Pl.'s Opp. at 32-33.) Yet, as defendants have explained, the PSLRA's safe harbor "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is ***immaterial***; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009) (emphasis added). (*See* Defs.' Open. Br. at 18 & n.32.) Moreover, as Judge O'Neill recently confirmed in *In re Aetna, Inc. Securities Litigation*, forward looking statements can also be immaterial puffery. No. 07-4451, 2009 U.S. Dist. LEXIS 48910, at *67-72 (E.D. Pa. June 9, 2009) (holding that Aetna's statements that it was "committed to 'disciplined pricing'" were both forward looking and immaterial puffery).

[10] Defendants note that plaintiff has not identified the statements that have been highlighted in bold and italics as ***non***-forward looking statements. (*See* Pl.'s Opp. at 16-17.)

**¶ 70:**      We were pleased with the Company's second quarter results, ***which were highlighted by solid organic and acquisitive revenue growth, profitability and cash flow***.  <u>Market demand is strong, and Kenexa's brand recognition continues to grow</u> as reflected by the growing number of inbound inquiries that we are fielding related to our total solution offerings.

**¶ 72:**      [W]e had another very successful cash flow quarter.  And at the halfway point of the year, your cash flow from operations is up more than five-fold compared to the first six months of 2006.  <u>We continue to benefit from our participation in an attractive market that is experiencing strong demand and growing awareness</u>.  ***We are pleased with the high level of execution across all our global organization.***

(*See* Am. Compl. ¶ 60 (quoting Defs.' Exh. 18, 05/08/07 Press Release); ¶ 70 (quoting Defs.' Exh. 20, 08/08/07 Press Release); ¶ 72 (quoting Defs.' Exh. 32, 08/08/07 Conf. Call Tr. at 2) (bold and italics in original; underlining added); Pl.'s Opp. at 16-17 (identifying underlined statements as non-forward looking).

Even if these statements ***were*** considered part of plaintiff's Rule 10b-5 claim against defendants, they could not save the Amended Complaint from dismissal for plaintiff has alleged no facts showing that they were false or misleading.  These statements, which are set forth in paragraphs 60, 70 and 72 of the Amended Complaint, merely describe Kenexa's positive financial results for the first and second quarters of 2007, which results plaintiff does ***not*** allege were inaccurately reported.  Indeed, as explained in Section II.C *supra*, the large majority of Kenexa's business experienced significant growth throughout the putative Class Period, giving credence to Mr. Karsan's statements that "market demand [was] strong and interest [was] growing for talent management solutions" as of May 2007, that market demand remained strong as of August 2007, and that the Company benefitted from these trends.  Moreover, despite plaintiff's assertions to the contrary (Pl.'s Opp. at 34-35), such positive portrayals, when coupled with factually accurate financial reports, are nothing more than immaterial puffery.  *See, e.g., In*

*re Advanta Corp. Sec. Litig.* 180 F.3d 525, 538-39 (3d Cir. 1999) (holding that postitive

portrayals reporting company's past successes and expressing confidence in the company's

prospects for the future did not create liability under Section 10(b)).

### 3.    Kenexa's Revenue Projections Were Accompanied By Meaningful Cautionary Language

As defendants explained at length in their Opening Brief, the "risk factors" set

forth in Kenexa's 2006 Form 10-K fully satisfy the "meaningful cautionary language" prong of

the PSLRA's safe harbor.  (*See* Defs.' Open. Br. at 22-27.)  Not only were these risk factors

"directly related" to the alleged defects in defendants' May 8 and August 8, 2007 revenue

projections, but they were sufficiently "extensive and specific" as well.  (*See, e.g.,* Defs.' Open.

Br. at 22-27 (citing cases).  In a vain attempt to find fault with Kenexa's risk disclosures,

plaintiff quibbles about the fact that the Company utilized substantially the same language in its

2005, 2006 and 2007 Form 10-Ks.  (Pl.'s Opp. at 39-41.)  Yet the fact that a company uses the

*same* cautionary language to describe the *same* risks does not make the language "boilerplate" as

plaintiff baldly asserts.  Indeed, to defendants' knowledge *no* court has drawn any such

conclusion or opined that risk disclosures must be unique from year to year.  Nor does plaintiff

cite any such authority.  Moreover, the very risk disclosures the Third Circuit recently found

acceptable in Avaya, Inc.'s Form 10-Q, *see Institutional Investors Group v. Avaya, Inc.*, 564

F.3d 242, 257-58 (3d Cir. 2009) (analyzing Avaya Form 10-Q for period ended December 31,

2004), were essentially identical to the disclosures set forth in Avaya's Form 10-Q for same

quarter the prior year.  (*Compare* Avaya 10-Q for period ended Dec. 31, 2003 (filed 02.10.04) at

28-32, appended hereto as Exhibit 43, *with* Avaya 10-Q for period ended Dec. 31, 2004 (filed

02.08.05) at 44-48, appended hereto as Exhibit 44.)  Thus, so long as a company's risk

disclosures are "substantive, extensive and tailored to the future-looking statements they

reference," *Avaya*, 564 F.3d at 257, it is irrelevant to the safe harbor analysis whether the *same* "meaningful" language is used year after year.

> **B.      Even If The Statements Listed On Pages 16-17 Were Deemed Non-Forward Looking As Plaintiff Contends, Plaintiff Has Failed To Plead A Rule 10b-5 Claim**

As explained above, the statements listed on pages 16-17 of plaintiff's Opposition are either forward-looking (*see supra* Section III.A.1) or not alleged in the Amended Complaint to be false or misleading (*see supra* Section III.A.2).  But even assuming ***arguendo*** that all of these statements can be considered non-forward looking as plaintiff contends, the Amended Complaint nonetheless fails to plead with the requisite particularity the essential elements of falsity and scienter.

> **1.      Plaintiff's Contention That Kenexa Had A Duty To Disclose Client B's Reduction In EPO Services That Occurred During The First Half Of 2007 Fails To State A Rule 10b-5 Claim**

Plaintiff argues that the statements listed on pages 16-17 of its Opposition were materially misleading because they did not disclose the alleged fact that Client B had reduced its demand for Kenexa's EPO services during the first and second quarters of 2007.  (*See, e.g.,* Pl.'s Opp. at 1-4, 11, 17-18, 22, 30-32.)  Yet plaintiff concedes that Kenexa met its revenue projections in both quarters and that the Company's reports of these financial results were accurate.  In addition, plaintiff does not allege that either the Company's revenue projections or its reported revenues for these quarters failed to account for the Client B staff reductions.  Nor does plaintiff aver any facts suggesting that these staff reductions were not included in Kenexa's revenue projections for the third quarter.  Because Client B's reduced demand for Kenexa's services during the first two quarters did ***not*** impact the Company's revenues as either projected or reported, this information would ***not*** have "significantly altered the 'total mix' of information made available" and, therefore, was immaterial.  *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S.

438, 449 (1976).  Indeed, disclosing this information would have involved "burying the shareholders in an avalanche of trivial information," which is neither required nor desirable under the securities laws.  *Id.* at 448.

Furthermore, even if Client B's reduction in Kenexa services had been material, the Company had no duty to disclose it.  Only where a company has an affirmative duty to disclose material information is it required to do so to avoid liability under Rule 10b-5.  *E.g., Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) (recognizing that "[e]ven non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information.").  In the Third Circuit, "a duty to disclose may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Id*. at 285-86.  No such circumstances existed here.

First, as plaintiff concedes (Pl.'s Opp. at 30-31), there is no statute, rule or regulation that required Kenexa to tell investors that one of its customers had reduced its demand for the Company's services.  Indeed, several years ago, the SEC specifically decided ***not*** to require public companies to disclose such information, explaining that it agreed with commenters[11] that, *inter alia*, "a reduction of customer orders can be difficult to discern as such reductions can happen over a period of time."  SEC, Final Rule: Additional Form 8-K Disclosure

---

[11] Copies of the five commenters' letters referenced in the SEC's Final Rule are appended hereto as Exhibits 46-50.  *See, e.g.,* Exh. 46, Letter from PricewaterhouseCoopers LLP (Aug. 26, 2002), http://sec.gov/rules/proposed/s72202/pricewater1.htm ("We believe that issuers' compliance with this proposed rule may be difficult and inconsistent in practice due to all of the events that could transpire unknown to an executive officer of a company.  For example, how would an executive officer know what a customer's intentions were and at what point in time would it become a measurable event?"); Exh. 47, Letter from New York City Bar Association (Aug. 26, 2002), http://sec.gov/rules/proposed/s72202/rflangan1.htm ("[W]ith regard to the termination of contracts, it would be very easy for people after the fact with 20/20 hindsight to claim that a loss or reduction was material, whereas earlier in the relationship it was far from clear.").

Requirements and Acceleration of Filing Date, Release Nos. 33-8400, 34-49424 (Mar. 16, 2004), appended hereto as Exhibit 45.[12]

Second, the "abstain or disclose" rule, cited by plaintiff (Pl.'s Opp. at 30), only applies to *actual* claims of insider trading violations and *not* to allegations of insider stock sales that are used only to bolster an inference of scienter in a securities class action. *See, e.g., In re Safeguard Scientifics*, No. 01-3208, 2004 U.S. Dist. LEXIS 23796, at *8 (E.D. Pa. Nov. 23, 2004) (holding that "[a]n insider's duty to disclose information under the narrow 'abstain or disclose' rule is not transferable to general securities fraud claims, such as an omission claim brought under Section 10(b)") (citing cases). Thus, the "insider trading" disclosure requirement does not apply here.

Third, although an affirmative duty may arise when there has been an inaccurate, incomplete, or misleading prior disclosure, *Oran*, 226 F.3d at 286-85, that duty is not implicated unless the statements alleged to be false and misleading "put into play" the information allegedly omitted, *Galati v. Commerce Bank Corp.*, 220 Fed. Appx. 97, 102 (3d Cir. 2007) (holding that none of the statements identified by plaintiffs "put into play" the allegedly omitted facts, and therefore defendant had no duty to disclose). Here, *none* of the statements plaintiff claims are false and misleading made any affirmative representations about Kenexa's contractual relationship with Client B. Indeed, not one of them even mention the EPO component of the Company's business. (*See* Pl.'s Opp. at 16-17, 32.) Instead, *all* of these statements refer only to Kenexa's *general* financial condition. (*See supra* Sections II.C, III.A.) Thus, because the

---

[12] Public companies are required under SEC Regulation S-K, Item 101(c)(vii), however, to disclose the name of any customer who is responsible for "10 percent or more of the [the Company's] consolidated revenues and the loss of such customer would have a material adverse effect on the [the Company] and its subsidiaries taken as a whole." In both 2006 and 2007, Kenexa reported that "[n]o single client accounted for more than 10% of [its] revenue." (Defs.' Exh. 1, 2006 Form 10-K at 16; Defs.' Exh. 41, 2007 Form 10-K at 15.)

Company never "put into play" any information about its contractual relationship with Client B, it had no duty to disclose the fact that Client B had reduced its demand for Kenexa's services. Without a duty to disclose there can be no **reckless** duty to disclose (*see* Pl.'s Opp. at 17) and, therefore, plaintiff has failed to plead a strong inference of scienter as well.

### 2. Plaintiff's Allegations Regarding Kenexa's Methodology For Projecting EPO Sales Fail To State A Rule 10b-5 Claim

Plaintiff contends that Kenexa's EPO revenue projections were "unreasonable and unreliable" because they allegedly included prospective EPO deals "that were only in 'stage four' of a six-stage sales cycle." (Pl.'s Opp. at 28.)  Nowhere in either its Opposition or its Amended Complaint does plaintiff cite to any rule, regulation or even an industry standard that would support such a bald assertion.  Plaintiff's contention moreover is belied by the alleged fact that Kenexa used the **same** forecasting methodology in quarters when the Company met or exceed its revenue forecasts both before and after the third quarter of 2007.  (*See* Defs.' Open. Br. at 32-33; Am. Comp.¶¶ 56-57.)  But even if plaintiff's conclusory assertion that Kenexa's methodology was "unreasonable" and "unreliable" could be accepted as true, it nonetheless fails to support a Rule 10b-5 claim against defendants.  At most, plaintiff's contention suggests negligent, **not** reckless, conduct, and as such, does not state a cognizable claim of securities fraud.  *See, e.g., In re Alpharma Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004) (recognizing that allegations of mismanagement do not state a cognizable claim of securities fraud).

### 3. Plaintiff's Speculative Allegations Regarding Kenexa's U.K. Assessments Business Fail To Support A 10b-5 Claim

Fatal to plaintiff's claim that Kenexa's revenue forecasts for its U.K. assessments business did not comply with U.S. GAAP requirements is the complete absence of **any** indicia of an actual GAAP violation, such as a restatement of the Company's 2007 financial statements, which **never** occurred.  *See In re Sawtek, Inc. Sec. Litig.*, No. 6:03-CV-294, 2005 U.S. Dist.

LEXIS 39223, at *31 (M.D. Fla. Oct. 6, 2005) (pointing out that the absence of such allegations "robs the Lead Plaintiffs of a source of particularized factual support" for their accounting fraud claim).  Instead, plaintiff relies solely on alleged statements made by two former, ***non-accountant*** employees, CW10 and CW11, who worked in the Company's U.K. offices during the putative Class Period.  (Am. Compl. ¶¶ 58-59.)  Yet, as pointed out in defendants' Opening Brief, these former employees are completely unreliable in that ***they*** were the "weak management" in the U.K. assessments business that contributed to Kenexa's third quarter revenue "miss."  (*See* Defs.' Open. Br. at 34.)  Moreover, neither CW10 nor CW11 has accounting expertise or other qualifications to offer an opinion on whether Kenexa's revenue projections complied with GAAP.  Thus, their statements should be steeply discounted, if not flatly rejected.  *See Cal. Pub. Employees' Ret. Sys. v. Chubb*, 394 F.3d 126, 152-53 (3d Cir. 2004) (finding that the plaintiffs' "attempts to substantiate claims of accounting fraud by reference to a number of former employees who held positions that would not appear to render them privy to the company's bookkeeping practices, let alone the specific accounting that went into the company's financial reporting" does not plead with particularity the accounting fraud theory that would support the claim that financial statements were false).  As pointed out in defendants' Opening Brief, the fact that the Company received unqualified audit reports from its independent auditor, and has never been required to restate its financial statements, completely belies the plaintiff's conclusory assertions.  (*See* Defs.' Open. Br. at .7; Defs.' Exh. 38.)

Furthermore, the statements made by CW10 and CW11 provide ***no factual support*** for the element of scienter under either an actual knowledge or a recklessness standard. These statements allege no facts showing that the individual defendants were directly involved in any way with the purported (and unsubstantiated) violations of GAAP, or even that the

individual defendants were aware of, and disregarded, the alleged GAAP violations.[13]  (*See* Am. Compl. ¶¶ 58-59.)  Nor do CW10 and CW11 contend that either Mr. Karsan or Mr. Volk made or directed the alleged revenue recognition decisions they claim occurred.  Such bare allegations have been routinely rejected by the Third Circuit in strikingly similar circumstances.  *See, e.g.*, *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 149-151 (3d Cir. 2004) (granting dismissal and holding that conclusory allegations of GAAP violations at Brazilian subsidiary failed to establish recklessness where complaint failed to allege that company insiders were involved in or were aware of certain accounting procedures).[14]  Moreover, plaintiff pleads no facts showing that CW10 and CW11 ever notified anyone at Kenexa (let alone the individual defendants) about the accounting issue they now allege, or that any internal or external investigation took place.  Plaintiff's wholly conclusory averments do not state a Rule 10b-5 claim and must be dismissed.  *See, e.g.*, *Alpharma*, 372 F.3d at 151 (granting motion to dismiss and rejecting plaintiff's "whistleblower allegations" of improper accounting practices at a subsidiary as "wholly conclusory").[15]

---

[13] The Complaint's allegations (Am. Compl. ¶¶ 18-20) offer no factual support for plaintiff's revenue recognition theory and are nothing more than bald unsupported allegations.  The allegations merely allege that the individual defendants knew GAAP was required, but offer no factual support that they knew GAAP wasn't purportedly being followed during the Class Period with respect to revenue projections in the Company's U.K. assessments business.

[14] *See also Kushner v. Beverly Enter., Inc.*, 317 F.3d 820, 827-28 (8th Cir. 2003) (holding that allegations that defendants "designed and implemented" improper accounting policies failed to state a claim for securities fraud in the absence of "allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it . . . .  Rote allegations that the defendants knowingly made false statements of material fact fail to satisfy the heightened pleading standard of the Reform Act.") (citation and internal quotations omitted).

[15] Defendants note also that plaintiff's GAAP violation allegations fail to satisfy Rule 10b-5's loss causation requirement in that plaintiff has failed to allege a corrective disclosure or some other corrective event.  In order to plead loss causation, a plaintiff must allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *In re Tellium, Inc. Sec. Litig.*, No. 02-cv-5878, 2005 U.S. Dist. LEXIS 26332, at *11 (D.N.J. Aug. 26, 2005) (quoting *Lentell v. Merrill Lynch*, 396 F.3d 161, 173 (2d

(continued...)

### C.    The Individual Defendants' Stock Sales Weaken Any Inference Of Scienter

#### 1.    The Scope Of The Individual Defendants' Stock Sales Negates Any Inference Of Scienter

In its Amended Complaint and Opposition, plaintiff attempts to bolster its scienter argument by ignoring relevant facts of public record, distorting facets of the individual defendants' stock sales[16], and avoiding arguments raised by defendants regarding controlling Third Circuit case law that requires dismissal.  (*See* Am. Compl. ¶¶ 8, 34-35, 98-100; Pl.'s Opp. at 44-49.)

---------------------

(continued...)

Cir. 2005) (emphasis in original)).  "In other words, Plaintiffs must allege that at some point, the concealed scheme was disclosed to the market, because where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss."  *Tellium*, 2005 U.S. Dist. LEXIS 26332, at *11 (internal quotations omitted).  At the center of plaintiff's revenue recognition allegations is that Kenexa refused to recognize revenue from its U.K. assessments business early enough according to GAAP, while knowingly making false statements about the Company's prospects in May and August 2007.  However, the November 7, 2007 earning conference call that plaintiff alleges was when "the truth emerged" and a "curative disclosure" neither revealed that Kenexa's actual revenue from its U.K. assessments business had been allegedly overstated or that the U.K. assessments revenue projections did not conform to GAAP. (Defs.' Exh. 21, 11/07/07 Press Release; Defs.' Exh. 33, 11/07/07 Conf. Call Tr. at 6-7; Am. Compl. ¶¶ 25, 86.) Where a complaint, like the Amended Complaint here, fails to allege that the concealed scheme was *ever* disclosed to the market, courts within the Third Circuit have held that the requirement of loss causation has not been met.  *See Marsden v. Select Med. Corp.*, No. 04-4020, 2007 U.S. Dist. LEXIS 9893, at *16-*19 (E.D. Pa. Feb. 6, 2007) (granting motion to dismiss based on plaintiff's failure to plead loss causation on alleged improper accounting practices where the complaint "makes not a single allegation that Defendant company ever publicly disclosed that it maintained improper revenue practices or misrepresented its revenues."); *Tellium*, 2005 U.S. Dist. LEXIS 26332, at *11-*14 (rejecting loss causation allegations that did not demonstrate a market correction of the artificial inflation caused by defendants' misrepresentations).

[16] Plaintiff's Amended Complaint and Opposition contain various factual inaccuracies regarding the individual defendants' and Mr. Troy Kanter's stock sales during the Class Period.  (*See* Am. Compl. ¶¶ 98-99; Pl.'s Opp. at 44-45.)  Mr. Karsan's Oct. 4, 2007 Form 4, which was publicly filed with the SEC, attests to the fact that he retained *1,201,630* shares (*not* 1,001,630 shares as depicted in plaintiff's Amended Complaint and Opposition) as of his last stock trade of the Class Period.  (*See* Defs.' Open. Br., Exh. 6, 34.)  Likewise, non-defendant Troy Kanter's publicly filed May 31, 2007 Form 4 confirms that he retained *210, 474* shares (*not* 21,475 shares as depicted in plaintiff's Amended Complaint and Opposition) as of his last stock trade of the Class Period.  (*See* Defs.' Open. Br., Exh. 8, 34.)  Thus, Plaintiff's computation of the percentages of their Kenexa stock sold during the Class Period are also incorrect.  (*See* Am. Compl. ¶¶ 98-99; Pl.'s Opp. at 44-45.)  Mr. Karsan sold 189,900 shares or *less than 14%* of his total shares (not 15.94%) and Mr. Kanter sold 62,096 shares or approximately *23%* of his total shares (not 74.30%) during the Class Period.  (*See* Defs.' Open. Br., Ex. 34.)  Defendants do not know how plaintiff arrived at its "End of CP Stock Holdings, % Sold, or % Sold, Incl. Options" calculations for either Mr. Karsan or Mr. Kanter. (*See* Am. Compl. ¶ 98.)

First, the individual defendants retained a great majority of their stake in Kenexa, which defeats any finding of a "cogent" and "compelling" inference of scienter.[17] "Low aggregate sales and large retained aggregate holdings rebut an inference of motive, even when some defendants have sold significant percentages." *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313-14 (D.N.J. 2001) (concluding no inference of scienter where two individual defendants retained approximately 92% of their total holdings, despite the fact that one defendant sold 100% of his shares); *see also In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 234 (D.N.J. 2002) (declining to infer fraud from the fact that defendants sold stock, particularly where they retained 74% of their aggregate holdings). Here, Messrs. Karsan and Volk retained *83.88%* (1,269,654/1,513,554) of their aggregate holdings at the end of the Class Period.[18] Far from supporting a "cogent" and "compelling" inference that the individual defendants had a motive to capitalize on artificially inflated stock prices, these facts clearly demonstrate that Mr. Karsan and Mr. Volk had every incentive to keep Kenexa profitable. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1423 n.12 (3d Cir. 1997) (dismissing complaint and holding no scienter where plaintiffs failed to explain "how a temporal inflation of . . . stock price would help management increase its compensation or preserve its jobs.").

---

[17] Plaintiff's Opposition failed to address defendant's argument (Defs.' Open. Br. at 41-42) that stock sales by non-defendant Troy Kanter are not probative of whether the individual defendants had any fraudulent motive and should not be considered by the Court. Even if Mr. Kanter's sales could be properly considered, they do not amount to much. Mr. Kanter still retained over *77%* of his shares at the end of the Class Period, a fact that militates against any inference of fraud. (Defs.' Open. Br. at 41-42; Defs.' Exh. 34.)

[18] Defendants Karsan and Volk sold approximately 16.12% (209,900/1,513,554) of their aggregate holdings during the Class Period. (*See* Defs.' Exh. 34 (providing a complete description of the individual defendants' stock sales).) Plaintiff argues that stock options should not be included in this analysis, but doing so does not change the conclusion. Excluding vested options retained, Messrs. Karsan and Volk retained *82.03%* (1,241,654/1,513,554) of their holdings at the end of the Class Period – an insignificant difference. (*See id.*)

Second, the aggregate size of the individual defendants' stock sales was not at all unusual or suspicious.[19]  Total sales resulting in $6,914,432 in gross proceeds, ***not profits***, over a sixth month period by two individual defendants (Messrs. Karsan and Volk) are simply insufficient to raise an inference of scienter.[20]  (*See* Defs.' Exh. 6-7, 34 (providing a complete explanation of the individual defendants' sales of stock and stock options).)  As previously stated (Defs.' Open. Br. at 39-40), the Third Circuit has held that stock sales with $40 million in proceeds and $25 million in profits over a three-month period immediately prior to the relevant corrective disclosure were insufficient to give rise to a strong inference of scienter.  *See Oran v. Stafford*, 226 F.3d 275, 289-90 (3d Cir. 2000); *Avaya*, 564 F.3d at 279 (finding no marginal increase in inference of scienter where two individual defendants sold stock for approximately $5.2 million).

Third, plaintiff's contention that the size of the individual defendants' stock sales is "unusual" in comparison to their 2007 base salaries is completely disingenuous and misplaced.  First, Messrs. Karsan and Volk's overall compensation for their work at Kenexa in 2007 did not merely include their base salaries as plaintiff contends.  (*See* Pl.'s Opp. at 45.)  Indeed, Kenexa's

---

[19] Plaintiff's reliance on *In re Suprema Specialties, Inc., Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006), and *Voit v. Wonderware Corp.*, 977 F. Supp. 363 (E.D. Pa. 1997), is entirely misplaced and easily distinguishable from the facts of this case.  The timing and scope of the defendants' stock sales in *Suprema* were egregiously more unusual and suspicious than the stock sales here.  *Id.* at 277-78.  The stock sales in *Suprema* involved aggregate sales of over 35% of the insider defendants' holdings.  *Id.*  More importantly, the timing of all the stock sales in *Suprema* occurred a mere ***six weeks*** before two of the insider defendants ***resigned*** from their positions at the company and only weeks before it was publicly announced that the company was being ***criminally investigated*** by the FBI, FDA, SEC, and NJ Dept. of Agriculture.  *Id.*  Furthermore, the fraudulent business transactions in *Suprema* involved a 66% overstatement of revenue, a 95% overstatement of inventory, and nearly 100% of its growth over the entire class period.  *Id.* at 278.  Finally, the *Voit* decision is no longer good law on the issue of scienter because it was decided before the Third Circuit's precedential decision in *Advanta*, which laid out the Circuit's standard for evaluating scienter under the PSLRA.

[20] As previously stated (Defs.' Open. Br. at 36-37), the size of the individual defendants' stock sales during the Class Period were comparable to, if not less than, their past stock sales that occurred the previous year in 2006 – a fact that does not support a "cogent" and "compelling" inference of scienter.  Plaintiff's counter argument (Pl.'s Opp. at 46-47) amounts to nothing more than semantics, and contradicts Third Circuit law.

2008 Proxy Statement reveals that Messrs. Karsan and Volk were paid $2,198,071 and $2,338,136, respectively, in 2007 for their work at Kenexa, while their base salaries were merely a portion of their executive compensation package -- $500,000 and $300,000 respectively.  (*See* Exh. 42, Kenexa Schedule 14A, Definite Proxy Statement (4/09/08) at 26 (hereinafter "2007 Proxy Statement").)  When correctly compared to their overall executive compensation, the individual defendants' stock sale proceeds (***not profits***) are anything but remarkable.  The gross proceeds from the sales realized by Mr. Volk were less than one-fifth ($474,108) of his overall executive compensation ($2,338,136) for the same year.  (*Id.* at 26.)  And while the gross proceeds (***not profits***) realized by Mr. Karsan ($6,441,324) were larger relative to his overall executive compensation ($2,198,071), much of these proceeds (along with Mr. Volk's) were the "result of accumulated stock options and were an intended part of [the defendant's] overall compensation package", a major distinction that this Circuit has recognized.  *Advanta*, 180 F.3d at 541 (citing *Burlington Coat Factory*, 114 F.3d at 1424 (finding sales of stock options are expected "in the normal course of events")); *see also In re Astea Int'l Inc. Sec. Litig.*, No. 06-1467, 2007 WL 2306586, at *14 (E.D. Pa. Aug. 9, 2007); *Party City*, 147 F. Supp. 2d at 313 (noting that the Third Circuit has recognized that stock options are commonly an important part of compensation packages and refusing to impute scienter based on such sales).  Far from supporting an inference of scienter, the "normal course" of the individual defendants' stock sales tends to weaken the conclusion that the scope of their stock sales was either unusual or suspicious.

     **2.**    **The Timing Of The Individual Defendants' Stock Sales Refutes Any Inference Of Scienter**

     Plaintiff argues that the timing of the stock sales was somehow suspicious because most of them took place after public announcements of Kenexa's First Quarter 2007

Results in May 2007.[21]  (Am Compl. ¶¶ 98, 100; Pl.'s Opp. at 45-46.)  Not only would plaintiff's theory eviscerate most public companies' insider trading polices, but such allegations are of no consequence since "[t]rading following public announcements simply evidences compliance with the securities laws." *Party City*, 147 F. Supp. 2d at 312 (citing *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir. 1988)); *Astea*, 2007 WL 2306586, at *15 (finding "it is very likely that defendants' stock sales following the positive third quarter results merely reflect compliance with securities law which prohibits insiders from trading on undisclosed information.").  "Indeed, insiders are only permitted to trade in a 'window' after a public announcement is made." *Party City*, 147 F. Supp. 2d at 312.  Thus, the timing of those sales is not at all suspicious.

Furthermore, plaintiff's argument that the timing of Mr. Karsan's October 2007 stock sales is somehow "suspicious" is disingenuous at best.  (*See* Pl.'s Opp. at 46.)  Those specific sales were ***prearranged*** in both size and timing months before, in May 2007, by Mr. Karsan pursuant to a Rule 10b-1 plan.  (*See* Defs.' Open. Br. at 40, Defs.' Exh. 6, 34.)  Setting aside the significance of a 10b5-1 plan[22], plaintiff cannot dispute that all of Mr. Karsan's and Mr. Volk's stock sales during the Class Period either were executed or were prearranged ***several months*** before the third quarter earnings announcement that marks the end of the Class Period. (*See* Defs.' Open. Br. at 42-43.)  As courts in the Third Circuit have consistently recognized, such a "broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter." *Party City*, 147 F. Supp. 2d at 313 (concluding stock sales of three, four,

---

[21] For support, plaintiff cites various Ninth Circuit district court decisions that are not controlling on this Court, and typically follow precedent that is not the law in the Third Circuit on federal securities law.

[22] *See* Defs.' Open. Br. at 40-41 (discussing the import of Rule 10b5-1 plans by federal courts in a scienter analysis).

and twelve months before the disclosure of bad news is too attenuated to draw a strong inference

of scienter).

## IV.     CONCLUSION

For all of the above reasons, as well as the grounds set forth in defendants'

Opening Brief, plaintiff's Amended Complaint should be dismissed with prejudice.

Respectfully submitted,


_/s/ Robert L. Hickok_
Robert L. Hickok
Gay Parks Rainville
Thomas T. Watkinson, II
John L. Schweder, II
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103
(215) 981-4000

Attorneys for Defendants
Kenexa Corporation
Nooruddin S. Karsan
Dated:  March 1, 2010          Donald Volk

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of March 2010, copies of the foregoing

Memorandum of Law in Opposition to Plaintiff's Motion to Strike were served on the following

counsel of record via electronic mail, and by filing the document through the Court's CM/ECF

system, where it is available for viewing and downloading.

Deborah R. Gross
LAW OFFICES BERNARD M. GROSS, P.C.
Suite 450, Wanamaker Building
Juniper and Market Streets
Philadelphia, PA 19107

-and-

Laura M. Andracchio
Jonah H. Goldstein
Maureen E. Mueller
Danielle S. Myers
Francis A. Digiacco
COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

-and-

Eli K. Greenstein
COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
100 Pine St., Ste. 2600
San Francisco, CA 94111

-and-

Jack Reise
COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
120 E. Palmetto Park Rd.
Ste. 500
Boca Raton, FL 33432


  */s/ Gay Parks Rainville*
Gay Parks Rainville