IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BUILDING TRADES UNITED PENSION | : | CIVIL ACTION |
| TRUST FUND | : | |
| v. | : | No. 09-2642 |
| | : | |
| KENEXA CORPORATION, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                    **September 27, 2010**

Building Trades United Pension Trust Fund (BTUPTF) brings this consolidated securities

fraud class action on behalf of all persons who purchased the common stock of Kenexa Corporation

(Kenexa) between May 8, 2007, and November 7, 2007 (the Class Period). The Plaintiff class

asserts claims against Kenexa, CEO Nooruddin "Rudy" Karsan, and CFO Donald Volk for

violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5.

Defendants ask this Court to dismiss Plaintiffs' claims, arguing: (1) Plaintiffs have failed

to adequately plead scienter; (2) Plaintiffs cannot hold Defendants liable for omissions related to

future losses; and (3) the safe harbor provision of the Private Securities Litigation Reform Act

(PSLRA), 15 U.S.C. § 78u-5(c), protects Defendants' forward-looking written or oral statements.

Because Plaintiffs have not met the heightened standard for pleading scienter as set forth in *Tellabs,*

*Inc. v. Makor*, 551 U.S. 308 (2007), this Court will grant Defendants' Motion to Dismiss.

Also before this Court is Plaintiffs' Motion to Strike Exhibit 36 of Defendants' Motion to

Dismiss, or, in the alternative, to convert Defendants' motion into a motion for summary judgment,

which shall be granted.[1]

**FACTS**

Kenexa and its subsidiaries operate in the Human Capital Market (HCM) industries, providing software, content, and services to help human resources departments hire and retain employees. Kenexa provides "talent acquisition" services, which involves finding and recruiting employees, and outsourcing services known as Employment Process Outsourcing (EPO). Kenexa earns revenue by charging subscription fees for its services and by charging fees for additional support or any other discrete professional services. At the beginning of the Class Period, Kenexa had 13 EPO accounts, which collectively constituted about 15-20% of Kenexa's total revenue. The revenue generated by the EPO accounts was divided evenly between subscription fees and discrete services fees.

In June 2005, during Kenexa's initial public offering (IPO), the company sold 5.75 million shares of common stock at $12 per share. Kenexa grew quickly during the following years, acquiring seven other companies from January 2006 through August 2007.

---

[1] Plaintiffs seek to strike Defendants' Exhibit 36, which purports to be a redacted contract between Kenexa and a client known as "Client B." In deciding a motion to dismiss, courts may consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). A district court may not consider matters extraneous to the pleadings unless the document is "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks and citations omitted); *see also Pension Ben. Guar. Corp.*, 998 F.2d at 1196 (holding a Court may consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document").

Here, Plaintiffs contest authenticity of the contract, stating they are unfamiliar with the document, which has been attached in redacted form. Although Defendants offered to provide an unredacted copy of the document to Plaintiffs, Plaintiffs are entitled to challenge the veracity of the document at this stage of the litigation. Because this document is not necessary for the resolution of Defendants' motion to dismiss, this Court will grant the motion to strike.

On May 8, 2007, Kenexa reported its results for the first quarter of 2007 (Q1), stating a total revenue of $42.2 million (an 83% increase from the first quarter of 2006). Kenexa asserted it earned $34.7 million in subscription revenue and $7.5 million of other revenue, including professional services. Defendant Karsan stated interest in Kenexa was "strong" and the company was benefitting from the trend towards hiring HCM firms because of Kenexa's "proven ability to deliver tangible business benefits for [its] customers and growing brand awareness." Compl. ¶ 60. Karsan stated he anticipated Kenexa's revenues for 2007 would be $186-189 million. In a conference call later the same day, Karsan expressed similar optimism, telling investors the company's acquisitions were expected to boost profitability. Karsan stated the company's 35% annual growth was unlikely to decrease.

In response to this positive forecast, the price of Kenexa stock rose from $31.94 on May 8, 2007, to $32.96 on May 9, 2007, and continued to climb for the remainder of May 2007. During that month, Defendant Karsan sold 127,400 shares of Kenexa stock for proceeds of more than $4.6 million. Defendant Volk sold 20,000 shares of stock in May 2007 for proceeds of approximately $764,000. Non-defendant board member Troy Kanter, Kenexa's President and Chief Operating Officer, sold 62,096 shares of stock for proceeds of $2.25 million.

Plaintiffs allege the May 8, 2007, forecast was materially false because at the time Karsan made his statements, Kenexa officers knew the company was poised to lose one of its largest EPO clients, a biotechnology firm referred to as "Client B."[2] Client B, a pharmaceutical company, was a subscription client whose account generated approximately $6 million annually for Kenexa.

---

[2] Kenexa does not disclose the identity of Client B pursuant to its contractual obligation to maintain anonymity. Because the identity of Client B does not affect this Court's analysis of the Complaint's legal merits, it shall remain anonymous for the purposes of this opinion.

During early 2007, Kenexa reduced the number of employees who worked at Client B because Kenexa knew Client B was experiencing difficulties related to certain pharmaceutical products. Given these problems, Plaintiffs allege it was unreasonable for Defendants to include the $6 million value of Client B's contract in Kenexa's 2007 forecast. Plaintiffs also argue the forecast was false because Karsan knew EPO sales had slowed and Kenexa's international businesses were reporting revenue in a method which was not in conformity with U.S. Generally Accepted Accounting Principles (GAAP), in violation of SEC requirements.[3] Plaintiffs further argue Defendants engaged in insider trading during the Class Period, thereby profiting from their misrepresentations and omissions.

On August 8, 2007, following its acquisition of StraightSource, a provider of recruitment process outsourcing services, Kenexa updated its 2007 revenue estimate to $188-192 million. This slightly increased projection was troublesome, according to Plaintiffs, because the $2-3 million increase was less than the $4-7 million in projected StraightSource revenue. During the conference call reporting results from the second quarter of 2007 (Q2), Karsan reassured investors that organic growth was "solid," estimating a growth rate of 30-35% for the remainder of the year. By August 9, 2007, stock prices had dropped from $41 to $33.85. Plaintiffs assert the latter price was still artificially inflated because the August forecast was materially false.

Kenexa performed poorly in the third quarter of 2007 (Q3), with preliminary reports $2 million short of its projections. As a result, the company revised its revenue estimate for 2007

---

[3] In November 2006, Kenexa acquired PSL, a U.K.-based accounting firm which used U.K. accounting principles, allowing it to declare more revenue upfront. Kenexa argues that at all times relevant to this lawsuit, its accounting practices have conformed with GAAP. In support, it cites its Form 10-K for 2007, which contains an outside auditor's assertion Kenexa's financial statements were in conformity with GAAP. Defs.' Mot. to Dismiss Ex. 2.

downward by $7 million. Kenexa informed investors on November 7, 2007, that there were

problems with Client B, slow EPO sales, and problems with its foreign acquisitions' accounting.

Stock prices immediately plummeted, declining 40% by the following day.

A month before the November disclosure, Karsan sold 37,500 shares of stock for a gain of

$1.2 million. These sales were made pursuant to a Rule 10b5-1 trading plan put in place after the

commencement of the Class Period. Of the five Kenexa officers, Karsan was the only one to sell

stock between May 30, 2007, and the end of the Class Period, November 7, 2007.

Plaintiffs identify several non-forward looking statements made in response to Kenexa's Q1

and Q2 results which they believe create liability for Defendants. This Court finds the following

statements made on May 8, 2007, or portions thereof,[4] to be non-forward looking:

(1) "Market demand is strong . . . ." Compl. ¶ 60 (citing Kenexa's Q1 press release).

(2) "Kenexa is benefitting from these trends [toward growing interest in talent management

firms] due to our differentiated value proposition, proven ability to deliver tangible business

---

[4] The fact a statement has a forward-looking component does not preclude a finding it also has components containing representations of present fact. *E.P. Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 874 (3d Cir. 2000). When a statement includes both forward looking and non-forward looking statements, a court must consider the non-forward looking statements separately because the PSLRA's safe harbor cannot apply to such statements. *See Avaya, Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."); *see also City of Hialeah Emps.' Ret. Sys. & Laborers Pension Trust Funds for N. Cal. v. Toll Bros., Inc.*, No. 07-1513, 2008 WL 4058690, at *3 (E.D. Pa. Aug. 29, 2008) (holding that when a defendant's statements contained misrepresentations about both present and future facts, the statements "cannot be eligible for protection under 'bespeaks caution' or the safe harbor provision [because to] allow otherwise would circumvent the requirement of both the 'bespeaks caution' doctrine and the safe harbor provision that a statement be forward-looking"). Thus, this Court has removed any forward looking language included in the above statements in order to consider only the portions of those statements which deal with current or past events. The forward looking portions of such statements shall be addressed when this Court considers the applicability of the PSLRA safe harbor provision.

benefits for our customers . . . ." *Id.* (citing Kenexa's Q1 press release).

(3) "[O]ur revenue continues to be highly visible as a result of our diverse customer base, long-term contracts, renewal rates that continue to be in the 90%-plus range, and the growing number of new customers that we are adding to our overall customer base." Compl.¶ 62 (citing Kenexa's Q1 conference call).

Plaintiffs also point to several forward-looking statements made on May 7, 2007, which they contend fall outside the scope of the PSLRA safe harbor provision so as to create liability for Defendants:

(1) "[I]nterest is growing . . . ." Compl.¶ 60 (citing Kenexa's Q1 press release).

(2) "[W]e are currently ahead of where we would target at this point in the year, and as such we will be primarily focused on optimizing sales productivity in the near term."[5] Compl.¶ 62 (citing Kenexa's Q1 conference call).

(3) "For the full year 2007, we are slightly increasing our revenue and profitability guidance. We now expect the following: Total revenue of $186 million to $189 million, subscription revenue to be $149 million to $152 million; non-GAAP operating income of

---

[5] Statements classified as forward-looking include, inter alia, "any statement of the assumptions underlying or relating to" statements which contain revenue projections or information about future economic performance. 15 U.S.C. § 78u-5(i)(1). Although Plaintiffs contend these first two statements relate to present or past facts, this Court finds the first is a classic forward-looking statement implying interest will continue to grow and the second is an underlying assumption that Defendants will meet their revenue projection for 2007. Moreover, the Third Circuit's decision in *Avaya* makes clear that a statement regarding whether a company is "on track" to meet its annual projection cannot "meaningfully be distinguished from the future projection of which they are a part." 564 F.3d at 255.

$40.7 million to $42.8 million." *Id.*[6]

On August 8, 2007, following the release of its Q2 results, Defendants made the following non-forward looking statements, which Plaintiffs contend are material misrepresentations:

(1)  "We were pleased with the Company's second quarter results, which were highlighted by solid organic growth and acquisitive revenue growth, profitability and cash flow.  Market demand is strong, and Kenexa's brand recognition continues to grow as reflected by the growing number of inbound inquiries that we are fielding related to our total solution offerings."  Compl. ¶ 70 (citing Kenexa's Q2 press release).

(2)  "We continue to benefit from our participation in an attractive market that is experiencing strong demand and growing awareness.  We are pleased with the high level of execution across all our global organization."  Compl. ¶ 72 (citing Kenexa's Q2 conference call).

(3)  "Our revenue continues to be highly visible as a result of our diverse customer base, long-term contracts, renewal rates that continue to be in the 90% plus range and the growing number of new customers that we are adding to our overall customer base."  *Id.*

(4)  "I'm not feeling like it is a slowdown in organic [growth], in fact I'm feeling like it's really, really solid."  Compl. ¶ 74 (citing Karsan's comments during Kenexa's Q2 conference call).

Additionally, Plaintiffs highlight several forward-looking statements made on August 8,

---

[6] This same assertion regarding projections for 2007 was made in Kenexa's Q1 press release. Compl. ¶ 61.  Kenexa also raised its Q2 projections as follows:  revenue was raised to range from $43 to $44.9 million, subscription revenue to range from $34.9 to $35.9 million, and non-GAAP operating income to range from $8.7 to $9.1 million.  *Id.*  Plaintiffs' allegations do not specifically relate to Kenexa's Q2 projections, which the company met for the quarter.

2007, which they believe are false and misleading:

(1) "Kenexa's brand recognition continues to grow . . . ." Compl. ¶ 70 (citing Kenexa's Q2 press release).[7]

(2) "Third Quarter 2007: [Kenexa] expects revenue to be $48 to $50 million subscription revenue to be $38.4 to $40 million and non-GAAP operating income to be $10.8 to $11.3 million. . . ." Compl. ¶ 71 (citing Kenexa's Q2 press release).

(3) "Full Year 2007: [Kenexa] expects total revenue to be $188 million to $192 million, subscription revenue to be $150 to $153 million and non-GAAP operating income to be $40.7 to $42.8 million. . . ." *Id.*

(4) "We are optimistic about our outlook for the remainder of the year and we continue to be very excited by our long term potential, based on the expanded breadth and depth of our solutions, growing market share and the strength of the talent management market momentum." Compl. ¶ 72 (citing Kenexa's Q2 conference call).

(5) "I think [when] we started this year, we were talking about organic growth at the beginning of the year at 29 to 32% range. . . . I would say the second half of the year we're going to be in the 30 to 35[%] range." Compl. ¶ 74 (citing Karsan's comments during Kenexa's Q2 conference call).

In addition to statements made in 2007 during the Q1 and Q2 investor conference calls and in Kenexa's related press releases, Plaintiffs point to statements made by third parties from

---

[7] Similarly, although Plaintiffs assert this statement relates to present facts, this statement is also forward-looking because it relates to the reasons underlying Kenexa's prediction of future success in its field.

September to October 2007 which Plaintiffs believe reflect misrepresentations by Kenexa officers.[8]

On June 11, 2009, Plaintiffs filed a Complaint alleging the above statements were misrepresentations made with scienter and Defendants failed to disclose material information they were obligated to reveal. Plaintiffs filed an Amended Complaint on October 26, 2009. Defendants filed a motion to dismiss on December 14, 2009.

**DISCUSSION**

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quotation marks and citations omitted). Courts must accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). In short, a complaint will be dismissed unless it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Section 10(b) of the Securities Exchange Act makes it unlawful to "employ, in connection

---

[8] The first third-party statements cited in the Complaint were made by a Credit Suisse analyst and merely repeat Defendants' assertions regarding Kenexa's organic growth rate, attributing these comments to management. Compl. ¶ 82. The other third-party statements were contained in a Wedbush Morgan Securities report issued after Kenexa's World User Conference in September 2007. The report stated, in relevant part, "[W]e are incrementally more positive on the shares and believe that the negative sentiment since the Q2 earnings call is mostly unwarranted, as customers we spoke with seemed very satisfied with their engagements. . . ." Compl. ¶ 83. Because Plaintiffs have not pled the elements of the "adopt or endorse" test required to impute third-party statements to securities fraud defendants, *see In re Crown Am. Realty Trust Sec. Litig.*, No. 95-202, 1997 WL 599299, at *19 (W.D. Pa. Sept. 15, 1997), this Court need not consider these statements in its analysis.

with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention" of any rule promulgated by the SEC designed to protect the investing public. 15 U.S.C. § 78j(b). Section 10(b) is enforced through SEC Rule 10b-5, which makes it unlawful: (1) "to employ any device, scheme, or artifice to defraud," (2) "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," or (3) "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. To state a claim under Section 10(b) and Rule 10b-5, a private plaintiff must plead facts which demonstrate: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, . . . [also called] transaction causation; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (internal quotation marks and citations omitted).[9] Only the first two of these elements at issue here.

Before passage of the PSLRA, complaints alleging securities fraud under Rule 10b-5 were subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be

---

[9]Although § 10(b) and Rule 10b-5 did not expressly create a private cause of action, the Supreme Court established a cause of action for investors adversely affected by false or misleading statements. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196 (1976) (finding a private cause of action is appropriate when there is an intent to deceive, manipulate, or defraud); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 748-49 (1975) ("[W]e are not dealing here with any private right created by the express language of § 10(b) or of Rule 10b-5 . . . . We are dealing with a private cause of action which has been judicially found to exist[.]").

averred generally." Fed. R. Civ. P. 9(b). As applied to § 10(b) claims, Rule 9(b) requires a plaintiff plead "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). This heightened pleading standard requires that plaintiffs "support their allegations of securities fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue."[10] *Id.* at 217 (internal quotation marks and citations omitted). Due to this heightened standard, a complaint which would normally survive a Rule 12(b)(6) motion may still fail on Rule 9(b) grounds. *Burlington*, 114 F.3d at 1424.

In an effort to restrict abuses in securities class action litigation, Congress passed the PSLRA, which added even more stringent requirements to the heightened pleading standard of Rule 9(b).[11] *See Tellabs*, 551 U.S. at 313 ("As a check against abusive litigation by private parties, Congress enacted the [PSLRA]."). Where the plaintiff alleges the defendant made an untrue or misleading statement, the PSLRA "imposes two exacting and distinct pleading requirements." *In re Aetna, Inc. Sec. Litig.*, No. 09-2970, 2010 WL 3156560, at *4 (3d Cir. Aug. 11, 2010). In their Complaint, Plaintiffs must: (1) "specify each statement alleged to have been misleading [and the

---

[10] The heightened pleading standard of Rule 9(b) gives defendants "notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlement." *Burlington*, 114 F.3d at 1418.

[11] These pre-PSLRA abuses included: "(1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys." *In re Advanta*, 180 F.3d 525, 531 (3d Cir. 1999) (*citing* H.R. Conf. Rep. No. 104-369, at 28 (1995)).

reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b). Under the current standard, a complaint alleging securities fraud under § 10(b) and Rule 10b-5 must satisfy the heightened pleading requirements of both Rule 9(b) and the PSLRA.[12] *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004).

Defendants contend Plaintiffs fail to satisfy the second prong of PSLRA's heightened pleading standard because they have not "state[d] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The required state of mind, scienter, is defined as an intention "to deceive, manipulate, or defraud." *Hochfelder,* 425 U.S. at 194. In *Tellabs*, the Supreme Court articulated a three-pronged procedure to determine whether a complaint articulates facts giving rise to a strong inference of scienter. 551 U.S. 308 (2007). First, as with any motion to dismiss, a court must accept all factual allegations in the complaint as true. *Id*. at 322. Second, a court must analyze the complaint as a whole and examine the sources courts typically consider when faced with a Rule 12(b)(6) motion, particularly "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* "The inquiry . . . is whether *all* the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-23. Third, the court must consider all plausible opposing inferences and determine whether "a reasonable person would deem the inference of scienter cogent

---

[12] Although Rule 9(b) allows the general pleading of mental states, the PSLRA's requirement the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]," 15 U.S.C. § 78u-4(b)(2), supercedes Rule 9(b) in Rule 10b-5 actions. *Advanta*, 180 F.3d at 531 n.5.

and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 234. Thus, while the inference of scienter must be "compelling," it need not be "the *most* plausible of competing inferences." *Id.* (emphasis added) (citations omitted). In creating these requirements, the *Tellabs* Court attempted to strike a balance between reinforcing the enhanced pleading requirements of the PSLRA and limiting the burden on plaintiffs during the preliminary stages of litigation. In short, scienter is adequately pled if facts are alleged which, taken as a whole, give rise to an inference it was *just as likely* the defendant acted with scienter as the inference he did not. This standard does not require plaintiffs to prove defendants had actual knowledge of a statement's falsity; instead, plaintiffs may show recklessness by demonstrating defendants disregarded a fact "so obvious that the actor must have been aware of it." *Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 267 n.42 (3d Cir. 2009).

Although *Tellabs* established a comparative analysis, the opinion sheds little light on what kinds of facts are appropriate to consider when conducting this analysis. After *Tellabs*, allegations of motive and opportunity to commit fraud, or facts constituting strong circumstantial evidence of fraud, are still relevant, but courts must take a more holistic approach and consider these allegations in relation to opposing inferences suggested by defendants. *See Tellabs,* 551 U.S. at 325 (holding evidence of motive, misbehavior, or recklessness should be considered if present, but "the absence of a motive allegation is not fatal"). The *Tellabs* Court cited with approval several factors the Sixth Circuit identified as relevant to create an inference of scienter: (1) insider trading at a suspicious time or in unusual amounts; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5)

existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of accounting sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending stock sale; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)). Although this list is not exhaustive, it is instructive in determining what types of facts are persuasive.

Plaintiffs first argue Defendants knew or should have known their statements were false due to the problems with Client B, the inclusion of sales that had not yet closed, the lengthening of the EPO sales cycle, and Kenexa's failure to update its international assessment revenue recognition practices with regard to a newly acquired U.K. firm. Plaintiffs further assert Defendants engaged in insider trading during the Class Period, supporting an inference of scienter. Defendants contend Plaintiffs did not plead facts showing Defendants acted with actual knowledge their statements were false or with recklessness to obvious facts. Specifically, Defendants say there is no way they could have known Client B would terminate its EPO contract or that certain EPO sales would not close in time to be included in Kenexa's 2007 revenue report. Defendants further argue the allegations regarding Kenexa's U.K. acquisition are groundless. As to stock transactions which Plaintiffs say evince insider trading, Defendants assert their sales during the Class Period cannot create an inference of scienter because they owned a much larger volume of stock and engaged in fewer transactions during the Class Period than they did in 2006. Defendants also note two of Kenexa's

three officers retained substantial portions of their stock holdings. Finally, Defendants argue non-defendant officer Troy Kanter's sales are not probative of the Defendants' scienter.

Following the Supreme Court's instruction in *Tellabs*, this Court will examine each of Plaintiffs' allegations of scienter individually and then determine if, taken collectively, they create a strong inference of scienter.

In support of their allegations, Plaintiffs cite statements made by eleven confidential witnesses (CWs). Because Plaintiffs have little documentary evidence to support their scienter claims, the statements of these CWs are especially important for this Court's analysis. *See Avaya*, 564 F.3d at 261 ("Where, as here, plaintiffs lack documentary evidence such as internal memoranda, reliance on confidential sources to supply the requisite particularity for their fraud claims . . . assumes a heightened importance." (internal quotation marks and citations omitted)). In general, a confidential source's allegations must be described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Chubb*, 394 F.3d at 148 (quoting *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000)); *see also Avaya*, 564 F.3d at 263 ("The PSLRA imposes a particularity requirement on all allegations, whether they are offered in support of a statement's falsity or of a defendant's scienter."). Thus, when considering confidential sources' statements, a court must examine the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Id.* (quoting *Chubb*, 394 F.3d at 147).

The first three CWs were on-site recruiters at Client B whose affidavits assert Client B was reducing its workforce and the number of Kenexa employees working on-site during the first and

second quarters of 2007.  None of these CWs maintained employment throughout the entire Class Period.[13]  These witnesses do not have any information related to communications between Client B and Kenexa management regarding the potential cancellation of Client B's contract prior to the third quarter of 2007.  While the testimony of these three CWs does show Client B was reducing its workforce, it does not demonstrate Defendants knew the above statements were false.  Moreover, the problems facing a single client do not render any of the above statements of present fact false when that client's business was a small fraction of the total revenue.  Even if Defendants knew Client B would attempt to terminate its contract with Kenexa,[14] a single company's internal problems[15] do not mean the general market was not strong with regard to the need for Kenexa's services, and Kenexa did, in fact, have a "highly visible" source of revenue through its recurring client contracts.  Similarly, CW4, a vice-president of human resources, merely asserts Client B was one of Kenexa's largest EPO clients.[16]  CW4's statements do not demonstrate that executive leadership knew about problems with Client B.

CW5 and CW6 were Program Directors who state Kenexa's executive leadership reviewed

---

[13] CW1 was employed from October 2006 through July 2007.  CW2 worked for Kenexa at Client B's headquarters from 2006 through May or June 2007, when he or she was transferred to a different account.  CW3 worked for Kenexa at Client B's headquarters from January 2006 until he or she was terminated in Summer 2007.

[14] Plaintiffs' assertion Defendants had such advance knowledge does not rise above mere speculation.  Neither the confidential witness statements nor the evidence of Karsan and Volk's trading activity is sufficient for this Court to find there is more than a mere possibility Defendants knew Client B would seek to terminate its contract the following quarter.

[15] While the identity of Client B has not been disclosed pursuant to Kenexa's contractual obligations, both parties agree the client operated in the pharmaceutical industry and was severely impacted by regulatory problems related to one of its most lucrative medications.

[16] EPO contracts accounted for approximately 15-20% of Kenexa's revenue.

weekly reports about each EPO client, including Client B, although neither employee worked on the Client B account. They also report that executives attended quarterly meetings about each EPO account. CW7 and CW9 provide similar information regarding the flow of information within Kenexa. While these statements can provide circumstantial evidence Kenexa executives knew Client B was experiencing a reduced need for Kenexa's services, they do not help to show executives knew Client B would terminate its contract or that these problems with Client B would cause Kenexa to miss its revenue projections.

The statements of CW8, an Inside Sales Manager at Kenexa's Nebraska office, also do not aid this Court in finding a strong inference of scienter. CW8 asserts Kenexa based its sales projections on sales which were not finalized. According to CW8, the company's projections included sales in which the potential client had identified Kenexa as a contract finalist along with one other HCM vendor, sales where only a verbal agreement had been obtained, as well as sales in which a contract had been signed. Even assuming CW8's knowledge of Kenexa's practices in its Nebraska office applies to Kenexa's other locations and is company policy, Plaintiffs do not adequately allege why including such sales in projections–which are, by definition, estimates of future outcomes–is improper. Plaintiffs do not describe the normal industry practice and do not elaborate regarding why including incomplete sales would be legally actionable. Moreover, Defendants used the same practice for estimating sales in previous quarters, wherein they met revenue projections.

In sum, Plaintiffs' allegations regarding Client B and the lengthening EPO sales cycles and the supporting CW statements provide little support for a strong inference of scienter. While it appears Defendants knew Client B had a reduced demand for Kenexa's services, Defendants are

not required to predict the future or hypothesize that Client B might cancel its contract sometime in 2007. Even if such foresight were required, Client B's termination of Kenexa's services does not render the company's forecast for 2007 knowingly false. Client B was one of 13 EPO clients, and Kenexa earned a significant amount of revenue from sources other than EPOs. Regarding Plaintiffs' allegations that Kenexa's knowledge of lengthening EPO sales cycles rendered its forecasts false, such allegations are too vague to meet the particularity standard required in all fraud cases because Plaintiffs do not allege any facts regarding how much longer these cycles were becoming as compared to the cycles of prior years.

Plaintiffs also offer statements from CW10, Senior Vice President of Kenexa's U.K. operations through Summer 2007, and CW11, Kenexa's European Sales Director until February 2008, to support Plaintiffs' argument Kenexa did not follow GAAP after it acquired a U.K.-based company in November 2006.[17] CW10 said it was acknowledged that the U.K. company's revenue recognition practices would need to change to comply with GAAP, and both CWs stated such a change was not made in a "timely" manner. Even if such allegations are true, these vague statements cannot support an inference of scienter. *See In re Astea Int'l Inc. Sec. Litig.*, No. 06-1467, 2007 WL 2306586, at *18 (E.D. Pa. Aug. 9, 2007) ("[M]ere violations of GAAP, without more, do not provide evidence of scienter." (citing *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.

---

[17] SEC regulations require financial statements filed with the SEC must conform with GAAP. 17 C.F.R. § 210.4-01(a). While mere allegations a defendant violated GAAP are alone insufficient to show scienter, factual allegations regarding such violations, if properly supported, can contribute to an inference of scienter. *Advanta*, 180 F.3d at 534. Because the Complaint contains no details regarding the alleged GAAP violations in this case, however, Plaintiffs' GAAP allegations are too unreliable to show scienter. *See In re Milestone Scientific Sec. Litig.*, 103 F. Supp. 2d 425, 474 (D.N.J. 2000) ("[T]he mere assertion that the Defendants violated various provisions of GAAP, without providing any specific factual support, cannot meet the pleading requirements under the PSLRA.").

2000))). The CWs' statements do not indicate specific executives were aware of such GAAP violations. Furthermore, the CWs do not identify the time frame in which Kenexa actually changed the accounting practices for its U.K. acquisition, or the time frame in which it was required to do so. Instead, the Complaint characterizes the CWs as alleging such a switch was not "timely." This allegation is insufficiently detailed to credibly suggest Defendants intended to engage in deception by delaying the switch in accounting practices after it acquired the U.K.-based entity.[18]

Finally, Plaintiffs allege stock sales by Volk, Karsan, and Kenexa executive Troy Kanter reinforce an inference of scienter. A court may not "infer fraudulent intent from the mere fact that some officers sold stock." *Burlington*, 114 F.3d at 1424. Instead, stock sales support an inference of scienter if they are unusual in scope or timing. *See id.* (stating that, in a securities class action, "plaintiffs must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter"). To determine whether a stock sale is unusual in timing and scope, courts consider factors such as: (1) the profit made; (2) the quantity of stock sold; (3) the ratio of stock sold compared to the amount retained; (4) the number of insiders who sold stock; (5) whether the sales were "normal and routine"; and (6) "whether the profits were substantial relative to the seller's ordinary compensation." *In re Suprema Specialities, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (quoting *Burlington*, 114 F.3d at 1423). Courts must also

---

[18] Similarly, CW11's contention international sales were "soft" is too vague to factor into this Court's scienter assessment. CW11 does not compare sales to prior periods in which Kenexa met its revenue projections, nor does CW11 provide a time frame within which sales were "soft." This last point is of particular importance because CW11 was employed at Kenexa through February 2008, and Kenexa admitted its international sales were not up to par during the third quarter of 2007. In Karsan's conference call of November 7, 2007, he partially attributed the third-quarter revenue miss to weak sales management in Kenexa's U.K. assessments business. *See* Defs.' Mot. to Dismiss 34.

consider whether the stock sales were made pursuant to a 10b5-1 trading plan. *See In re NutriSystem, Inc. Sec. Litig.*, 653 F. Supp. 2d 563, 576 (E.D. Pa. 2009) ("A Rule 10b5-1 plan prearranges stock transactions and provides an affirmative defense to an allegation of insider trading, provided the plan is adopted in writing prior to becoming aware of material non-public information." (citing 17 C.F.R. § 240.10b5-1(c)). Because stock options are typically included in an executive's compensation package, the Third Circuit has sometimes declined to allow an inference of scienter to stem from the sale of such options. *See, e.g.*, *Burlington*, 114 F.3d at 1424 ("A large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events."); *Advanta*, 180 F.3d at 541 ("[T]he profits realized by the defendants . . . were the result of accumulated stock options and were an intended part of their overall compensation package.").

There is no bright line rule fixing the percentage or total value of stock which must be sold to establish scienter. *See Astea*, 2007 WL 2306586, at *13 ("[L]arge dollar amounts, standing alone, typically do not suffice to establish motive." (quoting *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382 (E.D.N.Y. 2003))). When analyzing the timing of stock sales, a longer delay between the sale and the negative disclosure will weigh against an inference of scienter. *See Astea*, 2007 WL 2306586, at *15 (holding the "lapse of five months weakens the inference that the individual defendants were motivated to cash out before the company disclosed [bad news]").

Here, Plaintiffs point to stock sales made by Defendants Volk and Karsan and non-defendant executive Troy Kanter. At the outset, it is noteworthy that these three executives were the only Kenexa officers who sold stock during the Class Period, while the company's other two officers made no stock sales during this time. This weakens any inference of scienter which may otherwise

stem from these stock sales. *See In re Gildan, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271-72 (S.D.N.Y. 2009) ("The fact that other insiders did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit." (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)) (internal punctuation omitted)). This Court must now examine whether the stock sales of Volk, Karsan, and Kanter were sufficiently unusual in timing and scope to support a finding Defendants acted with the required scienter.

During the Class Period, Volk conducted a single stock transaction, selling 20,000 shares on May 30, 2007, for proceeds of approximately $764,858. Compl. ¶ 38. Volk retained 68,024 shares and vested options, comprising 77% of his total holdings.[19] By comparison, Volk earned more than $2.3 million in total annual compensation in 2007.[20] Pl.'s Mot. to Dismiss Resp. Ex. 42.

---

[19] The parties disagree about whether it is appropriate to include vested stock options when calculating Defendants' total holdings for the purpose of determining what portion of the holdings were retained. Because the value of such options decreased as the price of Kenexa stock fell, and because these options are routine compensation for executives, it is reasonable to include stock options in our analysis of the officer's total holdings. *See Astea*, 2007 WL 2306586, at *14 n.18 (including stock options in the calculation of defendants' total holdings); *In re Audible Inc. Sec. Litig.*, No. 05-1027, 2007 WL 1062986, at *3 n.9 (D.N.J. Apr. 3, 2007) ("[T]his Court concludes that it is reasonable to infer that the Third Circuit would likely believe that stock options should be taken into account when calculating an individual's total holdings.").

While it thus appears appropriate to include vested stock options in calculating Defendants' total holdings, the numbers would not change significantly even if the Court were to exclude such options. Excluding vested stock options, Karsan and Volk collectively retained 82% of their holdings at the end of the Class Period, slightly less than the 83.88% retained by including options. The Court does not find this difference–less than 2%–to be significant for its analysis.

[20] Similarly, because the Third Circuit has recognized stock options are "a common form of compensation for corporate executives," it is logical to include these options in calculating executives' overall compensation. *Astea*, 2007 WL 2306586, at *14 n.18; *see also Advanta*, 180 F.3d at 541 ("[P]roceeds [which] were the result of accumulated stock options . . . were an intended part of [executives'] overall compensation package.").

These numbers do not indicate Volk engaged in trading unique in scope. The timing of Volk's single trade during the Class Period–made May 30, 2007–also counsels against an inference of scienter, because the sale was made far in advance of Kenexa's November 7, 2007, disclosure, the event which precipitated a drop in Kenexa stock. In this case, these facts are particularly relevant because Volk's trading activity occurred during Q2, a quarter in which Kenexa met its revenue projections. Finally, Volk's single trade during the Class Period is not unusual in the context of his prior trading activity. During the same May-November period in 2006, Volk made one sale as well, selling 9,800 shares of stock for proceeds of $294,062. An examination of the six-month period immediately prior to the Class Period[21] reveals Volk sold an identical amount of stock during the first two months of 2007, trading 20,000 shares for proceeds of $740,542. This activity counsels against any inference Volk learned information during the beginning of the Class Period which inspired him to engage in insider trading; instead, it shows his single sale was part of his routine trading activity. In sum, Volk's stock sale during the Class Period does not contribute to an inference of scienter. The sale was made six months before Kenexa's disputed disclosure, and does not represent a substantial portion of Volk's holdings. To find such facts merit an inference of scienter would mock the meaning of "scienter" painstakingly crafted by the Supreme Court in *Tellabs*.

---

[21] There is no controlling Third Circuit law delineating exactly what time period should be compared to the Class Period in order to determine whether a defendant's trading activity is unusual in scope. Plaintiffs urge this Court to limit its inquiry to the same period in 2006–i.e., from May 7, 2006, to November 11, 2006–undoubtedly to avoid the inclusion of the significant trades all three officers made in March 2006 and Volk's sales in early 2007. Because this Court must decide whether the sales made during the Class Period are unusual, it is relevant to consider the officers' trading activity during the period immediately proceeding the Class Period in addition to comparing the prior fiscal year to the year in which the Class Period occurs.

Of the three officers who made trades during the Class Period, Karsan was the most active, selling a total of 189,900 shares of stock for proceeds of more than $6.7 million.[22]  Compl. ¶ 38. Karsan retained 1,201,630 shares at the end of the Class Period, or approximately 86% of his holdings.  Defs.' Mot. to Dismiss Ex. 34.  Karsan's proceeds are more than three times his total 2007 compensation of $2,198,071.  During the same May-November period in 2006, Karsan made no trades.  On their face, these facts could potentially enhance an inference of scienter; however, other facts counsel against such an inference.  Most importantly, if this Court expands its analysis of Karsan's prior trading activity to include the entirety of 2006, Karsan sold more stock (200,000 shares) in 2006 and gifted a similar amount (27,000 shares) the same year.  Due to his one large sale in 2006, Karsan made $5.4 million in proceeds that year.  In light of this sale, Karsan's trading activity during the Class Period does not seem unusual, particularly when this Court considers the fact only three of five Kenexa officers sold stock.  Of these three, Karsan was the only officer who earned significantly more from his stock sales than the value of his total compensation–but he is also the only officer who made similar earnings from stock sales in 2006.[23]  These facts diminish any inference of scienter which might otherwise stem from Karsan's trading activity during the Class Period, and thus any such inference from these sales is minimal.

---

[22] Karsan also gifted 34,000 shares during the Class Period.

[23] This Court must also consider what value, if any, to assign to the fact many of Karsan's trades were made pursuant to a 10b5-1 trading plan.  Plaintiffs allege this Court should not consider Karsan's 10b5-1 trading plan relevant because it was adopted after the beginning of the Class Period, when Karsan possessed material, non-public information.  Defendants assert the plan is relevant with regard to Karsan's state of mind during October 2007 because the plan, put in place in May 2007, was created months before the October trades were executed.  Drawing all inferences in favor of the Plaintiffs, this Court finds Plaintiffs properly pled Karsan could have had material, non-public information when he created his 10b5-1 trading plan in May 2007.  This Court will therefore not consider Karsan's trading plan in its analysis.

Having determined the stock sales of Volk and Karsan are insufficient, standing alone, to create a strong inference of scienter, this Court must determine whether Kanter's sales during the Class Period add to this Court's scienter analysis. As a preliminary matter, because Kanter is a non-defendant, his sales are not relevant to evaluate the scienter of Defendants. *See In re Radian Litig.*, No. 07-3375, 2010 WL 1767195, at *11 (E.D. Pa. Apr. 30, 2010) (finding allegations regarding the stock sales of non-defendants "insufficient to add to a strong inference of the defendants' scienter"); *see also Nat'l Junior Baseball League v. Pharmanet Dev. Grp.*, No. 08-5723, 2010 WL 1379735, at *25 (D.N.J. Mar. 30, 2010) (rejecting plaintiffs' argument the stock sales of non-defendant executives are probative of defendants' scienter). Moreover, Kanter's trading during the Class Period would not aid an inference of scienter because he actually sold or gifted more shares during the same period the previous year than he did during the Class Period.[24]

Because Plaintiffs failed to adequately plead facts giving rise to a strong inference of scienter, their Complaint is properly dismissed on this basis alone. An analysis of whether the Complaint alleges material misrepresentations or omissions in accordance with the PSLRA is thus unnecessary. This Court will, however, briefly address the nature of the challenged misstatements and omissions for the purpose of completeness. In sum, Plaintiffs' allegations regarding the challenged statements are unavailing because the statements are too vague and immaterial to create liability.

For a statement to be actionable under securities law, it must be a misrepresentation of a

---

[24] Kanter gifted 35,960 shares of Kenexa stock on August 23, 2006, and sold 35,000 shares of stock on September 13, 2006, making his total trading activity 70,960 shares during the relevant period of 2006. Defs.' Mot. to Dismiss Ex. 34. In contrast, Kanter sold only 62,096 shares of Kenexa stock during the Class Period. *Id.*

material fact. *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000). A fact is material if "a reasonable investor would believe that it 'significantly alter[s] the 'total mix' of information' available to that investor." *In re Viopharma Sec. Litig.*, No. 06-1627, 2003 WL 1824914, at *6 (E.D. Pa. Apr. 7, 2003) (quoting *Oran*, 226 F.3d at 282). Corporate executives may "express ordinary corporate optimism, or puffery, without exposing themselves to liability under the PSLRA, as these statements are too general to cause a reasonable investor to rely upon them." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 274 (S.D.N.Y. 2009) (citing *ECA v. JP Morgan*, 553 F.3d, 206 (2d Cir. 2009)) (internal quotation marks and additional citations omitted); *see also Aetna*, 2010 WL 3156560, at *10 (upholding the district court's finding that the defendants' statements regarding "disciplined" pricing were "immaterial and not actionable because they [were] puffery, vague and non-specific expressions of corporate optimism on which reasonable investors would not have relied"). In other words, a statement is immaterial if it is "too vague to be actionable." *See Burlington*, 114 F.3d at 1428 (holding the company's statement it believed it could "continue to grow net earnings at a faster rate than sales" was too vague to be relied upon by a reasonable investor). A securities defendant's statements the company will "'continue to do well and gain market share and outperform the competition [are], without more, simply expressions of confidence in the viability of [defendant's] future business which do not give rise to a securities violation.'" *Id.* (quoting *Steinberg v. Ericsson LM Tel. Co.*, No. 07-9615, 2008 WL 5170640, at *9 (S.D.N.Y. Dec. 10, 2008)) (second alterations in original).

Many of Defendants' challenged statements are not even demonstrably false and thus cannot create liability. *See In re Loewen Group, Inc.*, No. 98-6740, 2003 WL 22436233, at *13 (E.D. Pa. July 16, 2003) ("Obviously, there can be no securities fraud violation for a true statement."). For

example, executives attributed Kenexa's success to its "diverse customer base, long-term contracts, renewal rates that continue to be in the 90%-plus range, and the growing number of new customers that we are adding to our overall customer base." Compl. ¶ 62. The Complaint does not plead facts to show any of these statements are false, as the statements of CWs and exhibits do nothing to disprove that these were factors in Kenexa's ability to earn revenue, even if such revenue was slightly less than expected.

Many of the remaining statements are classic examples of puffery. Kenexa executives described demand as strong and the company's growth as solid, statements of general optimism that are not actionable. The executives told investors they were pleased with the company's growth and its "high level of execution." Compl. ¶ 72. Indeed, Kenexa had performed better during the first six months of 2007 than it had during the same time period in 2006. The executives characterized the HRM market as attractive, and expressed optimism Kenexa would maintain a strong position in that market. Such vague assertions cannot create liability under securities law, because no reasonable investor would rely on such statements.

Even if the above affirmative misstatements are not actionable, Plaintiffs allege Defendants are responsible for omitting material information from their Q1 and Q2 reports. A defendant is liable for omissions if an affirmative duty to disclose information arose, such as "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000). In other words, in the absence of insider trading or a statutory mandate, a duty to disclose will arise if officers "put in play" certain fraudulent activities by making other incomplete or misleading statements. *Galati v. Commerce Bank Corp.*, 220 F. App'x 97, 102 (3d Cir. 2007); *see also In re Aetna Sec. Litig.*, 34 F. Supp. 2d

935, 948 (E.D. Pa. 1999) ("There is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or volunteered, not misleading."). While "statements concerning the company's 'dramatic deposit growth,' 'strong performance,' and 'unique business model,' constitute nothing more than mere 'puffery,' insufficient to sustain a Rule 10b-5 claim," *Galati,* 220 F. App'x at 102, affirmative false statements characterizing a specific sector of the company as "adequate," "conservative," and "cautious," put those practices in play under Rule 10b-5. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992).

Having determined Plaintiffs have not plead sufficient information to show Defendants engaged in insider trading, this Court need only address Plaintiffs' contention there were material omissions because Kenexa's disclosures were incomplete and misleading, thereby requiring disclosure of lengthening EPO sales cycles and Client B's decreasing need for EPO services. Regarding Defendants' statement of past and present fact,[25] Plaintiffs contend Defendants made false assertions by stating Kenexa's revenue was "highly visible"[26] due to its customer base, long-term contracts, strong renewal rates, and new customers. Plaintiffs assert these statements were misleading in light of Client B's internal problems, difficulties with EPO sales, and weak international sales. Defendants contend their general statements about Kenexa's revenue stream cannot create an affirmative duty to disclose issues regarding a single EPO client. Because nothing in the Complaint demonstrates Kenexa's revenue was not highly visible as a general matter, this Court finds Defendants had no affirmative duty to disclose additional information to investors.

---

[25] Because Defendants' forward-looking statements are covered by the PSLRA safe harbor provision, they will be addressed separately.

[26] The term "highly visible" is frequently used in companies' quarterly reports to describe recurring revenue generated from regular clients and long-term contracts.

Plaintiffs do not dispute that Kenexa's renewal rates were in the 90% range as stated during the Q2 conference call, nor do they challenge the nature of Kenexa's customer base and its number of long-term contracts. Any problems related to Kenexa's relationship with a single client do not render its general statements misleading. Similarly, as described above, Karsan's statement that he believed organic growth was "really, really solid" is puffery which does not create an affirmative duty to disclose additional information.

Having considered the totality of the allegations pled in the Complaint, and the supporting documents integral to the Complaint, this Court finds Plaintiffs have not adequately alleged scienter with regard to Defendants' non-forward looking statements, nor have they pled sufficient facts for a trier of fact to find Defendants made material misrepresentations or omissions with regard to Defendants' statement of past and present facts. Regarding Defendants' forward-looking statements, Defendants contend those statements are protected by the PSLRA's safe harbor provision, 15 U.S.C. § 78u-5(c). Under this provision, the issuer of a security will not be held liable for written or oral forward-looking statements if: (1) the issuer identifies which statements are forward-looking; (2) the issuer makes a meaningful, cautionary statement identifying important factors which could cause the results to differ from the forward-looking statements; and (3) the plaintiff is unable to prove the forward-looking statement was made with actual knowledge of its falsity. 15 U.S.C. § 78u-5(c)(1); *Avaya*, 564 F.3d at 254. The Third Circuit has also recognized that, like the safe harbor provision, the "bespeaks caution" doctrine protects forward-looking statements by rendering alleged omissions or misstatements immaterial as a matter of law if the issuer uses sufficient cautionary language when making such forward-looking statements. *See E.P. Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 868 (3d Cir. 2000); *see also Hialeah*, 2008 WL

4058690, at *3 ("The Third Circuit has recognized the 'bespeaks caution' doctrine, stating that 'forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors." (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993))). Both the safe harbor provision and the bespeaks caution doctrine only protect truly forward-looking statements, which include "projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic, or operational performance." 15 U.S.C. § 78u-5(i)(1).

Defendants argue the statements this Court has identified above as "forward-looking" are entitled to the safe harbor provision because there was meaningful cautionary language and Plaintiffs cannot show the statements were knowingly false. This Court has already identified which statements are forward-looking and has determined Defendants did not act with scienter, thereby satisfying two of the three elements necessary for application of the safe harbor. The remaining question is whether Defendants' statements in their Q1 and Q2 press releases and conference calls were accompanied by risk disclosures which were "substantive, extensive and tailored to the future-looking statements they reference." *Avaya*, 564 F.3d at 257. These disclosures need not "actually accompany the alleged misrepresentation" so long as they are "directly related to the alleged misrepresentation." *EP Medsystems, Inc.*, 235 F.3d at 874. Thus, language contained in the company's SEC filings may be incorporated into earnings releases and conference calls. *See Avaya*, 564 F.3d at 257 (finding the safe harbor provision applicable due to the presence of proper disclosures because defendants specifically referenced cautionary language in their SEC filings in conference calls and press releases).

Kenexa's Q1 and Q2 earnings releases both included warnings stating the releases contained forward-looking statements which may relate to "future revenue and earnings, operations, expected benefits from the BrassRing transaction, prospects of the business generally, intellectual property and the development of products." Defs.' Mot. to Dismiss Ex. 18, at 2. Each press release told investors: "These statements are based on our current beliefs or expectations and are inherently subject to various risks and uncertainties . . . . Actual results may differ materially from these expectations due to changes in global political, economic, business, competitive, market and regulatory factors, [or] Kenexa's ability to implement business and acquisition strategies. . . ." *Id.* The releases referred investors to Kenexa's annual report on Form 10-K for a list of risk factors and advised investors to look at the company's quarterly reports on Form 10-Q. During Kenexa's Q1 and Q2 conference calls, Volk cautioned participants that there would be forward-looking statements and again referred listeners to Kenexa's SEC filings for more information. Kenexa's 2006 Form 10-K, the last annual report available to investors during the Class Period, contains a 13-page section entitled "Risk Factors" which includes a detailed list of factors which could adversely impact Kenexa's business. Defs.' Mot. to Dismiss Ex. 1, at 20-32. Such factors include: "Our business will suffer if our existing clients terminate or do not renew their software subscriptions," "Our financial performance may be difficult to forecast as a result of our focus on large clients and the long sales cycle associated with our solutions," "Our quarterly operating results may fluctuate significantly, and these fluctuations may cause our stock price to fall [due to factors such as] our ability to renew and increase subscriptions sold to existing clients . . . [and] the length of sales cycles for our solutions . . . ." *Id.*

The risk factors outlined in Kenexa's Form 10-K, and the references thereto in Defendants'

Q1 and Q2 communications, closely conform with the factors recently approved by the Third Circuit in *Avaya*. 562 F.3d at 257-58 (holding there was appropriate cautionary language when, "[i]n each conference call and press release, defendants also explained that the forward-looking statements involved risks and uncertainties that could cause actual outcomes and results to differ materially from projections and specifically directed readers to Avaya's SEC filings"). Kenexa properly warned investors stock prices could fall if sales cycles lengthened, or profits could decrease if clients terminated their contracts. These are the very problems which did, in fact, negatively impact Kenexa's Q3 earnings. The cautionary language here is meaningful, substantive, extensive, and well-tailored toward the statements here. Thus, Defendants' forward-looking statements are protected by the PSLRA's safe harbor.[27]

This Court has examined each allegation individually and has asked how, if at all, the allegation "affect[s] the relative strengths of the culpable and non-culpable inferences" in this case to determine whether Defendants "acted consciously or recklessly." *Avaya*, 564 F.3d at 280. Having considered the totality of Plaintiffs' scienter allegations pursuant to the Supreme Court's instructions in *Tellabs*, this Court finds Plaintiffs have not adequately pled scienter under the PSLRA for both Defendants' non-forward looking and forward looking statements. Furthermore,

---

[27] Plaintiffs contend Defendants' forward-looking statements were knowingly false because Defendants should have known their projections could not be achieved "due to lengthening in the EPO sales cycles and weakness in the Company's international assessments." Compl. ¶¶ 67, 81. As further described above, the CWs' statements are insufficient to show Defendants had knowledge its projected revenue could not be attained. Indeed, Kenexa's revenue projections *were* reached in Q2. Although Defendants were aware of problems with Client B, the Complaint states no facts which support the proposition that Defendants actually knew Client B would cancel its contract. Thus, Plaintiffs have failed to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Defendants have not adequately pled Defendants made material omissions with scienter. Instead, all Plaintiffs have shown is Kenexa's stock price fell after Defendants announced the company's 2007 earnings would be lower than expected due, in part, to the unexpected loss of a client. Such contentions are insufficient to maintain a § 10(b) claim.

Because the Individual Defendants' liability as controlling persons under § 20(a) derives from a § 10(b) violation, *Advanta*, 180 F.3d at 541, and because Plaintiffs have failed to state a claim under § 10(b), Plaintiffs' § 20(a) claims shall also be dismissed. Accordingly, Defendants' Motion to Dismiss is granted.

An appropriate Order follows.

BY THE COURT:


\s\ Juan R. Sánchez
Juan R. Sánchez, J.
U.S. District Judge